**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| In re: | Chapter 11 |
| PAT MCGRATH COSMETICS LLC,[1] | Case No. 26-10772 (LMI) |
| Debtor. | |

**DECLARATION OF PATRICIA MCGRATH IN**
**SUPPORT OF THE CHAPTER 11 PETITION AND FIRST DAY FILINGS**

I, Patricia McGrath, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the chief executive officer of Pat McGrath Cosmetics LLC (the "Debtor" or the "Company"), the debtor and debtor in possession in the above-captioned chapter 11 case (the "Chapter 11 Case"). I founded the Company in 2015 and have been its chief executive officer since that time.

2. As the Debtor's CEO, I am familiar with and knowledgeable of the Debtor's day-to-day operations, business and financial affairs, and books and records, as well as the circumstances leading to the commencement of this Chapter 11 Case. I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances and events that led to the commencement of the Debtor's Chapter 11 Case and in support of the motions and applications that the Debtor has so-far filed with the Court, including the "first-day" papers filed concurrently herewith (the "First Day Filings"). I am authorized to submit this Declaration on behalf of the Debtor.

---

[1] The last four digits of Pat McGrath Cosmetics LLC's tax identification number are 3615 and its mailing address is 29 East 19th Street, 8th Floor, New York, NY 10003.

3.  Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees and officers of the Debtor, my opinion based upon my experience, knowledge, and information concerning the Debtor's operations and financial condition, or from my discussions with the Debtor's legal counsel, Pack Law ("Pack Law"). If called upon to testify, I would and could testify competently to the facts set forth in this Declaration on that basis.

**The Brand**

  

4.  The Debtor is the entity that brings the Pat McGrath Labs brand and its products to market. The Debtor is responsible for the business activities associated with the Brand and for the liabilities that are the subject of this Chapter 11 Case. The Debtor develops, markets, and sells prestige beauty products under the Pat McGrath Labs name, including color cosmetics and complexion products. In doing so, the Debtor works with third-party manufacturers and vendors and manages product development, packaging, inventory, and fulfillment. The Debtor also oversees marketing activities and brand presentation across its sales platforms.

5.  I am a makeup artist, creative director, and entrepreneur. I am the founder of "Pat McGrath Labs" (the "Brand"), which is operated by the Company. I began my career more than three decades ago, working in fashion, editorial, and runway environments across the United

Kingdom, Europe, and the United States. Over the course of that career, I developed makeup concepts and looks for leading fashion houses, designers, publications, and global brands, and my work became closely associated with innovation, inclusivity, and creative leadership within the beauty industry. My professional experience, creative philosophy, and industry relationships form the foundation of the Brand's identity and positioning in the global prestige beauty market.

6. I founded the Brand because I wanted to take what I was doing backstage and bring it to people directly. I wanted to make the high-quality products that I used on set and on the runway available to a wider audience. From the beginning, the focus was on the products themselves. I cared about how they performed, how they looked on different skin tones, and how they made people feel when they used them. Shade range and inclusivity were not afterthoughts. They were part of the work from the start. The way the products were presented also mattered to me. Visual storytelling has always been part of how I think about makeup.  I am honored that this uninterrupted focus eventually would make me known as the "Mother" of make-up, directly emanating from the love and dedication I have poured into my craft.[2]

7. The Debtor owns the Brand and certain of the related intellectual property. The Brand has achieved significant visibility in mainstream culture, including through its association with the world's most famous and successful artists and entertainers.  To understand the nature of the Debtor's business and the value it has developed over time, it is necessary to begin with the Brand's origins and early product launches, starting in 2015.

8. Consumer demand for the Brand's products has been evident since the Brand's initial launch and has continued through the development of a core portfolio of widely recognized

---

[2] https://www.lofficielusa.com/beauty/interview-makeup-artist-pat-mcgrath-labs-mother-of-makeup-maison-margiela-beauty

products. The Brand debuted in 2015 with *Gold 001*, a highly pigmented gold eyeshadow product that was first introduced in professional fashion settings and quickly drew attention from both industry professionals and consumers. *Gold 001* became closely associated with the Brand's identity and helped establish Pat McGrath Labs as a line rooted in professional artistry.

9. Following that initial launch, the Debtor expanded its product offerings across multiple core makeup categories. The Brand developed its *MatteTrance* lipstick line, which became known for highly saturated color and distinctive packaging, and its *LiquiLUST™ Legendary Wear Matte Lipstick*, which was widely carried by prestige beauty retailers and frequently referenced in beauty and fashion media. These lip products helped broaden the Brand's consumer reach beyond early adopters and professional users. The Debtor also introduced complexion products under the *Skin Fetish: Sublime Perfection* line, including foundation and concealer products designed to address a wide range of skin tones. These products were notable for their emphasis on shade range and finish and became recurring offerings within the Brand's lineup. Together, these products established a portfolio that included both statement items associated with fashion and editorial work and everyday products used by consumers on a regular basis.

10. These signature products are carried by major prestige stores such as Bergdorf Goodman, Nordstrom, and Selfridges, as well as beauty retailers Sephora, Ulta Beauty BluMercury and Harrod's, and are also sold directly to consumers through the Brand's own platforms. The continued presence of these products in established retail environments reflects sustained consumer demand and retailer confidence. The combination of early launches, recognizable core products, and ongoing retail placement supports the conclusion that the Brand's popularity has not been limited to isolated releases or short-term trends.

11.     The Brand has achieved substantial recognition through established cultural and commercial institutions. Its products and creative work have been regularly featured in widely read publications such as *Vogue*, *Allure*, *Glamour*, and *The Guardian*. The Brand has also been involved in collaborations with major designers and cultural institutions, including the Metropolitan Museum of Art. Pat McGrath Labs maintains a large public following across major social media platforms, numbering in the millions. The Brand's visibility in mainstream media, its presence with well-known prestige retailers, and its direct connection to a broad consumer audience reflect a level of scale and recognition that extends well beyond niche fashion circles.

12.     The Brand's significance is also reflected in the direct creative work performed by its founder at the highest levels of popular culture. I personally designed and executed the makeup looks for numerous films, shows and some of the most high-profile music videos to have been released in the past several decades. These projects involved close collaboration with the creative teams of world-famous artists and brands and required the development of multiple distinct looks to support the video's visual narrative. Fashion and beauty publications, including *Vogue*, reported on the scope of Ms. McGrath's role as central to the finished productions. These collaborations received widespread media attention and placed the Brand's creative capabilities before a global audience well beyond the fashion industry. This type of hands-on creative leadership in a major mainstream production is not typical of most consumer beauty companies and reflects the unique nature of the Brand and its business.

13.     The Brand's involvement in high-profile cultural projects is not isolated. Pat McGrath Labs products and creative work have been used repeatedly in connection with major red-carpet appearances, fashion campaigns, and entertainment events. Mainstream fashion and beauty publications have reported on the use of the Brand's products in makeup looks for widely

recognized performers and public figures. These appearances have taken place in settings such as award shows, film premieres, and editorial features that reach large global audiences. The consistent selection of the Brand for these visible moments reflects its reputation for performance, reliability, and creative distinction at the highest levels of professional use.

## The Business

14. The Debtor sells its products through a combination of high-end, direct-to-consumer marketing and third-party distribution arrangements. Direct-to-consumer sales are conducted through online platforms operated by or on behalf of the Debtor, such as www.patmcgrathlabs.com. The Debtor also sells products through wholesale and other arrangements with established beauty and fashion retailers.

15. The Debtor's business is operationally and commercially viable. Consumer demand for the Debtor's products persists, and the Brand continues to maintain strong engagement across digital platforms, social media, and editorial outlets. Its current challenges are not the result of a lack of market demand or brand relevance. Rather, the Debtor's financial issues stem from an unsustainable capital structure, accumulated legacy liabilities, and liquidity constraints that have impaired the Debtor's ability to operate efficiently and strategically. Through this Chapter 11 Case, the Debtor seeks to preserve the strength and goodwill associated with the Brand, stabilize its operations, and use the protections and flexibility of the bankruptcy process to reset its balance sheet while evaluating restructuring options, including a potential capital infusion or a transaction involving the business.

## The Debtor's Prepetition Corporate and Capital Structure

**I.    Corporate Structure.**

16. The Debtor is a New York entity organized under the laws of the State of New York, with its office located at 29 East 19th Street, 8th Floor, New York, NY 10003.

17. The Debtor's ownership structure includes equity interests held by a number of minority investors. Certain ownership interests have been pledged as collateral in connection with prepetition financing arrangements, as described further below.

18. The Debtor's management is composed primarily of Ms. McGrath, who oversees strategic and operational decision-making, but much of that composition has been disrupted in the past several months by GDA's (defined herein) control over operations for the several months prior to the case. In the period leading up to the Chapter 11 Case, the Debtor undertook efforts to stabilize governance, evaluate strategic alternatives, and prepare for this potential restructuring.

## II. Prepetition Capital Structure.

### A. Overview.

19. The Debtor's prepetition capital structure is complex and highly leveraged relative to the Debtor's operating cash flow and working capital needs. As of the Petition Date, the Debtor's obligations included secured debt, merchant cash advances, and trade unsecured debt, litigation exposure, and equity interests.

### B. Senior Secured Debt, Guaranty and Equity Pledge.

20. The Debtor's primary funded indebtedness consists of a senior secured credit facility (the "GDA Loan") provided by GDA PMG Funding LLC ("GDA"). GDA is a special purpose Delaware limited liability company affiliated with Gabriel de Alba, founder of GDA Luma Capital Management LP, a Miami-based investment firm focused on distressed assets, special situations, and control-oriented investing. The agreements comprising the GDA Loan (collectively, the "Loan Documents") are as follows:

    a. Business Loan and Security Agreement dated April 30, 2025 by and between GDA and the Debtor, in an original principal amount of up to $10 million, subject to lender discretion. The loan is secured by a first-priority lien on substantially all of the Debtor's assets, is guaranteed by Patricia

7

        McGrath personally, and contains customary covenants, events of default, and remedies (the "Original Loan Agreement").

    b.    Promissory Note dated April 30, 2025, executed by the Debtor in favor of GDA, evidencing the Debtor's obligation to repay amounts advanced under the Original Agreement, together with interest, fees, and other charges (the "Note").

    c.    Amendment No. 1 to the Original Loan Agreement dated June 12, 2025, by and between GDA and the Debtor, which increased the maximum amount available under the loan to $17.5 million, subject to lender discretion and satisfaction of specified conditions. The amendment also imposed enhanced cash-management and reporting requirements ("Amendment 1").

    d.    Amendment No. 2 to the Original Agreement dated June 30, 2025, by and between GDA and the Debtor ("Amendment 2").

    e.    Guaranty dated April 30, 2025, executed by Patricia McGrath in favor of GDA, pursuant to which Ms. McGrath unconditionally guaranteed the Debtor's obligations under the loan documents (the "Guaranty").

    f.    Pledge and Security Agreement dated April [29–30], 2025, executed by Patricia McGrath in favor of the Senior Secured Lender, pursuant to which Ms. McGrath pledged certain of her membership interests in the Debtor (the "Pledged Units") to GDA as collateral for the loan obligations (the "Pledge Agreement").

21.    There is a material dispute regarding the amount of obligations asserted to be outstanding under the GDA Loan. Although the Debtor received loan advances totaling $17.5 million, and although substantial revenues generated by the Debtor's operations were directed to lender-controlled accounts and should have been applied to reduce the loan balance, GDA has asserted that the outstanding amount due under the GDA Loan is in excess of $43 million.

**C. Merchant Cash Advances and Trade Debt.**

22.    In addition to the funded indebtedness described above, the Debtor's prepetition liabilities include obligations arising from certain merchant cash advances or revenue-based financing arrangements (collectively, the "MCA Obligations"), the terms, amounts, and characterization of which are subject to further review. The MCA Obligations were entered into

8

at various times to address short-term liquidity needs and working capital constraints. As of the Petition Date, the Debtor estimates that amounts outstanding under the MCA Obligations are approximately $3 million, inclusive of any asserted fees, charges, or contractual remittances, though the Debtor has not yet completed a full reconciliation of such amounts. The Debtor reserves all rights, claims, and defenses with respect to the MCA Obligations, including, without limitation, the characterization of such obligations as true sales, loans, or otherwise, the enforceability of applicable agreements, and the applicability of usury, recharacterization, or other defenses under applicable law.

23. The Debtor's prepetition liabilities include substantial trade debt ("Trade Debt"). The Debtor is in active discussions with many of its critical trade vendors, to ensure that operations continue without disruption. The accumulation of Trade Debt reflects the Debtor's liquidity constraints rather than a lack of underlying demand for its products: indeed, the Debtor is sitting on millions of dollars of orders that cannot be fulfilled because of cash diverted strictly for GDA's benefit. In short, many of the Debtor's trade counterparties remain critical to the Debtor's ongoing operations, supply chain continuity, and brand presence, as discussed in certain of the First Day Filings, and the Debtor intends to address such obligations through a Chapter 11 process that preserves value for the Debtor's estate and all stakeholders.

### D. Equity Interests.

24. The Debtor's equity interests consist of ownership interests owned by Ms. McGrath and minority and preferred investors.

### III. Key Events Leading to the Chapter 11 Case and Intentions in Chapter 11.

25. The Debtor's products are in high demand. Despite the strength of the Brand, its products, and continued consumer demand, the Debtor faced growing financial headwinds in early 2025. Those challenges included liquidity constraints and legacy financial obligations that limited

9

the Debtor's ability to operate with flexibility and pursue longer-term solutions on its own timeline. In that context, the Debtor sought short-term financing to stabilize operations while it explored a more comprehensive capital solution. In April 2025, the Debtor entered into the GDA Loan, which was intended to serve as a temporary bridge while the Debtor worked toward a longer-term resolution.

26. By June 2025, the Debtor had not been able to refinance or repay the GDA Loan on the timeline originally contemplated. On June 12, 2025, the Debtor entered into Amendment No. 1 to the GDA Loan documents ("Amendment No. 1"). Among other things, Amendment No. 1 imposed enhanced cash-management requirements and significantly increased GDA's control over the Debtor's incoming revenues. Pursuant to the amendment, an account was established at UBS for the benefit of GDA (the "UBS Account"), and the Debtor was required to direct all customer and counterparty payments to that account. The Debtor does not have access to the UBS Account and is not authorized to initiate or direct payments from the UBS Account to its creditors.

27. Following the implementation of Amendment No. 1, the Debtor was required to notify its customers and other account counterparties to remit payments directly to the UBS Account. As a result, payments from major customers that previously would have been received by the Debtor were instead deposited into the UBS Account. GDA retained discretion over the disbursement of funds from the UBS Account, including whether and when amounts would be paid to satisfy the Debtor's operating expenses and vendor obligations. These changes materially restricted the Debtor's access to operating cash at a time when the business depended on timely payments to maintain inventory, preserve vendor relationships, and continue ordinary-course operations.

28. By early fall 2025, the Debtor's ability to operate in the ordinary course had materially deteriorated. The cash-management restrictions imposed under Amendment No. 1, combined with the Debtor's lack of access to incoming revenues, significantly impaired the Debtor's ability to satisfy vendor obligations, maintain inventory levels, and continue normal business operations. As vendor payments fell behind, key counterparties curtailed or ceased doing business with the Debtor, further disrupting operations and cash flow.

29. On October 17, 2025, through its legal counsel, GDA sent a demand letter asserting the occurrence of multiple events of default under the Loan Documents and demanding immediate payment of all amounts purportedly due. The letter asserted an aggregate outstanding balance of approximately $38.8 million and reserved GDA's right to pursue remedies against both the Debtor and Patricia McGrath personally. By that point, the Debtor's operations had already been substantially destabilized by the loss of access to operating cash and the resulting breakdown in vendor and supply relationships.

30. As set forth below, the coalescence of lender demands and operational concerns compounded. During this period, the Debtor engaged in ongoing efforts to stabilize liquidity, including cost reductions, deferral of non-essential expenditures, negotiations with vendors, and discussions with lenders and investors regarding potential amendments, forbearance, or recapitalization transactions. These efforts were undertaken in good faith and with the objective of preserving enterprise value and avoiding value-destructive enforcement actions.

### A. Capital Structure Stress and Liquidity Stronghold.

31. Prior to the Petition Date, the Debtor's senior secured financing became distressed. The Debtor's Senior Secured Lender, GDA, asserted that the loan was in default, with in excess of $38 million owing thereunder (exclusive of any additional asserted interest, fees, costs, and other charges). In parallel, the Debtor faced pressure from other stakeholders in its capital structure.

32. These capital pressures quickly translated into an acute liquidity crisis. By approximately October 2025, the Debtor accumulated substantial trade and legacy liabilities that became increasingly difficult to manage in the ordinary course. Multiple key manufacturers and logistics providers demanded payment of substantial past-due amounts and/or threatened to suspend performance absent immediate payment arrangements. The Debtor also faced meaningful occupancy and facilities pressure. During this time, the Company was working with a number of investors and strategics that expressed (and continue to express) serious interest in a capital infusion.

33. The pressures in the background that have since surfaced created a risk of brand-harming disruption: inventory interruptions, inability to fulfill wholesale or direct-to-consumer demand, deterioration of retailer confidence, and potential damage to long-standing commercial relationships. The Debtor's management accordingly prioritized solutions that would preserve the Brand's consumer goodwill and minimize supply chain interruption while broader restructuring options were evaluated.

### B. Commencement of Involuntary Article 9 Foreclosure Process.

34. On or about October 17, 2025, GDA delivered a written notice asserting the occurrence of one or more events of default under the Loan Agreement and related loan documents

(the "Default Notice").  The Debtor disputes the certain assertions contained in the Default Notice and reserves all rights, claims, and defenses with respect thereto.

35. Thereafter, on or about December 4, 2025, the Senior Secured Lender delivered a further written notice to me personally stating that, as a result of the alleged continuing defaults, the Senior Secured Lender was exercising its asserted rights under the Pledge Agreement, including the purported assumption of voting, management, and control rights with respect to the pledged equity interests in the Debtor.

36. In the same period, and without the Debtor's consent, the Senior Secured Lender began taking steps to pursue a foreclosure and disposition of collateral pursuant to Article 9 of the Uniform Commercial Code (the "Article 9 Process").  The Debtor understands that these steps were undertaken based on the Senior Secured Lender's unilateral determination that defaults had occurred and remained uncured.  As part of the Article 9 Process, the Senior Secured Lender retained Hilco Global (the "Marketing Agent") to market and conduct a public foreclosure sale of certain collateral, including assets associated with the Brand and/or equity interests derived from the Pledge Agreement.

37. The Marketing Agent circulated marketing materials and notices describing a proposed Article 9 auction of assets "on behalf of the secured party," with a stated bid deadline of January 26, 2026, and a scheduled public auction on January 27, 2026 (the "Proposed Article 9 Sale").  The materials indicated that the sale would be conducted on an "as-is, where-is" basis, without representations or warranties, and outside of court supervision. The Debtor understands that the Proposed Article 9 Sale was structured to occur on an expedited timeline, during a period in which the Debtor was experiencing acute liquidity constraints, active vendor pressure, threatened litigation, and significant operational instability.  The Debtor was not

afforded a meaningful opportunity to stabilize operations, solicit competing restructuring proposals, or otherwise ensure that the value of the Brand and business would be maximized through a holistic process.

38. While the Debtor does not concede the validity, scope, or enforceability of the asserted defaults, the Pledge Agreement remedies, or the contemplated Article 9 disposition, the initiation of the Article 9 Process materially accelerated the Debtor's need for immediate Court intervention, particularly in light of the fact that the Senior Secured Lender may not have provided either the Debtor or Ms. McGrath with the requisite notification of disposition of collateral as required under NY Article 9, including but not limited to section 9-613 thereof. Upon information and belief, the Senior Secured Lender may have also failed to provide the required notification of disposition to other parties that may assert junior lien against certain of the Debtor's assets that are proposed to be sold at the Article 9 Sale.

39. Accordingly, in addition to the general need for restructuring described above, the Debtor commenced this Chapter 11 Case to prevent the irreparable harm to the Debtor that would have resulted from what the Debtor believes would have been a commercially unreasonable Article 9 sale being conducted by GDA. It accordingly is in the best interests of all creditors and parties in interest that any sale, restructuring, or recapitalization of the Debtor occurs in a commercially reasonable, transparent, orderly, and value-maximizing manner under the supervision of this Court and consistent with the protections afforded by the Bankruptcy Code.

## The Debtor's First Day Filings

40. The First Day Filings seek relief to allow the Debtor to meet necessary obligations and fulfill its duties as a debtor in possession. I am familiar with the contents of each First Day Filing and believe that the relief sought in each First Day Filing is necessary to enable the Debtor

to operate in chapter 11 with minimal disruption or loss of productivity and value and best serves the Debtor's estate and creditors' interests.  The facts set forth in each First Day Filing are incorporated herein by reference.  The First Day Filings seek to include the following relief: the provision for postpetition financing, employee-related wages payments and benefits, critical vendor payments, and other relief necessary to ensure the continuation of the Debtor's operations in the ordinary course of business.  I believe all relief sought in the First Day Filings is critical to the continued success of the Debtor during this Chapter 11 Case and ultimately, of benefit to all stakeholders.

41. Several of the First Day Filings request authority to pay certain prepetition claims against the Debtor.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtor has narrowly tailored its requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtor and its estate.  The Debtor will defer seeking other relief to subsequent hearings before the Court.

42. The above describes the Debtor's business and capital structure, the factors that precipitated the commencement of this Chapter 11 Case, and the critical need for the Debtor to obtain the relief sought in the First Day Filings.

*[Remainder of Page Intentionally Left Blank]*

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.**

Dated: January 25, 2026
Miami, FL

By: *Patricia McGrath*
Name: Patricia McGrath
Title: Founder and CEO