**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br><br>PAT MCGRATH COSMETICS LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-10772-LMI |

**GDA PMG FUNDING LLC'S OBJECTION**
**TO DEBTOR'S EMERGENCY MOTION FOR**
**ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN**
**POST-PETITION FINANCING PURSUANT TO SECTIONS 105(a), 362, 364(c) OF THE**
**BANKRUPTCY CODE, AND (II) GRANTING SUPER PRIORITY CLAIMS TO THE**
**DIP LENDER PURSUANT TO SECTION 364(c)(1) OF THE BANKRUPTCY CODE**

GDA PMG Funding LLC (generally, "GDA," "Lender," or "Senior Secured Lender," as applicable), by and through its undersigned counsel hereby submits this objection (this "Objection") to the above-captioned *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Obtain Post-Petition Financing Pursuant to Sections 105(a), 362, 364(c) of the Bankruptcy Code, and (II) Granting Super Priority Claims to the DIP Lender Pursuant to Section 364(c)(1) of the Bankruptcy Code* [Docket No. 4] (the "DIP Motion"), and respectfully states as follows:

**PRELIMINARY STATEMENT**

1.  The proposed DIP facility (generally, the "PM DIP Facility") by founder, Dame Patricia McGrath ("McGrath"), is the product of an unprincipled, last-ditch effort to avoid a value-maximizing Article 9 sale of the business, to the detriment of the employees, suppliers, vendors,

---

[1] The last four digits of Pat McGrath Cosmetics LLC's (the "Company," "Debtor," or "PMC Labs," as applicable) tax identification number are 3615 and its mailing address is 29 East 19th Street, 8th Floor, New York, NY 10003.

customers, and creditors of the Debtor. A duly noticed Article 9 sale, spearheaded by Hilco, was scheduled for January 27, 2026, and had generated significant interest. The sale was noticed following PMC Labs' default of GDA's Senior, Secured Loan(s) and, following default notices, subsequent actions by the Debtor and McGrath in repeated violation of loan covenants, eroding the value of GDA's collateral. Instead of cooperating with GDA in selling the assets through the Article 9 sale process, the Debtor and McGrath actively undermined the process and filed this petition with a request for approval of a $1 million debtor-in-possession loan that purports to be provided by McGrath personally. It is unclear the source of those funds because during the past months, the Company and McGrath appear to have taken out various loans from hard-money lenders, at exorbitant interest rates, that also double pledge GDA's Senior, Secured collateral, as detailed below. Proceeds of those loans were being directed away from the Company, which McGrath appears to have directed to her personal account. *See* Exhibit K (<u>Amerifi Hard-Money Loan Agreement</u>, ACH Authorization Form (as defined below)). Neither the Debtor nor McGrath contacted GDA about becoming the DIP lender despite its first priority secured position in the capital structure. Moreover, the PM DIP Facility is wholly inadequate to fund the Company's short-term needs and is justified only by a budget prepared by the Debtor and McGrath herself that projects revenue over a three-week timeframe that the Company has not achieved in over a year. The PM DIP Facility gets the Company nowhere and certainly will not be sufficient to pay employees, clean up legacy payables to critical vendors, meet obligations with retailers, nor support a successful emergence from Chapter 11.

2.      GDA, as a Senior, Secured Lender, understands the needs of the Company and the capital needed to allow it to reorganize and survive. For months GDA has attempted to work cooperatively with McGrath in an effort to recapitalize the Company, normalize relationships with

suppliers, vendors, and retailers, and return the Debtor to sound financial footing. To that end, GDA is prepared to become the DIP lender for this case and is offering a $10 million DIP loan at a lower interest rate (12.5%) than that proposed by McGrath (15%) (as further described below, the "GDA DIP Facility" or "GDA DIP Loan," as applicable). GDA has offered the required quantum and better economics, as outlined in the proposed GDA DIP Loan, which the Debtor and McGrath have seemingly rejected. Without the GDA DIP Loan, the Debtor is administratively insolvent, and the case will either be dismissed out of hand or devolve into Chapter 7. The GDA DIP Facility offers ten times the capital at a lower interest rate than the PM DIP Facility, which, in the good faith exercise of its fiduciary duty, the Debtor would be expected to accept. The rejection of the GDA DIP Facility, coupled with McGrath's pre-petition conduct reflects an absence of sound business judgment and good faith by the Debtor to follow a process for an orderly reorganization.

<strong>PERTINENT FACTUAL BACKGROUND</strong>

**I.     The Debtor's Business And Operations,
         And Relationship With Prepetition Secured Lenders.**

3.      GDA PMG Funding LLC is a single purpose lending entity, and a subsidiary of GDA Luma Capital Management LP, a global investment firm which focuses on special situations and strategic recapitalization. GDA holds no equity in the Debtor.

4.      Dame Patricia McGrath ("McGrath") is a well-known makeup artist, who is also the founder, CEO, managing member, and (due to a lack of a well-rounded C-suite) attempts multiple other roles in Pat McGrath Cosmetics LLC, a New York limited liability Company, d/b/a as Pat McGrath Labs ("PMC" or "PMC Labs"). PMC Labs is purportedly governed by a two-person Board consisting of McGrath and Fredric Kantor ("Kantor"), who apparently authorized the Chapter 11 filing. Petition (as defined below) at 5-7. Kantor also toggles as PMC

3

Labs' financial manager, and upon information and belief, appears to have facilitated PMC Labs' entering into the several Hard-Money Loans (as further explained and defined below).

5. By early 2025, PMC Labs was struggling to pay its suppliers, leading to an inventory crisis, rapidly declining store fill-rates, and further dilution of the Pat McGrath brand. *See Declaration of Patricia McGrath in Support of the Chapter 11 Petition and First Day Filings* ¶ 25 [Docket No. 8] (the "McGrath First Day Declaration"). Following negative press articles about PMC Labs released in March 2025, PMC Labs connected with GDA in April 2025 and began a discussion about PMC's pressing capital needs. *See id*. At the time GDA and PMC Labs were negotiating how GDA could assist PMC Labs in recapitalizing its business, PMC Labs was in default with all of its existing secured lenders and behind on payments to critical vendors and suppliers, including TVT Capital Source LLC ("TVT"), Settle Funding LLC ("Settle"), and Keyhaven PMG Blocker, Inc. ("Keyhaven"), in the aggregate amount of approximately $25 million. *See* Exhibit A, Schedule III (Loan Agreement).

6. Based on these negotiations and the representations McGrath and PMC Labs made about the brand, including its historical financials, and its willingness to recapitalize the Company, on April 30, 2025, GDA and PMC Labs agreed to enter into a business relationship wherein GDA would extend short-term funding to PMC Labs until a recapitalization of PMC could be accomplished. This agreement was evidenced by the Business Loan and Security Agreement (the "Loan Agreement"), attached hereto as **Exhibit A**. Shortly before entering into the Loan Agreement, GDA, at the request of McGrath, acquired the secured debt held by Settle via assignment, which, at the time, had an aggregate outstanding principal balance of approximately $10,074,653.57 (the "Settle Debt"), attached hereto as **Exhibit B**. GDA also acquired the TVT loans with an aggregate outstanding principal balance of $3,339,515.00 (the

4

"TVT Sale and Assignment Agreement"), attached hereto as **Exhibit D**.

7. In connection with and prior to PMC Labs and GDA entering into the Loan Agreement, Keyhaven agreed to subordinate its payment and lien position to certain obligations and liens of GDA (including the obligations of PMC Labs under the Settle Debt and under the Loan Agreement) pursuant to the terms of the Limited Consent and First Amendment to Secured Promissory Note (the "Limited Consent Agreement"), attached hereto as **Exhibit C**.

8. Pursuant to the Loan Agreement, GDA thereafter extended credit to PMC Labs of up to $10 million to "fund (i) the acquisition of inventory, (ii) other working capital costs, (iii) debt service . . . and/or (iv) such other purposes approved by [GDA]." Exhibit A, § 2(a). Under the Loan Agreement, among other obligations, PMC Labs agreed to deal exclusively with GDA regarding a recapitalization,[2] and PMC Labs covenanted not to (a) create, guarantee, or otherwise incur any indebtedness; (b) allow any lien, pledge, encumbrance, or security interest on any collateral; or (c) sell, transfer, convey, or otherwise permit the transfer of any collateral nor any ownership interest in PMC without the prior written consent of GDA. Exhibit A, § 6(b)(i-iv).

9. To secure the Loan Agreement, PMC granted GDA a "continuing first priority security interest in all Collateral[.]" Exhibit A, § 5(a).[3] The obligations under the Loan

---

[2] Specifically, following execution of the Loan Agreement, all parties agreed to "immediately enter good faith negotiations to recapitalize [PMC]'s business prior to the maturity date [June 29, 2025] in terms satisfactory to [GDA], [PMC] and [McGrath] in all respects" so long as the terms were at least as favorable as a prior recapitalization offer provided by a different entity. Exhibit B, § 6(c).

[3] The Loan Agreement defined "Collateral" as: "[A]ll of [PMC]'s right, title and interest in and all of [PMC]'s assets, wherever located, whether nor existing or hereafter arising or acquired including, without limitation, the following: (i) all accounts (including health-care-insurance receivables), goods, inventory, equipment (including such goods, inventory and equipment currently or hereafter held on consignment), documents (including, if applicable, electronic documents), fixtures, instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims, general intangibles (including all payment intangibles and intellectual property), money, deposit accounts, and any other contract rights or rights to the payment of money; and (ii) all proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity,

Agreement are also secured with a related pledge agreement, as well as a personal, unlimited guarantee from McGrath, personally. Exhibit A, § 5(c). GDA completed the requisite UCC filings on May 1, 2025.

10. Subsequent to the closing of the Loan Agreement and after the full $10 million was fully disbursed under the Loan Agreement, PMC requested additional funding due to shortfalls in PMC's working capital. To facilitate this request, GDA agreed to increase the amount available under the agreement to $17.5 million, which increase was memorialized in Amendment No. 1 to Business Loan and Security Agreement, which GDA funded up until the maturity date (the "First Amendment"), attached hereto as **Exhibit E**.

11. Subsequently, as described further below, PMC Labs requested, and GDA provided, an extension of the maturity date to August 27, 2025 (the "Second Amendment"), attached hereto as **Exhibit F**.[4]

12. As a result, GDA, holds a first-priority, senior secured position in the capital structure. As of the Petition Date (as defined below), GDA, inclusive of the TVT and Settle loans, is owed approximately $30.5 million in principal, exclusive of pre-petition interest, late fees, and costs of collection.

II. **Events Precipitating Bankruptcy:
Managerial and Operational Failures,
Misappropriation Of Funds, Double-Pledging Of
Assets In Violation Of The Loan Agreement, And The Article 9 Sale Process.**

14. Following its original investment, GDA quickly became aware that PMC Labs needed more capital to pay and build credibility with nearly all of its retailers, suppliers, and

---

warranty or guaranty payable to [PMC] from time to time with respect to any of the foregoing." Exhibit A, § 5(a)(i)(ii).

[4] Pursuant to the Limited Consent Agreement, Keyhaven consented to this extension.

6

vendors, as it was behind or in default of its payment and operational obligations, facing millions of dollars in liabilities, with many vendors and partners threatening lawsuits. *See* McGrath First Day Declaration ¶¶ 23, 32. At this early-stage PMC Labs and McGrath appeared to be engaging in good faith in the promised recapitalization discussions. In reliance on the apparent good faith negotiations, GDA agreed to the First and Second Amendments. *See* Exhibits E (First Amendment) & F (Second Amendment).

15. On October 17, 2025, based on PMC Labs' failure to make its required payments and its lack of engagement in the recapitalization negotiations, GDA sent out default notices (the "Default Letter"), attached hereto as **Exhibit G**. To date, PMC has failed to engage in any meaningful discussions to recapitalize and failed to take any steps to cure its payment defaults. *See* Exhibit G (Default Letter).

16. McGrath and PMC Labs have been reckless stewards of the Company's assets. Instead of negotiating the needed recapitalization of the Company with GDA, McGrath and PMC Labs have entered into three loans with "hard-money" lenders, at interest rates between 75-140% (generally, the "Hard-Money Loans"). Each of these Hard-Money Loans constitute a breach of the Loan Agreement covenants to not incur additional debt, pledge collateral to other parties, or transfer collateral. Beginning in October 2025, PMC and McGrath breached the Loan Agreement in an attempt to evade its obligations to GDA and impair GDA's all-asset security interest. *See* Exhibit A, §§ 6(b)(i-iv).

17. Specifically, on October 22, 2025, PMC entered into a loan agreement with E Advance Services LLC ("E Advance"), pursuant to which it purported to "sell" $1 million of its future sales receipts in exchange for $950,000.00 provided by E Advance (the "E Advance Hard-Money Loan Agreement"), attached hereto as **Exhibit H**. While presented as a factoring

7

agreement, the E Advance Hard Money Loan Agreement requires PMC Labs to pay a weekly flat fee of $38,535.00 for the initial 36 weeks, translating to an interest rate of 140.8%, which McGrath herself contends may have been usurious. *See* Exhibit H (E Advance Hard-Money Loan Agreement); McGrath First Day Declaration ¶ 22. Regardless of the characterization as a loan or factoring agreement, both, along with the double pledging of GDA's collateral without its prior written consent, are plain breaches of GDA's Loan Agreement. McGrath also provided a personal guarantee on the E Advance Hard-Money Loan Agreement and signed, on behalf of PMC, a "consent judgment" as purported security for the loan (the "Personal Guarantee"), attached hereto as **Exhibit I**. GDA was never informed of and did not provide prior written consent to PMC to enter into the E Advance Hard-Money Loan Agreement.

18.    Shortly thereafter, on November 26, 2025, Parkview Advance LLC ("Parkview") filed a UCC financing statement (the "Parkview UCC") with the New York Secretary of State's Office in which Parkview represented that it had a security interest in "[a]ll [PMC Labs] assets now owned or hereafter acquired and wherever located, including but not limited to, the following subcategories of assets," and went on to list numerous subcategories of assets, a copy of which is attached hereto as **Exhibit J**.

19.    Then, on December 24, 2025, PMC entered into another hard-money loan with Amerifi Capital ("Amerifi") at a purchase price of $650,000.00 with a weekly remittance of $37,375.00 (the "Amerifi Hard-Money Loan") for "all of [PMC Labs'] future accounts, contract rights and other entitlements arising from or relating to the payment of monies from [PMC Labs'] customers and/or other third party payors," including from receipts and transactions (the agreement, the "Amerifi Hard-Money Loan Agreement"), a copy of which is attached hereto as **Exhibit K**. On January 26, 2026, four days after the Petition Date, Amerifi filed a UCC financing

8

statement with the New York Secretary of State's Office (the "Amerifi UCC"), attached hereto as **Exhibit L**. Again, the collateral provided is double pledged, and in breach of the GDA Loan Agreement.

20. After numerous attempts by GDA to engage with PMC Labs towards a recapitalization plan failed to produce a meaningful outcome, on December 12, 2025, GDA engaged Hilco Global ("Hilco") to proceed with a sale of the collateral pursuant to Article 9 of the Uniform Commercial Code. Hilco initiated the sale process on December 12, 2025. Hilco sent marketing materials to 122 parties, 34 of which signed NDA's and thereafter received access to the data room. Hilco sent an additional 13 NDAs, two of which were in negotiation, as of the Petition Date. Bids for the sale were due Monday, January 26, 2026, and the sale was to be held on Tuesday, January 27, 2026.

### III. Initiation Of The Chapter 11 Filing, With $0 In Cash And Minimal Information, In An Effort To Stop The Impending, Value-Maximizing Article 9 Sale Process.

21. On January 22, 2026, the Debtor filed a voluntary petition for relief [Docket No. 1] (the "Petition") pursuant to Chapter 11 of the Bankruptcy Code (the "Petition Date"), commencing the above-captioned Chapter 11 case (the "Chapter 11 Case") in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court" or "Court"). McGrath and Kantor authorized the Chapter 11 filing via a Resolution of the Board of Managers of Pat McGrath Cosmetics LLC (the "Board" and the resolution, the "Board Resolution," as applicable). However, upon information and belief, Kantor is not in fact an active member of the Board, and he lacks the requisite authority to authorize such action.

22. On January 23, 2026, the Court entered a notice of deadlines to correct filing deficiencies, including (a) a service matrix, (b) a corporate ownership statement, (c) a schedule of

9

the 20 largest unsecured creditors, (d) schedule of assets and liabilities, (e) schedules declaration, and (f) a statement of financial affairs, as well as (g) a case management summary. [Docket No. 2] (the "Deficiency Order"). On January 23, 2026, the Court entered an order authorizing PMC Labs to continue operation of its business, close pre-petition bank accounts, and open debtor in possession bank accounts [Docket No. 3].

23. On January 25, 2026, PMC Labs filed a motion for entry of an order to obtain debtor-in-possession financing under the PM DIP Facility, "provided" by founder and CEO, McGrath, consisting of an unsecured $1 million loan, with an interest rate of 15%, repaid as "superpriority administrative expense claim." DIP Motion ¶ 9. Accompanying the DIP Motion is an unusually short, and detail-lacking, three-week budget, as seen here:

Pat McGrath Cosmetics, LLC - Proposed 3 Week Cash Flow Beginning 1/26/26

| Week | W/E | Beginning Cash | Retailer Receipts (Prepetition Receivables) | Retailer Receipts (Postpetition Receivables) | Website Receipts (Postpetition Receivables) | DIP Financing | Cash In (Excluding Cash Collateral) | Total Cash In | Employee Costs | Sales & Other Taxes | Critical Vendors (Prepetition) | Rent | Beauty Advisors/ Contractors | Shipping & Logistics | IT / ERP / SAAS | Utilities & Office Expenses | Insurance | Product | Chapter 11 Professional Fees | Total Cash Out | Net Weekly Cash Flow | Ending Cash |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week 1 | 01/30/26 | 0 | 93,449 | | 87,200 | 1,000,000 | 1,087,200 | 1,180,649 | 689,324 | | 193,410 | | | 156,600 | 64,163 | 10,422 | | | 25,000 | 1,138,918 | 41,731 | 41,731 |
| Week 2 | 02/06/26 | 41,731 | 414,324 | 75,000 | 82,840 | | 157,840 | 572,164 | | | 125,536 | 30,000 | 35,900 | 156,600 | 64,163 | 10,422 | 30,000 | | 25,000 | 477,621 | 94,543 | 136,274 |
| Week 3 | 02/13/26 | 136,274 | 65,446 | 1,500,000 | 78,480 | | 1,578,480 | 1,643,926 | 410,601 | 40,000 | 125,536 | | | 156,600 | 69,531 | 10,422 | | | 25,000 | 837,690 | 806,235 | 942,509 |
| | | | 573,219 | 1,575,000 | 248,520 | 1,000,000 | 2,823,520 | 3,396,739 | 1,099,925 | 40,000 | 444,482 | 30,000 | 35,900 | 469,800 | 197,858 | 31,265 | 30,000 | 0 | 75,000 | 2,454,230 | | |

24. The budget projects the receipt of approximately $415,000.00 of pre-petition receipts in week two and approximately $1.5 million in post-petition receipts in week three. Based on current information made available to GDA, PMC Labs has not generated receipts of these weekly magnitudes at any time in the last 12 months.

25. On January, 25, 2026, the Debtor also filed (i) a motion for interim and final orders authorizing certain payments to pre-petition critical vendors [Docket No. 5] (the "Critical Vendors Motion"); (ii) a motion seeking authorization of payments of certain pre-petition wages and continuation of certain employee benefit programs [Docket No. 6] (the "Wages Motion"); and (iii) a motion for interim and final orders prohibiting utility providers from discontinuing services,

10

allowing purported adequate assurances, and establishing related procedures [Docket No. 7] (the "Utilities Motion," collectively, with the Critical Vendors Motion and Wages Motion, the "First Day Motions"). In support thereof, the Debtor the McGrath First Day Declaration.

26. On January 25, 2026, GDA, through counsel, proposed an alternative route for debtor-in-possession financing, consisting of, up to $10 million staged funding over a three month term, with an interest rate of 12.5%, repaid as senior secured over existing debt, and subject to a budget (designed to fit the necessary liquidity needs of the Company).

27. Despite representations that it would review and respond to the GDA DIP Facility proposal, as of this writing, GDA has heard nothing.

**ARGUMENT**

I. **The Debtor's Case Strategy Is Designed To Benefit Insider, Dame Patricia McGrath, Is Not Proposed In Good Faith, Is Not An Exercise Of Sound Business Judgement, Is Not In The Estates' Best Interests, And Should Not Be Approved.**

27. To obtain post-petition financing under section 364 of the Bankruptcy Code, the Debtor must demonstrate that the proposed financing is in the best interests of the general creditor body, and fair, reasonable, and adequate under the circumstances. *See In re L.A. Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011) ("In seeking approval of [DIP financing], the Debtors have the burden of proving that … [t]he terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender."); *In re DB Capital Holdings, LLC*, 454 B.R. 804, 822 (Bankr. D. Colo. 2011) (explaining that the court must determine that the proposed "financing is in the best interests of the estate and its creditors"); *In re Tenney Vill. Co., Inc.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989); *see also In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 769-70 (Bankr. S.D.N.Y. 2020) (citing, *inter alia*, *In re Lafayette Hotel P'ship*, 227 B.R. 445, 454 (S.D.N.Y. 1998) (explaining that insider "dealings with the debtor" receive "rigorous scrutiny by the court," and must satisfy "entire fairness" standard).

28. Key to understanding whether the proposed financing satisfies the business judgement rule is that the DIP must be negotiated in good faith, at arm's length, and with due care. *See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (explaining that the business judgment rule "shields corporate decision-makers and their decisions from judicial second-guessing when the following elements are present: '(1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or

waste of corporate assets.'') (internal citations omitted).

29. There is no dispute that McGrath, as founder, primary equity owner, and CEO, is an insider—requiring heightened scrutiny. In her individual capacity, the Debtor is proposing McGrath as the DIP lender. As a result, the Debtor's (i.e., McGrath's) business judgment cannot be relied upon to support a loan that she herself is providing. Rather, the Debtor must provide actual evidence that the proposed PM DIP Facility is fair, reasonable, adequate, and in the best interests of the Debtors' estates and the general creditor body—which it cannot. *See id.; In re Latam Airlines Grp. S.A.*, 620 B.R. at 768.

30. The Debtor's, or rather McGrath's, case strategy appears clear: avoid a value-maximizing Article 9 sale, so she can retain control of PMC towards an endpoint that is not presently disclosed to any constituent in the estate, based on the information currently provided. The proposed three-week budget is unprecedently inadequate and will inevitably result in further dilution of estate assets as PMC Labs' suppliers, retailers, and vendors begin to terminate their respective relationships with the Company. McGrath's intent to retain control of PMC at all costs is further evidenced by the fact that the Debtor did not engage with GDA on its objectively more favorable DIP financing facility. Indeed, McGrath went so far as to double-pledge PMC assets three times in direct violation of agreements with the Lender, including, upon information and belief, immediately prior to the filing of this case. *See* Exhibits H (E Advance Hard-Money Loan Agreement, J (Parkview UCC), and K (Amerifi Hard-Money Loan Agreement).

31. This founder not only propelled the Company into insolvency under her management, but she now attempts to extract remaining value and confidence in the Company by initiating a Chapter 11 filing on the eve of the Article 9 sale, with an unprecedented zero dollars in cash, and a Chapter 11 petition riddled with deficiencies. *See* Deficiency Order. For

instance, the Debtor failed to file a list of creditors holding the twenty largest unsecured claims yet indicated that the estimated number of creditors is between 200-999.  *See* Petition ¶ 14.

32. The DIP Motion proposes no budget for a plan process or an orderly wind-down, let alone any runway time to develop a plan, and no guidance as to an exit strategy, and thus, evades the usual checks and balances of confirmation requirements or otherwise.  In other words, using the powerful tools of Chapter 11 solely to benefit the founder, the Debtor-sponsored DIP Motion ignores what are meant to be the corresponding obligations to creditors, and provides no assurances for stakeholders.  All signs point to this Chapter 11 Case being converted or dismissed.  This does not align with the purpose of Chapter 11.

33. In addition, the granting of an administrative superiority claim impacts any future confirmation process as section 1129(a)(8) of the Bankruptcy Code requires that all administrative expenses must be paid in full, in cash, to satisfy its provisions, as further outlined below.

## II. The PM DIP Facility Is Inadequate, Is An Attempt To Subordinate Creditors And Avoid A Value-Maximizing Sale Process, And <u>Should Not Be Approved Because Better Financing Has Been Proposed</u>.

34. Where proposed financing favors the interests of one class of creditors to the detriment of the estate or at the expense of other creditors, it is not considered fair and reasonable or in the best interests of the estate.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 39 (S.D.N.Y. 1990) ("[P]roposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate"); *In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *8 (Bankr. S.D.N.Y. June 16, 2008) ("Any proposal should provide a pre-petition secured creditor with 'the same level of protection it would have had if there had not been post-petition superpriority financing.'") (quoting *In re Mosello,* 195 B.R. 277,

14

288 (Bankr. S.D.N.Y. 1996)); *see also In re Aqua Assocs.*, 123 B.R. 192, 195-98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor.").

35. The PM DIP Facility is wholly inadequate and positions the case toward administrative insolvency. It provides little to no runway, no proposed plan or exit strategy, but it does provide McGrath with 15% interest and a loan that will be repaid at the top of the capital stack. The PM DIP Facility results in a "priority in payment over any and all administrative expense of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, . . . except for the secured lender claims of creditors with liens on property of the Debtor's estate." DIP Motion, Ex. C (Proposed Order) ¶ 10. In essence, this means that the PM DIP Facility will still receive first-out repayment, at a 15% interest rate, despite being unsecured.

36. Specifically, while the PM DIP Facility would not prime Lender's valid and perfected first priority lien on all or substantially all assets of the Debtor, it could result in the payment of McGraths's DIP claim out of Lender's cash or other collateral and otherwise require the payment of McGrath's DIP claim ahead of Lender's pre-petition secured claim. For example, in the context of a plan of reorganization, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, McGrath's superpriority DIP claim would have to be paid in full in cash as a condition of confirmation. If there were insufficient cash or other liquid assets to pay both Lender's pre-petition senior secured claim and McGrath's DIP claim, it is possible that McGrath's claim would be paid ahead of Lender's secured claim. *See, e.g., In re Nat'l Litho, LLC*, No. 12-27566-LMI, 2013 WL 2303786, at *1 (Bankr. S.D. Fla. May 24, 2013). Moreover, given that the Debtor's right to surcharge Lender's collateral pursuant to Bankruptcy Code section 506(c) would not be waived under the proposed DIP order, McGrath could seek payment

of its DIP claim out of GDA's collateral. Finally, even if GDA were granted its own superpriority administrative claim under Bankruptcy Code section 507(b) on account of a failure to provide adequate protection of its clam, Lender's superpriority claim would be junior to the superpriority claim granted to McGrath, which is supposed to come ahead of all other administrative claims. Under the circumstances, the Debtor cannot meet their burden.

37. Look no further than *In re Nat'l Litho, LLC*, 2013 WL 2303786, at *1, before this Court, where a Chapter 11 DIP lender provided a DIP loan, granting the lender a superpriority claim "over any and all administrative expenses" (subject to a limited carve-out of certain professional fees and obligations owed to a pre-petition creditor), pursuant to section 364(c) of the Bankruptcy Code. There, upon conversion to Chapter 7, this Court ruled that conversion to Chapter 7 "does not impact the priority of a chapter 11 super-priority claim granted under section 364(c)(1), whether or not it is viewed as an administrative claim." *Id*. This Bankruptcy Court noted that "'Superpriority' is a term not defined in the Bankruptcy Code; it is used to describe a claim which, under applicable bankruptcy law and pursuant to court order, is to be paid ahead of some or all administrative expenses, and possibly ahead of secured creditors." *Id*. at *3, n. 4 (quoting *In re Energy Co-op., Inc.*, 55 B.R. 957, 963 n. 20 (Bankr. N.D. Ill. 1985)). In other words, should the case convert to Chapter 7, McGrath will still be paid first. While the PM DIP Facility does not prime other priorities and unsecured creditors, it effectively ensures repayment ahead of any other priority or unsecured creditor.

38. This is not the first time McGrath has extracted value to the detriment of stakeholders. McGrath and Kantor facilitated the double-pledging of assets at least three times and the concomitant violations of the pre-petition Loan Agreement, epitomized by PMC's execution of the E Advance Hard-Money Loan Agreement, deliberately breaching sections

6(b)(i)-(iv) of the Loan Agreement, which forbid PMC from incurring any further debt without GDA's prior written consent, granting security interests in GDA's secured collateral, or otherwise transferring GDA's secured collateral to any other party. See Loan Agreement §§ 6(b)(i)-(iv). Further, PMC breached the Loan Agreement by selling/securing its future sales receipts to E Advance, falling squarely within the collateral for which GDA is a first priority lien holder. Moreover, based on the Parkview UCC, it appears that PMC and McGrath have again breached multiple provisions of the Loan Agreement, by taking on further debt, and further transferring or pledging collateral, without the prior written consent of GDA. *See* Exhibits H (E Advance Hard-Money Loan Agreement), I (Personal Guarantee), J (Parkview UCC), & K (Amerifi Hard Money Loan Agreement).

39. Despite the conduct outlined above, GDA remains interested in supporting the Company, in good faith, through this process with the goal of restoring it to prosperity for the benefit of all creditors. Thus, the proffered GDA DIP Facility provides the much needed liquidity to preserve value, offering ten times the amount of the PM DIP Facility, at a two percent lower interest rate, and based on a budget that will consider both the long and short term liquidity needs, thereby stabilizing the freefall and providing confidence to customers, vendors, suppliers, and partners—all of which have been blind-sided by this Chapter 11 filing when they believed that the Company was going to be recapitalized to provide the long-needed stability it has been lacking.

40. In sum, the evidence on the record fails to demonstrate that any efforts were made to obtain DIP financing from any other source, including the Debtor's first-priority lender, GDA, fails to prove that the PM DIP Facility is the best financing availability, and demonstratively, GDA is prepared to offer better financing terms.

**RESERVATION OF RIGHTS**

37.     GDA reserves all of its respective rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Objection, to seek additional discovery, and to raise additional objections during the final hearing on the DIP Motion.

*[Remainder of page intentionally left blank]*

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Lender respectfully requests that the Bankruptcy Court: (i) sustain this Objection, (ii) deny the relief requested in the DIP Motion, and (iii) grant the Lender such other and further relief as is just and proper.

Dated: January 27, 2026

                              **STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**

                              */s/ Patricia A. Redmond*
                              Patricia A. Redmond, Esq.
                              Florida Bar No. 303739
                              150 West Flagler Street
                              Miami, Florida 33130
                              Telephone: (305) 789-3553
                              Facsimile: (305) 789-3395
                              predmond@stearnsweaver.com

                              -and-

                              Jeffrey L. Jonas (pro hac vice pending)
                              Elizabeth C. Castano (pro hac vice pending)
                              **BROWN RUDNICK LLP**
                              7 Times Square
                              New York, NY 10036
                              Telephone: (212) 209-4800
                              Facsimile: (212) 209-4801
                              Email: jjonas@brownrudnick.com
                                          ecastano@brownrudnick.com

                              -and-

                              James W. Stoll (pro hac vice pending)
                              **BROWN RUDNICK LLP**
                              One Financial Center
                              Boston, MA 02111
                              Telephone: (617) 856-8200
                              Facsimile: (617) 856-8201
                              Email: jstoll@brownrudnick.com

                              *Counsel to GDA PMG Funding LLC*

**CERTIFICATE OF SERVICE**

      I certify that a true and correct copy of the foregoing was filed and served via CM-ECF to all parties of record on January 27, 2026.

                      By: *s/ Patricia A. Redmond*
                            Patricia A. Redmond