

**ORDERED in the Southern District of Florida on February 13, 2026.**

**Laurel M. Isicoff, Judge**
**United States Bankruptcy Court**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | **Chapter 11** |
| **PAT MCGRATH COSMETICS LLC,** | § § | **Case No. 26-10772-LMI** |
| **Debtor.**[1] | § § § § § | |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364, 503(b) AND 507(a),
FED. R. BANKR. P. 2002, 4001, 6003 AND 9014 AND RULE 2002-1(a)
AND 4001-1 OF THE LOCAL BANKRUPTCY RULES (I) AUTHORIZING THE
DEBTOR TO OBTAIN POST-PETITION SECURED DEBTOR-IN-POSSESSION
FINANCING; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS; (III) MODIFYING THE AUTOMATIC STAY;
(IV) SCHEDULING FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "DIP Motion") of the Debtor and Debtor-in-possession in the above-
captioned Chapter 11 case (the "Debtor"), seeking, among other things, entry of an interim order
(the "Interim DIP Order") and final order (the "Final DIP Order," and together with the Interim DIP Order
(as defined below), the "DIP Orders") authorizing the Debtor to:

---

[1] The last four digits of each Debtor's federal tax identification number are 3615 and its mailing address is 29 East
19th Street, 8th Floor, New York, NY 10003.

(i)      Obtain credit and incur debt, pursuant to Sections 364(c), 364(d) and 364(e) of Chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code"), subject to the terms and conditions set forth herein, up to an aggregate principal amount of $20,000,000.00 consisting of:

(a)   New money term loans in the aggregate principal amount of $10 million (the "DIP New Money Loans") from the DIP Lender (as defined below) of which up to $5,000,000.00 is requested to be borrowed on an interim basis for a period (the "Interim Period") from the commencement of this Chapter 11 case (the "Case") through and including the date of the Final Hearing (as defined below) (in accordance with the Approved Budget (as defined below) and on the terms and conditions more fully described in this Interim DIP Order and the DIP Term Sheet (as defined below)); and

(b)   Immediately upon entry of the Interim DIP Order, $10,000,000.00 in aggregate principal amount of the Prepetition Loans shall automatically be deemed substituted and exchanged for DIP Roll-Up Loans (such substitution and exchange, the "DIP Roll-Up" and the Prepetition Loans rolled-up pursuant to this clause (b), the "DIP Roll-Up Loans" and together with the DIP New Money Loans, the "DIP Loans"), and such amount of DIP Roll-Up Loans shall be deemed funded;

which amounts shall be secured by first priority, valid, perfected and enforceable Liens (as defined in Section 101 of the Bankruptcy Code) on all real and personal property of the Debtor's estate pursuant to Sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, subject only to Permitted Prior Liens (as defined below), the Carve-Out (as defined below) and any property specifically excluded from the DIP Liens (as defined below) pursuant to the DIP Loan Documents (as defined below), as provided herein, and constituting a superpriority administrative claim with priority, over all other administrative expenses, as provided in Section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions contained herein;

(ii)     (a) Establish the financing arrangement ("DIP Facility") pursuant to (I) the terms of the First-Priority Senior Secured DIP Multi-Draw Term Sheet (the "DIP Term Sheet")[2], substantially in the form of **Exhibit B** to this Interim DIP Order, by and among Debtor, and GDA PMG Funding LLC (in its capacity as lender under the DIP Term Sheet, the "DIP Lender"), and (II) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Lender, including, without limitation, any security agreements, guaranties, mortgages, and Uniform Commercial

---

[2]    Capitalized terms used in this Interim DIP Order but not defined herein shall have the meanings ascribed to such terms in the DIP Term Sheet or in the DIP Motion, as applicable.

Code ("UCC") financing statements and all other related security documents delivered in connection therewith or related thereto (collectively, as the same may be amended, modified or supplemented and in effect from time to time, the "DIP Loan Documents"); and (b) incur the Obligations under and as defined in the DIP Term Sheet and this Interim DIP Order (collectively, the "DIP Obligations").

(iii)    Authorize the use of the proceeds of the DIP New Money Loans made pursuant to the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Loan Documents) solely to (a) fund working capital of the Debtor to the extent otherwise permitted in a manner consistent with the terms and conditions of the DIP Loan Documents (including without limitation each covenant contained therein) and in accordance with the Approved Budget (defined below) and (b) pay costs of administration of the Case in a manner consistent with the terms and conditions of the DIP Loan Documents (including the fees and expenses of the DIP Lender, the fees of the Debtor's retained professionals and other costs related to the Case), and in accordance with the Approved Budget.

(iv)    Authorize the Debtor, subject to entry of the Interim DIP Order and Final DIP Order, to effect the DIP Loan Roll-Up.

(v)    Grant, pursuant to Sections 361, 362, 364(c)(2),  364(c)(3) and 364(d) of the Bankruptcy Code, the DIP Lender continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security interests and Liens, senior and superior in priority to all other secured and unsecured creditors of the Debtor's estate except for Permitted Prior Liens, the Carve-Out as provided herein and any assets that are specifically excluded from the DIP Liens pursuant to the DIP Loan Documents, upon and to all of the DIP Collateral (as defined below).

(vi)    Grant, pursuant to Section 364(c)(1) of the Bankruptcy Code, the DIP Lender, subject to the Carve-Out, a superpriority administrative claim in respect of all DIP Obligations with priority over all other administrative expenses.

(vii)    Vacate and modify the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim DIP Order.

3

(viii)    Schedule a final hearing (the "<u>Final Hearing</u>") to consider entry of the Final DIP Order granting the relief requested in the DIP Motion on a final basis and approve the form of notice with respect to the Final Hearing.

(ix)    Waive the ten (10) day stay provisions of rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and provide for immediate effectiveness of this Final DIP Order.

This Court having considered the DIP Motion, the First Day Declaration (as defined in the DIP Motion), the exhibits attached thereto, the DIP Loan Documents, and the evidence submitted at the hearing on this Interim DIP Order (the "<u>Interim Hearing</u>"); and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014 and Local Rules 2002-1(a) and 4001-1 of this Court, due and proper notice of the DIP Motion and the Interim Hearing having been given; and an Interim Hearing having been held and concluded on February 13, 2026; and upon the record at the Interim Hearing; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtor pending the Final Hearing and is otherwise fair and reasonable and in the best interests of the Debtor, its estate, their creditors, their equity holders, and is essential for the continued operation of the Debtor's businesses and the preservation of the value of the Debtor's assets; and it appearing that the Debtor's entry into the DIP Loan Documents is a sound and prudent exercise of the Debtor's business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    **<u>Petition Date</u>**.  On January 19, 2026 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Florida.  The Debtor has continued in the management and operation of its business and property as a "Debtor-in-Possession" pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Case.

B.  **Jurisdiction and Venue**.  This Court has jurisdiction over this proceeding, pursuant to 28 U.S.C. §§ 157(b) and 1334, and over the persons and property affected hereby.  Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Case and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.  **Committee Formation**.  A Committee (as defined below) has not been appointed in the Case.

D.  **Notice**.  Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided prior to the Interim Hearing by the Debtor, whether by telecopy, email, overnight courier or hand delivery, to certain parties in interest, including: (i) the Office of the United States Trustee, (ii) the United States Department of Justice, (iii) the Internal Revenue Service and all other governmental agencies who are required to receive notice under the local rules of this Court, (iv) the Debtor's consolidated twenty (20) largest unsecured creditors, (v) all secured creditors of record, and (vi) counsel to the DIP Lender.  Under the circumstances, such notice of the Interim Hearing and the relief requested in the DIP Motion is due and sufficient notice and complies with Sections 102(1), 364(c) and 364(d) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(b), 4001(c), 4001(d) and the local rules of this Court.

E.  **Debtor's Stipulations**.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of a Committee (as defined below) or other parties-in-interest as set forth in paragraph 24 herein, the Debtor, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows (paragraphs E(i) through E(vii) below are referred to herein, collectively, as the "Debtor's Stipulations"):

(1)  **Stipulations Concerning Prepetition Loans**

(i)  *Prepetition Loans*.  Prior to the Petition Date, the Debtor was indebted to GDA PMG Funding LLC (in its capacity as lender on such prepetition indebtedness, the "Prepetition Lender") pursuant to the following:

(a)  Secured obligations of the Debtor owed to the Prepetition Lender in respect to advances made pursuant to multiple Business Loan and Security Agreements, which obligations

5

include (1) loan advances made pursuant to loan documentation between Debtor and Settle Funding LLC (collectively, the "Settle Documentation"), which loans and related loan documentation were assigned to the Prepetition Lender by Settle Funding LLC on or about April 30, 2025, and (2) subsequent advances made by Prepetition Lender after such assignment, including, without limitation, advances made under that certain Business Loan and Security Agreement, dated April 30, 2025, between Debtor and Prepetition Lender (as amended, the "GDA Loan Agreement", and collectively with the Loan Documents (as defined in the GDA Loan Agreement) and Existing Loan Documents (as defined in the GDA Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition GDA Documents" and, hereafter the obligations owed under the Prepetition GDA Documents shall be referred to as the "Prepetition GDA Loan");

(b)    Secured obligations of the Debtor, its affiliate Pat McGrath Ltd., and its principal shareholder and officer, Dame Patricia McGrath, individually, owed to Prepetition Lender pursuant to a Standard Merchant Cash Advance Agreement between Debtor and TVT Cap, as affected by a Settlement Agreement and Mutual Release, dated as of February 28, 2025 (collectively with the any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition TVT Cap Documents"), which obligations were assigned to Prepetition Lender by TVT Cap on May 1, 2025 (the "Prepetition TVT Cap Loan");

(c)    Secured obligations of the Debtor, its affiliate Pat McGrath Ltd., and Dame Patricia McGrath, individually, owed to the Prepetition Lender pursuant to a Standard Merchant Cash Advance Agreement between Debtor and TVT Capital Source LLC, as affected by a Settlement Agreement and Mutual Release, dated as of February 28, 2025 (collectively with the any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition Cap Source Loan Documents", and together with the Prepetition GDA Loan Documents, the Prepetition TVT Cap Loan Documents, the

"Prepetition Loan Documents"), which obligations were assigned to Prepetition Lender by TVT Capital Source LLC on May 2, 2025 (the "Prepetition Cap Source Loan", and together with the Prepetition GDA Documents and the Prepetition TVT Cap Documents, the "Prepetition Loans").

        (ii)    *Prepetition Lender Obligations*.  As of the Petition Date, the aggregate principal amount of outstanding under the Prepetition Loan Documents was approximately $37,425,180.94 (the "Prepetition Lender Obligations").

        (iii)    *Prepetition Liens and Prepetition Collateral*.  As more fully set forth in the Prepetition Loan Documents and the DIP Motion, prior to the Petition Date, as security for the Prepetition Lender Obligations, the Debtor granted to the Prepetition Lender, a first priority security interest in and continuing lien on (the "Prepetition Liens"), among other things, substantially all of their assets and property (which for the avoidance of doubt, includes Cash Collateral) and all proceeds, products, accessions, substitutions and replacements for, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising and regardless of where located (collectively, the "Prepetition Collateral").  The Prepetition Lender Obligations are valid and enforceable and not subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), or any other counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, subject, however, to the rights of a Committee and other parties in interest set forth in paragraph 24 below.

        (iv)    *Validity, Perfection, and Priority of Prepetition Lender Liens and Prepetition Lender Obligations*.  The Debtor acknowledges and agrees that as of the Petition Date (a) the Prepetition Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to Prepetition Lender for fair consideration and reasonably equivalent value; (b) the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Prepetition Loan Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date, the "Permitted Prior Liens"); (c) the Prepetition

Lender Obligations and the Prepetition Claim constitute legal, valid, binding, and non-avoidable obligations of the Debtor enforceable in accordance with the terms of the applicable Prepetition Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Lender Obligations exist, and no portion of the Prepetition Liens or Prepetition Lender Obligations is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtor and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, "lender liability" causes of action or avoidance claims under Chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including, without limitation, any recharacterization, subordination, avoidance, disgorgement, recovery or other claims arising under or pursuant to Sections 105, 510, or 542 through 552 of the Bankruptcy Code) against the Prepetition Lender or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition Loans or liens under the Prepetition Loan Documents; (f) the Debtor has waived, discharged, and released any right to challenge any of the Prepetition Lender Obligations and the priority of the Debtor's obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Lender Obligations; and (g) the Prepetition Lender Obligations constitute allowed, secured claims within the meaning of Sections 502 and 506 of the Bankruptcy Code to the extent of the value of the Prepetition Collateral.

(v)     *Agreements Regarding Subordination*. Prior to the Petition Date, as security for loans made by Keyhaven to the Debtor  evidenced by a note (the,"**Keyhaven Note")**, the Debtor granted to Keyhaven, a senior security interest in and continuing lien on the Prepetition Collateral (the "**Keyhaven Lien**"), which was subsequently modified to a junior security interest pursuant to the Keyhaven Subordination (defined below)**.** The Debtor, Keyhaven PMG Blocker, Inc. ("<u>Keyhaven</u>") and Prepetition Lender entered into that certain Limited Consent and First Amendment to

Secured Promissory Note dated as of April 29, 2025 (the "Keyhaven Subordination") to, among other things, approve the Debtor's incurrence of the indebtedness under the GDA Prepetition Loan Documents and govern the respective priority and positions of Prepetition Lender and Keyhaven.  On the date hereof, Keyhaven, the Debtor and the Prepetition Lender have entered into a Limited Consent (the, "**Limited Consent**") pursuant to which, inter alia, (i) Keyhaven has consented to the DIP Facility; and (ii) acknowledged and agreed that the Keyhaven Obligations and the Keyhaven Liens are subject and subordinate and junior in payment and lien priority to the Prepetition Loans and the Prepetition Liens and the $10,000,000 in New Money DIP Loans totaling $47,425,189.94 (which such amount may be increased by an amount not to exceed $5,000,000.00 if, in the good faith determination of the Borrower and GDA Lender, such additional funding is needed for Borrower's operations).  Pursuant to the Keyhaven Note, as of the Petition Date, subject to Paragraph 24 hereof, the Debtor acknowledges and agrees that it was indebted to Keyhaven in the principal amount of $10,000,000.00 with additional interest and fees totaling approximately $1,800,000.00. (the, "**Keyhaven Prepetition Claim**")

(vi)     *Default by the Debtor.*  The Debtor acknowledges and stipulates that it has been and is in default of its obligations under the Prepetition Loan Documents, including as a result of the Case, and that Events of Default had occurred under the Prepetition Loan Documents prior to the Petition Date and continue to exist.  As of the Petition Date, therefore, interest is accruing on the Prepetition Lender Obligations at the default rate.

(vii)     *Collateral Reserve Account.*

(ii)          .  In June 2025, pursuant to that certain Amendment No. 1 to Business Loan and Security Agreement, dated June 12, 2025, by and between the Debtor and Prepetition Lender ("First Amendment"), an account was established at UBS in Prepetition Lender's name, for the purpose of depositing the proceeds from certain accounts receivable of Debtor (the "Collateral Reserve

Account"). Since the establishment of the Collateral Reserve Account, the Debtor and Prepetition Lender have caused payments from revenue of the Debtor, including collections on certain accounts receivable from certain of the Debtor's account debtors, to be deposited into the Collateral Reserve Account in accordance with the First Amendment. This was done at the joint direction of the Debtor and Prepetition Lender pursuant to the First Amendment and, subsequent to the occurrence of Events of Default under the Prepetition Loan Documents, in accordance with the rights of the Prepetition Lender as a secured creditor whose loan was in default to notify account debtors to make payments to or for its benefit under Section 9-607 of the Uniform Commercial Code. In the First Amendment, the Debtor acknowledged that funds on deposit in the Collateral Reserve Account constituted collateral for the Prepetition Loans. Pursuant to the First Amendment, such funds could be and ultimately were withdrawn from the Collateral Reserve Account and applied to the Prepetition Loans upon the occurrence of an Event of Default (as defined in the GDA Loan Agreement).

(a)     Prior to the Petition Date, following the occurrence of Events of Default (as defined in the Prepetition Loan Agreement), the Prepetition Lender exercised its right as a secured creditor to collect receivables due from certain of the Debtor's account debtors, deposit such collections in the Collateral Reserve Account and apply a total of $3,734,242.80 of cash on deposit in the Collateral Reserve Account (the "Prepetition Applied Cash") to amounts due and owing under the Prepetition Loan Documents. Following the Petition Date, additional proceeds of accounts receivable were deposited into the Collateral Reserve Account. As of February 10, 2026, the balance remaining in the Collateral Reserve Account was approximately $353,386.48 (the "Undisbursed Cash Balance"). The Undisbursed Cash Balance constitutes the Prepetition Lender's Cash Collateral (as defined below) subject to the Prepetition Liens.

(b)     The Prepetition Applied Cash deposited in the Collateral Reserve Account prior to the Petition Date constituted Cash Collateral for the Prepetition Loans, subject to a valid, enforceable, duly perfected and non-avoidable first priority lien in favor of the Prepetition Lender and the application of such Applied Cash was consensual, consistent with the provisions of the Prepetition Loan

10

Documents and applicable law (including, but not limited to, the Uniform Commercial Code) and the application of the Prepetition Applied Cash is not subject to avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, except as set forth in paragraph 24 below and such Prepetition Applied Cash does not constitute property of the Debtor's estate.

(d)    The Undisbursed Cash Balance deposited into the Collateral Reserve Account since the Petition Date also constitutes Cash Collateral for the Prepetition Loans (the proceeds of accounts receivable in which the Prepetition Lender had and has a valid, enforceable, duly perfected and non-avoidable first priority lien). The Debtor represented to the Court that it would be in its and the estate's best interest for the Prepetition Lender to apply such cash to the Prepetition Loans as the amount of the proposed New Money DIP Loans was determined assuming such application.

(e)    The outstanding balance of the Prepetition Lender Obligations referenced in Paragraph E(ii) hereof reflects the application of the Prepetition Applied Cash prior to the Petition Date and the proposed application of the Undisbursed Cash Balance following the Petition Date.

F.    **Cash Collateral**. All cash, securities or other property of the Debtor (and the proceeds therefrom) in existence on the Petition Date (and subject to the Prepetition Liens), including, without limitation, all amounts on deposit or maintained by the Debtor in any deposit account of Prepetition Lender is subject to valid and enforceable rights of setoff and valid, perfected, enforceable first-priority liens, as the case may be, under the Prepetition Loan Documents and applicable law, and is included in the Prepetition Collateral, and therefore the Debtor's cash, cash balances, and cash accounts, are cash collateral of the Prepetition Lender within the meaning of Section 363(a) of the Bankruptcy Code. All such cash (including, without limitation, all proceeds of the Prepetition Collateral of the Debtor) and any and all cash proceeds of the DIP Collateral is referred to herein as "Cash Collateral."

11

G.    **Findings Regarding the Post-Petition Financing**.

(i)    *Need for Post-Petition Financing*.  An immediate need exists for the Debtor to obtain funds from the DIP Facility in order to fund the working capital requirements and other financing needs of the Debtor and to preserve its value as a going concern pending a potential sale of substantially all of its assets or reorganization.  The ability of the Debtor to finance their operations, to preserve and maintain the value of the Debtor's assets and maximize a return for all creditors requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtor, its estate, creditors and equity holders and the possibility for a reorganization or successful sale of the Debtor's assets.  Therefore, it is in the best interest of the Debtor's estate to establish the DIP Facility (including the DIP Loan Roll-Up) described in the DIP Motion permitting the Debtor to borrow DIP New Money Loans up to an aggregate amount of $5,000,000.00 on an interim basis, as set forth in this Interim DIP Order and up to an aggregate of $10,000,000.00 (including size of all advances during the Interim Period) thereunder on a final basis subsequent to entry of a Final DIP Order, in each case, as set forth and as contemplated by the DIP Loan Documents, and to authorize the Debtor's use of Cash Collateral (as defined in Section 363 of the Bankruptcy Code), subject to the terms and conditions in the DIP Term Sheet and other DIP Loan Documents and as set forth in this Interim DIP Order.

(ii)    *No Credit Available on More Favorable Terms*.  The Debtor has been unable to obtain (A) unsecured credit allowable under Bankruptcy Code Sections 503(b)(1), 364(a) and 364(b), or (B) credit for money borrowed secured by a junior Lien on property of the estate which is subject to a Lien, in each case, in the amount required to sustain the Debtor's operations on more favorable terms and conditions than those provided in the DIP Term Sheet and this Interim DIP Order, including but not limited to, granting the senior Liens to the DIP Lender, and the DIP Superpriority Claims to the DIP Lender, pursuant to Bankruptcy Code Sections 364(d) and 364(c)(i) and this Interim DIP Order.

H.    **Use of Proceeds of the DIP Facility**.  Proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Loan Documents) shall be used, solely to (i) fund working capital of the Debtor to the extent otherwise permitted in a manner consistent with the terms and

conditions of the DIP Loan Documents (including without limitation the investment covenant), and in accordance with the Approved Budget, (ii) pay costs of administration of the Case in a manner consistent with the terms and conditions of the DIP Loan Documents (including the fees and expenses of the DIP Lender, the fees of the Debtor's retained professionals) and other costs and expenses related to the Case, and in accordance with the Approved Budget, and (iii) effect the DIP Loan Roll-Up.

I.      **Extension of Financing**.  The DIP Lenders have indicated a willingness to provide financing to the Debtor in accordance with the DIP Loan Documents and subject to (i) the entry of this Interim DIP Order and a Final DIP Order, and (ii) findings by this Court that such financing is essential to the Debtor's estate, that the DIP Lender is a good faith financier, and that the DIP Lender's claims, superpriority claims, security interests and Liens and other protections granted pursuant to this Interim DIP Order (and the Final DIP Order) and the DIP Facility will not be affected by any subsequent reversal, modification, vacatur or amendment of this Interim DIP Order or the Final DIP Order or any other order, as provided in Section 364(e) of the Bankruptcy Code.  The DIP Liens (as defined herein) shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under Section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date or (ii) subordinated to or made *pari passu* with any other lien or security interest under Sections 363 or 364 of the Bankruptcy Code or otherwise.

J.      **Business Judgment and Good Faith**.

(i)      (a) The terms and conditions of the DIP Facility (including the DIP Loan Roll-Up) and the DIP Loan Documents are fair, reasonable, and the best available under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration; (b) the DIP Facility and the provisions thereof were negotiated in good faith (as such term is defined in Section 364(e) of the Bankruptcy Code), at arms' length and for fair consideration between the Debtor and the DIP Lender; and (c) the use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses,

the consequence of which is that the DIP Lender is entitled to the protection and benefits of Section 364(e) of the Bankruptcy Code.

        (ii)      The DIP Loan Roll-Up reflects the Debtor's exercise of prudent business judgment consistent with its fiduciary duties.  The DIP Lender would not be willing to provide the DIP Facility or extend credit to the Debtor thereunder without the DIP Loan Roll-Up.  The DIP Loan Roll-Up will benefit the Debtor and its estate because it will enable the Debtor to obtain urgently needed financing critical to administering the Case and funding its operations, which financing would not otherwise be available.

        (iii)      Accordingly, all of the Debtor's obligations and indebtedness arising under, in respect of, or in connection with the extension of the DIP Facility (including the DIP Loan Roll-Up), the DIP Loan Documents, and all fees and other obligations or indebtedness owing to the DIP Lender, shall be deemed to have been extended by the DIP Lender in good faith (as that term is used in Section 364(e) of the Bankruptcy Code), and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event that this Interim DIP Order, or any provision hereof, is vacated, reversed or modified, on appeal or otherwise.

        K.      **Property of the Estate**.  Each item of the DIP Collateral constitutes property of the estate of the Debtor.

        L.      **Relief Essential; Best Interest; Good Cause**.  The relief requested in the DIP Motion (and as provided in this Interim DIP Order) is necessary, essential and appropriate for the continued operation of the Debtor's business and the management and preservation of the Debtor's assets and personal property. It is in the best interest of the Debtor's estate to be allowed to establish the DIP Facility contemplated by the DIP Term Sheet.  Good cause has been shown for the relief requested in the DIP Motion (and as provided in this Interim DIP Order).

        M.      **Entry of Interim DIP Order**.  For the reasons stated above, the Debtor has requested immediate entry of this Interim DIP Order pursuant to Bankruptcy Rule 4001(c)(2).

N.  **Break-Up Fee.**  The Debtor, Dame Pat McGrath, individually, and GDA PMG Funding LLC, in its capacity as the DIP Lender and the Prepetition Lender, have entered into a Restructuring Term Sheet, which is attached as Exhibit A to the DIP Term Sheet.  The Debtor has represented to the Court that the Restructuring Term Sheet sets forth a proposed framework for a plan of reorganization supported by the Debtor, Dame Pat McGrath, individually, and GDA PMG Funding LLC, which, if confirmed by order of this Court, after its terms have been incorporated into a plan of reorganization and a disclosure statement related thereto and following appropriate notice and a hearing, would preserve the Debtor's business as a going concern and the jobs it provides.  The Restructuring Term Sheet provides that the DIP Lender would be entitled to a break-up fee (the "Break-Up Fee") of $2,500,000 in the event that a transaction contemplated by such term sheet does not close on the Plan Effective Date as set forth in the Restructuring Term Sheet (except as otherwise agreed by the DIP Lender),  The Debtor has further represented to the Court that such Break-Up Fee is reasonable, in the best interest of the Debtor and its estate  and a necessary inducement to the DIP Lender to provide the DIP Facility and to enter into the Restructuring Term Sheet and  that the DIP Lender would not have agreed to provide the DIP Facility or to enter into the Restructuring Term Sheet without such fee.  Based on such representations, the Court finds the Break-Up Fee to be reasonable, necessary and in the best interest of the Debtor and its estate.

**NOW, THEREFORE**, based on the DIP Motion of the Debtor and the record before this Court with respect to the DIP Motion, and with the consent of the Debtor and the DIP Lender as to the form and entry of this Interim DIP Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.  **Motion Granted**.  The DIP Motion is granted on an interim basis in accordance with the terms and conditions set forth in this Interim DIP Order and the DIP Term Sheet.  Any objections to the DIP Motion with respect to entry of this Interim DIP Order that have not been withdrawn, waived or settled, are hereby denied and overruled.

2.  **DIP Loan Documents**.

(a)    **Approval of Entry into DIP Loan Documents**.  The Debtor is expressly and immediately authorized, empowered and directed to execute and deliver the DIP Loan Documents and to incur and to perform the DIP Obligations in accordance with the Approved Budget, and subject to, the terms of this Interim DIP Order and the DIP Loan Documents, and to execute and deliver all instruments, certificates, agreements and documents which may be required or necessary for the performance by the Debtor under the DIP Facility and the creation and perfection of the DIP Liens described and defined in and provided for by this Interim DIP Order and the DIP Loan Documents.  The Debtor is hereby authorized and directed to do and perform all acts, pay the principal, interest, expenses and other amounts described in the DIP Term Sheet and all other DIP Loan Documents as such become due, including, without limitation, closing fees, and reasonable and documented attorneys', financial advisors' and accountants' fees and disbursements as provided for in the DIP Term Sheet which amounts shall not otherwise be subject to approval of this Court.  The Court further authorizes the Debtor to enter into the Limited Consent.

Without limitation of the generality of the foregoing, pursuant to and in accordance with Section 25 of the DIP Term Sheet, the Debtor is hereby authorized to incur and pay as and when due all fees and expenses in respect of the DIP Obligations, including, without limitation, the professional fees of the DIP Lender and the Alternative DIP Transaction Fee, the Exit Fee and the Break-Up Fee (as defined in the Restructuring Term Sheet), pursuant to and in accordance with the terms of the DIP Term Sheet.

(b)    **Authorization to Borrow**.

(i)    In order to enable the Debtor to continue to operate their business during the Case, and subject to the terms and conditions of this Interim DIP Order, the DIP Term Sheet, the other DIP Loan Documents, and the Approved Budget (subject to Permitted Variances), the Debtor is hereby authorized under the DIP Facility to borrow DIP New Money Loans up to $5,000,000.00 on an interim basis.

(ii)    (A) The Debtor is hereby authorized to substitute and exchange Prepetition Loans of the Prepetition Lender on a cashless, dollar-for-dollar basis with DIP Roll-Up Loans in accordance with the DIP Loan Roll-Up and subject to the terms and conditions set forth herein during the Interim

16

Period, and (B) upon entry of a Final DIP Order, shall be authorized to thereafter substitute and exchange Prepetition Loans of the Prepetition Lender on a cashless, dollar-for-dollar basis with DIP Roll-Up Loans in accordance with the DIP Loan Roll-Up and, subject to the terms and conditions set forth in the DIP Loan Documents.  The DIP Roll-Up Loans that are substituted and exchanged pursuant to this Paragraph 2(b)(ii) shall be deemed indefeasible, and the DIP Roll-Up Loans substituted thereby shall be deemed automatically exchanged therefor by DIP Lender.  The cashless substitution and exchange dollar-for-dollar of DIP Roll-Up Loans under the Prepetition Loans by "rolling-up" such amounts into DIP Loans as described in this paragraph 2(b)(ii) is authorized as compensation for, in consideration for, as a necessary inducement for, and on account of the agreement of the DIP Lender to fund the DIP New Money Loans and not as adequate protection for, or otherwise on account of, the Prepetition Loans.

(iii)    Upon execution and delivery of the DIP Loan Documents, such DIP Loan Documents shall constitute valid, binding and non-avoidable obligations of the Debtor enforceable against the Debtor in accordance with its respective terms and the terms of this Interim DIP Order for all purposes during the Case, any subsequently converted case of the Debtor under Chapter 7 of the Bankruptcy Code or after dismissal of the Case.  No obligation, payment, assignment or repayment thereof or recovery on or in respect thereof, transfer or grant of security under the DIP Loan Documents, or this Interim DIP Order shall be stayed, restrained, revocable, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under Sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim. The Debtor's use of borrowing under the DIP Facility shall be in accordance with the purposes described herein and the Approved Budget.

(c)    **Application of DIP Proceeds**.  The proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Term Sheet) shall be used solely to (i) fund working capital of the Debtor to the extent otherwise permitted in a manner consistent with the terms and conditions of the DIP Loan Documents (including without limitation the investment covenant), and in

accordance with the Approved Budget, (ii) pay costs of administration of the Case in a manner consistent with the terms and conditions of the DIP Loan Documents (including the fees and expenses of the DIP Lender, the fees of the Debtor's retained professionals and other costs related to the Case including, but not limited to, the Carve-Out), and in accordance with the Approved Budget, and (iii) effect the DIP Loan Roll-Up.

(d)    **Conditions Precedent**.  The DIP Lenders shall have no obligation to make any advances (including the Initial Advance or any Subsequent Advance, respectively) under the DIP Term Sheet during the Interim Period unless the conditions precedent to make such DIP Loans under Sections 11 and 12 of the DIP Term Sheet, as applicable, have been satisfied in full or waived by the DIP Lender in its sole and absolute discretion.

(e)    **Liens**.  Effective immediately upon the entry of this Interim DIP Order the DIP Lender, is hereby granted pursuant to Sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition security interests and Liens (the "DIP Liens"), senior and superior in priority to all other security interests and liens granted or purported to be held by any other secured and unsecured creditors of the Debtor's estate, except for Permitted Prior Liens and the Carve-Out, upon all of the DIP Collateral (as defined in the DIP Term Sheet), and, for the avoidance of doubt, the DIP Collateral (as defined in the DIP Term Sheet) shall include all pre-petition and post-petition real and personal property of the Debtor now owned or hereafter acquired and all other property of whatever kind, nature or description other than property that is expressly excluded from the DIP Liens pursuant to the DIP Loan Documents; provided, however, that the DIP Collateral (as defined in the DIP Term Sheet) shall not include any of the Debtor's claims and causes of action arising under Chapter 5 of the Bankruptcy Code, or the proceeds thereof (collectively, as used herein, the "DIP Collateral").

(f)    **DIP Lien Priority**.  The DIP Liens created and granted to the DIP Lender, as provided herein, (a) are created pursuant to Sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and (b) shall be valid, binding, continuing, enforceable, prior, fully perfected, first priority, unavoidable, and

superior to any security, mortgage, or collateral interest or Lien or claim to any of the DIP Collateral, subject only to: (x) the Carve-Out, and (y) the Permitted Prior Liens. The DIP Liens shall secure all DIP Obligations. The DIP Liens shall not be made subject to or *pari passu* with any Lien or security interest by any court order heretofore or hereafter entered in this Case except for the Permitted Prior Liens and the Carve-Out; and shall be valid and enforceable against any trustee subsequently appointed in this Case, upon any conversion this Case to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "Successor Case"), and/or upon dismissal of the Case. The DIP Liens shall not be subject to Sections 510, 549, 550 or 551 of the Bankruptcy Code, or, if approved in the Final DIP Order, Section 506(c) of the Bankruptcy Code or the equities of the case exception to Section 552(b) of the Bankruptcy Code. The DIP Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtor and their estate under Section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date, or (ii) subordinated to or made *pari passu* with any other lien or security interest under Sections 363 or 364 of the Bankruptcy Code or otherwise. Pursuant to Section 364(d) of the Bankruptcy Code, the DIP Liens granted to the DIP Lender, shall be senior to any adequate protection liens granted in favor of any party; provided, that such DIP Liens shall be immediately junior to any Permitted Prior Liens and the Carve-Out.

(g)    **Enforceable Obligations**.    The DIP Loan Documents shall constitute and evidence the valid and binding obligations of the Debtor, which obligations shall be enforceable against the Debtor, its estate and any successors thereto and its creditors, in accordance with its terms.

(h)    **Approved Budget**.    From and after entry of this Interim DIP Order, except as provided in the Interim DIP Order, or as approved by the DIP Lender, the Debtor shall not, directly or indirectly, (i) use any proceeds of the DIP Loans in a manner or for a purpose other than those consistent with the DIP Term Sheet, the Interim DIP Order and the Approved Budget; or (ii) permit a disbursement causing any deviation from the Approved Budget other than as Permitted Variances (as defined below).

(i)    **Superpriority Administrative Claim Status**.    Pursuant to Sections 364(c)(i), 503(b) and 507(b) of the Bankruptcy Code, all DIP Obligations shall, subject to the Carve-Out, constitute

an allowed superpriority administrative expense claim of the DIP Lender (the "DIP Superpriority Claim" and, together with the DIP Liens, the "DIP Protections") with priority over all administrative expense claims, the McGrath Interim DIP Order (as defined in the DIP Term Sheet) claims, and unsecured claims against the Debtor and its estate, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to Sections 105, 326, 328, 330 of the Bankruptcy Code (except as otherwise provided in Section 4 below), Sections 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code and, for the avoidance of doubt, any adequate protection superpriority claims, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.  Other than the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Bankruptcy Code Sections 328, 330, and 331, or otherwise, that have been or may be incurred in this proceeding, or in any Successor Case, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Protections or the DIP Obligations, or with any other claims of the DIP Lender arising hereunder.

      (j)    **Prepetition Applied Cash and Undisbursed Cash Balance**.  Subject to Paragraph 24 hereof, the Court hereby finds that the Prepetition Lender's application of the Prepetition Applied Cash to the Prepetition Loans prior to the Petition Date as described in Paragraph E(vii)(b) hereof was proper and appropriate and in accordance with applicable non-bankruptcy law and that the Prepetition Applied Cash did not constitute property of the Debtor's estate as of the Petition Date. The Court further authorizes the Prepetition Lender to apply the Undisbursed Cash Balance deposited in the Collateral Reserve Account since the Petition Date against the outstanding balance of the Prepetition Loans. Any cash collateral deposited into the Collateral Reserve Account from and after the date of this Interim DIP Order shall be transferred to the Debtor's debtor-in-possession bank account for use in accordance with the Approved Budget (defined below).

3.      <u>**Authorization to Use Proceeds of DIP Term Sheet**</u>.

(a)      The Debtor shall use the proceeds of the DIP Loans and the Collateral solely as provided in this Interim DIP Order and the DIP Loan Documents, and in accordance with the Approved Budget.  Pursuant to the terms and conditions of this Interim DIP Order, the DIP Facility and the DIP Term Sheet, and in accordance with the Approved Budget (as the same may be modified, supplemented or updated from time to time consistent with the terms of the DIP Term Sheet and this Interim DIP Order, the "<u>Approved Budget</u>"), which shall be in form and substance satisfactory to the DIP Lender, attached hereto as **<u>Exhibit A</u>**, the Debtor is authorized to use the advances under the DIP Term Sheet during the period commencing immediately after the entry of this Interim DIP Order and terminating upon termination of the commitment to fund the DIP Facility pursuant to the provisions of this Interim DIP Order.  All references to the Approved Budget in this Interim DIP Order and the DIP Term Sheet shall mean as the same is subject to Permitted Variances.  The Debtor may update the Approved Budget from time to time (but in no case more than once every four (4) weeks, unless the DIP Lender agrees); <u>provided</u> that such updated Approved Budget shall be in a form and substance acceptable to the DIP Lender in its sole and absolute discretion, and the Debtor shall be required always to comply with the Approved Budget, this Interim DIP Order and the DIP Term Sheet, subject to Permitted Variances.  Notice of such updated Approved Budget shall be provided to the offices of the United States Trustee, counsel to any official committee in the Case, and counsel to the DIP Lender.  Nothing in this Interim DIP Order shall authorize the disposition of any assets of the Debtor or its estate outside the ordinary course of business or other proceeds resulting therefrom, except as permitted pursuant to the DIP Facility, the DIP Term Sheet and this Interim DIP Order.

(b)      Compliance with the Approved Budget shall be tested weekly and on a cumulative basis, beginning on February 16, 2026 (each a "<u>Budget Test Period</u>").  During each Budget Test Period, the Debtor shall not permit (i) the aggregate disbursements for any one-week period in the Approved Budget, and the cumulative disbursements for each period from the Petition Date through the last day of any month, to exceed the respective amounts set forth in the Approved Budget for such one-week period or such cumulative period by more than 10%; and (ii) gross receipts for any one-week period in the Approved

21

Budget, and for the cumulative period from the Petition Date through the last day of any month, to be less than the respective amounts set forth in the Approved Budget for such one-week period or such cumulative period by more than 10% (the preceding sub-clauses (i) and (ii) each a "<u>Permitted Variance</u>," and, together, the "<u>Permitted Variances</u>").

(c)     The Debtor shall provide to the DIP Lenders on a weekly basis, a variance report, certified by their chief financial officer, and in form and substance acceptable to the DIP Lender, comparing actual cash disbursements and cash receipts on a line item basis for the immediately preceding two-week period, and for the cumulative period (including for each cumulative period from the Petition Date through each month end) from the Petition Date to the amounts for the same two-week and cumulative periods set forth in the Approved Budget, with a reasonably detailed explanation of the significant variances.  In connection with each weekly variance report, the Debtor shall deliver a roll forward of the initial 4-week cash flow report provided prior to the closing date of the DIP Facility.

(d)     Prior to the occurrence of an Event of Default, the Debtor shall be permitted to pay fees and expenses of Professionals (as defined below) solely to the extent that such fees and expenses are in accordance with the Approved Budget and authorized to be paid under Sections 330 and 331 of the Bankruptcy Code (other than any Professionals whose fees are not subject to such provisions) pursuant to an order of the Court, as the same may become due and payable.  Upon the occurrence of an Event of Default, the rights of the Debtor to pay the professional fees and expenses of the Debtor's Professionals shall terminate, other than as provided with respect to the Carve-Out.

4.     **<u>Lien Perfection</u>**.  This Interim DIP Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens, the Prepetition Lender Replacement Liens (defined below) and the Keyhaven Replacement Liens (defined below) without the necessity of filing or recording any financing statement, deed of trust, mortgage, assignment or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreements) to validate or perfect the DIP Liens, the Prepetition Lender Replacement Liens and the

Keyhaven Replacement Liens, or to entitle the DIP Liens or the Prepetition Lender Replacement Liens and the Keyhaven Replacement Liens to the priorities granted herein.  Notwithstanding the foregoing, the DIP Lender, the Prepetition Lender or Keyhaven may, in their sole discretion, file such financing statements, mortgages, security agreements, assignments, notices of Liens and other similar documents, and are hereby granted relief from the automatic stay of Section 362 of the Bankruptcy Code in order to do so, and with respect to the DIP Liens, all such financing statements, mortgages, security agreements, assignments, notices and other documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Case.  Upon request, the Debtor shall execute and deliver to the DIP Lender, all such financing statements, mortgages, notices and other documents as the DIP Lender may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens granted pursuant hereto.  The DIP Lender may file a photocopy of this Interim DIP Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim DIP Order.  Immediately upon entry of the Interim DIP Order, and as ratified by this Interim DIP Order, and without further action required by the DIP Lender, the DIP Lender shall be deemed a loss payee and additional insured on each of the Debtor's casualty and general liability insurance policies.

5.       **Authorization to Use Cash Collateral**.  Subject to the terms and conditions of this Interim DIP Order, the DIP Facility, and the DIP Loan Documents and in accordance with the Approved Budget (subject to such variances as permitted in the DIP Term Sheet), the Debtor is authorized to use Cash Collateral (excluding the Prepetition Applied Cash and the Undisbursed Balance) until the Termination Date (as defined herein); provided, however, that during the Enforcement Notice Period (as defined herein), the Debtor may use Cash Collateral in accordance with the terms and provisions of the Approved Budget or as otherwise agreed by the DIP Lender in its sole discretion.  Nothing in this Interim DIP Order shall authorize the disposition of any assets of the Debtor or its estate outside the ordinary course of business, or the Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this

Interim DIP Order, the DIP Facility, the DIP Loan Documents, and in accordance with the Approved Budget or by subsequent order of this Court.

6.    **Limitations on Use of DIP Facility Proceeds, DIP Collateral or Prepetition Collateral**. Notwithstanding anything to the contrary set forth in this Interim DIP Order, or in any other order by this Court to the contrary, no portion of the DIP Loans, the DIP Collateral, the Cash Collateral or the Carve-Out or the Prepetition Collateral may be used, or proceeds of the foregoing, may be used except with the prior written consent of the DIP Lender or Prepetition Lender, as applicable: (i) for any purpose that is prohibited under the Bankruptcy Code or an order of the Bankruptcy Court; (ii) for the payment of professional fees, disbursements, costs, or expenses incurred by any person: (a) to investigate (including by way of examinations or discovery proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (1) against the DIP Lender (in its capacity as such) and/or the Prepetition Lender, and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of (x) the DIP Lender under the DIP Loan Documents or this Interim DIP Order, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtor or any Committee appointed (if any) in the Case in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Lender to recover on the DIP Collateral or seeking affirmative relief against the DIP Lender related to the DIP Obligations or DIP Liens on the DIP Collateral or the Prepetition Lender related to the Prepetition Lender Obligations or the Prepetition Liens, or (y) the Prepetition Lender under the Prepetition

Loan Documents; (2) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations, the DIP Liens or security interests in the DIP Collateral, and/or the Prepetition Loans or the security interests of the Prepetition Liens; or (3) for monetary, injunctive, or other affirmative relief against the DIP Lender or with respect to the DIP Liens on the DIP Collateral or the Prepetition Liens on the Prepetition Collateral that would impair the ability of any of the DIP Lender to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations; (b) to object to or challenge in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including the DIP Liens) held by the DIP Lender related to the DIP Obligations or (to the extent applicable), the Prepetition Loans and Prepetition Liens; (c) to assert, commence, or prosecute any claims or causes of action whatsoever (including, without limitation, any Avoidance Actions) related to the DIP Obligations, the DIP Liens, the Prepetition Loans or the Prepetition Liens; or (d) to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of DIP Liens or any other rights or interests of the DIP Lender related to the DIP Obligations, or the DIP Liens or the Prepetition Loans or the Prepetition Liens; (iii) to prevent, hinder or delay, whether directly or indirectly, the DIP Lender's assertions or enforcement of their rights and remedies under the DIP Loan Documents, DIP Liens, security interests or realization upon any DIP Collateral; (iv) in any manner which is otherwise adverse to the interests of the DIP Lender or the Prepetition Lender; (v) to take any other action which with the giving of notice or the passing of time would result in an Event of Default; (vi) to make any distribution under a Chapter 11 plan unless the DIP Lender consents thereto or such plan provides for the indefeasible payment in cash of all of the DIP Obligations and Prepetition Lender Obligations; (vii) to make any payment in settlement of any claim, action or proceeding except as permitted under the Approved Budget, this Interim DIP Order, and the DIP Term Sheet, or otherwise agreed to by the DIP Lender; and/or (viii) for any purpose or in any manner not approved in the Approved Budget; provided, however, that the Carve-Out and such collateral proceeds and loans under the DIP Loan Documents may be used for allowed fees and expenses, in an amount not to exceed, subject to the Final DIP Order, $50,000.00 in the aggregate (the "Investigation Budget Amount"), incurred

solely by a Committee (if appointed), in investigating (but not prosecuting or challenging) the validity, enforceability, perfection, priority or extent of the Prepetition Liens and the Prepetition Lender Obligations, in accordance with paragraph 24 of this Interim DIP Order.

7.    **Carve-Out**.  (a) Notwithstanding anything to the contrary herein, the Debtor's obligations to the DIP Lender, and the liens, security interests and superpriority claims granted by the DIP Orders or under the DIP Loan Documents, and the payment of all such obligations, shall be subject and subordinate in all respects to payment of the following fees and expenses:  (i) all unpaid fees required to be paid to the Clerk of the Court or statutory fees payable to the United States Trustee under 28 U.S.C. § 1930, with interest at the statutory rate pursuant to 31 U.S.C. § 3717 (the "Government Fees"), which shall not be limited by any budget; (ii) the reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000.00; (iii) to the extent allowed at any time (whether by interim order, final order, procedural order or otherwise), all unpaid fees and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Debtor (the "Debtor Professionals") or any official committee of unsecured creditors (if any) appointed in the Chapter 11 Case (a "Committee" and such professionals to the Committee, the "Committee Professionals" and together with the Debtor Professionals, the "Retained Professionals") pursuant to Bankruptcy Code Sections 327, 328, 363 or 1103, as applicable, at any time before or on the first business day following delivery of a Trigger Notice (defined below), provided that such fees and expenses are accounted for in and do not exceed the amounts included in an Approved Budget (unless otherwise agreed to), and without regard to whether such fees and expenses were invoiced after the Carve-Out Trigger Notice Date and whether allowed by the Court prior to or after delivery of the Trigger Notice (the "Pre-Trigger Fees" and such amounts, the "Pre-Trigger Fee Cap"); and (iv) the Professional Fees of (x) the Debtor Professionals and Committee Professionals (if any) in an aggregate amount not to exceed $100,000.00 (the "Post-Trigger Fee Cap" and, together with the Pre-Trigger Fee Cap, the "Carve-Out Cap") incurred after the first business day following delivery of a Trigger Notice (as defined herein) (the "Post-Trigger Fees").  Any payment or reimbursement made to any Retained Professionals with respect to Pre-Trigger Fees on or after the delivery of the Trigger Notice shall

permanently reduce the Carve-Out on a dollar-for-dollar basis (the foregoing clauses (i) through (iv), collectively, the "Carve-Out").  The DIP Lender agrees that the Carve-Outs that apply to the Debtor's professionals are as follows, in the aggregate: (i) Pack Law, $1,000,000.00; (ii) Gordian Group, LLC ("Gordian"), (A) if the Plan of Reorganization (or an alternative plan that is otherwise supported by the DIP Lender in its sole discretion) is consummated, a flat fee of $1,950,000 (inclusive of success fees, monthly payments of $75,000, and all other amounts (other than reasonable expenses) paid under the Gordian engagement letter), (B) in the event the DIP Obligations and Prepetition Loans are repaid in full in cash, the terms otherwise contemplated in Gordian engagement letter, and (C) otherwise, monthly payments of $75,000 per month for up to three (3) months; (iii) Paladin Management Group, LLC, $500,000.

(b)     **Trigger Notice**.  For purposes of the Carve-Out, a "Trigger Notice" is a written notice (which may be given by e-mail from counsel to the DIP Lender) delivered by the DIP Lender, as the case may be, by e-mail to counsel to (i) the Debtor, (ii) the DIP Lender, (iii) any Committee (if any) appointed in the Case, (iv) any Chapter 11 trustee, Chapter 7 trustee or examiner appointed in the Case or a subsequent Chapter 7 case, and (v) the United States Trustee (collectively, the "Carve-Out Notice Parties"), in each case following the occurrence of a DIP Maturity Date, stating that the DIP Maturity Date has occurred and is continuing under the DIP Loan Documents and the DIP Lender has invoked the Post-Trigger Fee Cap.  The term "Carve-Out Trigger Notice Date" shall mean the day on which a Trigger Notice is received by the Debtor.  For the purposes hereof, the "DIP Maturity Date" shall mean the date that is the earlier of: (a) sixty (60) days after the Petition Date; (b) the date the DIP Obligations are accelerated pursuant to the terms of the DIP Loan Documents based on the occurrence of an Event of Default; (c) consummation of a sale of all or substantially all of the assets and/or capital stock of the Debtor; and (d) the effective date of a Chapter 11 plan of reorganization or liquidation.

(c)     To the extent that professional fees and expenses of the Retained Professionals have been incurred by the Debtor or the Committee (if any) at any time before or on the first business day after delivery of a Trigger Notice but have not yet been allowed by the Court, such professional fees and expenses of the Retained Professionals shall constitute Professional Fees benefiting from the Carve-Out

upon their allowance by the Court, whether by interim or final compensation order and whether before or after delivery of the Trigger Notice.

(d)      For the avoidance of doubt, and notwithstanding anything to the contrary in this Interim DIP Order or in any Prepetition Loan Documents, the Carve-Out shall be senior to all liens and claims securing the DIP Obligations, and any and all other forms of adequate protection, liens or claims securing otherwise granted hereunder.

8.      **Payment of Compensation**.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtor, any official committee or of any person or shall affect the right of the DIP Lender to object to the allowance and payment of such fees and expenses or to permit the Debtor to pay any such amounts in excess of the amounts set forth in the Approved Budget for the applicable period.  Nothing herein shall be construed to obligate the DIP Lender, in any way, to directly pay the fees of any Professional or U.S. Trustee, or to assure that the Debtor has sufficient funds on hand to pay the fees of any Professional or U.S. Trustee.

9.      **Payment of Carve-Out on or After the DIP Maturity Date**.  Any payment made in respect of any allowed fees and expenses of Retained Professionals incurred on or after delivery of the Trigger Notice shall permanently reduce the Post-Trigger Carve-Out Amount on a dollar-for-dollar basis. Any funding of the Carve-Out by the DIP Lender shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim DIP Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

10.      **Adequate Protection**.

(a)      *Prepetition Lender.*  The Prepetition Lender is entitled to receive adequate protection to the extent of any diminution in value of its interest in the Prepetition Collateral during this Case.  Pursuant to Sections 361, 363 and 507(b) of the Bankruptcy Code, the following is hereby granted as adequate protection to the Prepetition Lender for any such diminution:

(i)    Current payment of its reasonable and documented fees and out-of-pocket expenses (including legal and other professionals' fees and expenses of the Prepetition Lender) whether arising before or after the Petition Date in accordance with Paragraph 20(b) hereof,

(ii)    Adequate protection replacement liens on all of the DIP Collateral and Prepetition Collateral (the "Prepetition Lender Replacement Liens"), which adequate protection replacement liens shall be junior only to (A) the Carve-Out, (B) any Permitted Prior Liens, (C) the DIP Liens, and (D) the Prepetition Liens;

(iii)    Superpriority administrative claims pursuant to Sections 364(c)(1) and 507(b)(1) of the Bankruptcy Code (the "Prepetition Lender Superpriority Claims") which superpriority administrative claims shall be senior to all other administrative claims in this Case (including, but not limited to, the superpriority administrative claims granted pursuant to the McGrath Interim DIP Order) except for the DIP Superpriority Claim granted hereunder in respect to the DIP Obligations;

(iv)    Interest shall continue to accrue on, be added to and constitute part of the Prepetition Loans for purposes of this Interim DIP Order but shall not be payable in cash prior to the Maturity Date. Such accrued post-petition interest shall be entitled to the same treatment as the Prepetition Loan claims.

(b)    *Keyhaven*.  Keyhaven shall be entitled to receive adequate protection for any diminution in value of its interest in the Prepetition Collateral during this Case.  Pursuant to sections 361, 363 and 507(b) of the Bankruptcy Code, the following is hereby granted as adequate protection to the Keyhaven for any such diminution:

(i)    Adequate protection replacement liens on all of the DIP Collateral and Prepetition Collateral (the "Keyhaven Replacement Liens"), which adequate protection replacement liens shall be junior to (A) the Carve-Out, (B) any Permitted Prior Liens, (C) the DIP Liens, (D) the Prepetition Liens, and (E) the Prepetition Lender Replacement Liens; and

(ii)    Superpriority administrative claims pursuant to Sections 364(c)(1) and 507(b)(1) of the Bankruptcy Code (the "Keyhaven Superpriority Claims") which superpriority

administrative claims shall be junior to (A) the DIP Superpriority Claims granted in respect to the DIP Obligations hereunder, (B) the Prepetition Lender Superpriority Claims, and (C) the superpriority claims granted in respect to the McGrath Interim DIP Order.

(iii) For the avoidance of doubt, nothing contained in this Interim Order shall be construed as a stipulation, admission or finding as to the value of the Debtor or its assets or that the Keyhaven Prepetition Claim should be classified and treated as an "allowed secured claim" under Bankruptcy Code Section 506 (c) or an allowed general unsecured claim , it being understood that Keyhaven, the Debtors, the DIP Lender, the Prepetition Lender and all other parties in interest are reserving their rights as to the the appropriate treatment of the Keyhaven Prepetition Claim in this Case; provided, however, that any such treatment shall be consistent with the terms and conditions of the Limited Consent and applicable law.

11.    **Section 506(c) Claims**.  Except to the extent of the Carve-Out, subject to entry of the Final DIP Order, no expenses of administration of the Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against the DIP Lender or recovered from the DIP Collateral, or against the Prepetition Lender or the Prepetition Collateral pursuant to Section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender and no such consent shall be implied from any other action or inaction by the DIP Lender.

12.    **Collateral Rights**.  Unless the DIP Lender has provided its prior written consent or all DIP Obligations have been indefeasibly paid in full in cash (or will be paid in full in cash upon entry of an order approving indebtedness, if any, described in subparagraph (a) below), all commitments to lend have terminated, and all indemnity obligations under the DIP Term Sheet have been cash collateralized on a reasonable basis, there shall not be entered in this proceeding, or in any Successor Case, any order which authorizes any of the following:

(a)     The obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral and/or entitled to priority administrative status which is equal or senior to those granted to the DIP Lender; or

(b)     The use of cash collateral for any purpose other than to pay in full in cash the DIP Obligations or as otherwise permitted in this Interim DIP Order, the Approved Budget and the DIP Term Sheet; or

(c)     Relief from stay by any person other than of the DIP Lender on all or any portion of the DIP Collateral; or

(d)     The Debtor's return of goods constituting DIP Collateral pursuant to Section 546(h) of the Bankruptcy Code, except as permitted in the DIP Term Sheet.

13.     **Proceeds of Subsequent Financing**.  Without limitation of the provisions hereof and the DIP Protections provided hereunder, if at any time prior to the repayment or other satisfaction in full of all DIP Obligations and the termination of the DIP Lenders' obligations to make loans and advances under the DIP Facility, including subsequent to the confirmation of any Chapter 11 plan or plans (generally, the "Plan") with respect to the Debtor, the Debtor's estate, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to Bankruptcy Code Sections 364(b), 364(c) or 364(d) in violation of the DIP Term Sheet or engage in any Asset Sale, then all of the cash proceeds derived from such Asset Sale shall immediately be turned over to the DIP Lender for application to the DIP Obligations then outstanding pursuant to the terms of the DIP Term Sheet, in accordance with the terms of this Interim DIP Order.

14.     **Milestones; Events of Default**.  The Debtor shall comply with those certain Milestones set forth in Exhibit A of the DIP Term Sheet.  The occurrence of any "Event of Default" under the DIP Term Sheet, unless waived by the DIP Lender in accordance with the terms of the DIP Loan Documents, shall constitute an event of default (and "Event of Default") hereunder.

15.     **Remedies After Event of Default**.

(a)     The Debtor shall provide notice (which may be given by e-mail to counsel) to the DIP Lender, counsel to any statutory committee appointed in this Chapter 11 Case, and the U.S. Trustee immediately upon knowledge of the occurrence of any Event of Default.  Upon the occurrence of an Event of Default (and regardless of whether the Debtor has provided the foregoing notice), the DIP Lender shall be entitled to give written notice (which may be given by e-mail) to counsel to the Debtor, the U.S. Trustee and counsel to the Committee (if any), of the termination of the commitments under the DIP Facility, its right to charge default rate of interest, cease funding under the DIP Term Sheet and its intention to exercise remedies against the DIP Collateral (any such declaration made by the DIP Lender, an "Enforcement Notice").  During the Enforcement Notice Period (as defined below), the Debtor shall be entitled to use cash on hand solely in accordance with the Approved Budget.  After five (5) calendar days following the delivery of an Enforcement Notice (the "Enforcement Notice Period"), and following notice (which notice may run contemporaneously with the Enforcement Notice Period) and a hearing (a "Stay Relief Hearing"), provided that the Court rules at the Stay Relief Hearing that an Event of Default and the running of the Enforcement Notice period has occurred, the Court may fashion an appropriate remedy including lifting the automatic stay under Section 362 of the Bankruptcy Code to the extent necessary to permit the DIP Lender and Prepetition Lender to exercise remedies available to it under the DIP Loan Documents and the Prepetition Loan Documents, this Interim DIP Order or applicable law, subject to the Carve-Out and any Permitted Prior Liens.  During the Enforcement Notice Period, the Debtor and/or a Committee (if appointed) shall be entitled to seek an emergency hearing within the Enforcement Notice Period; provided that the sole issue that the Debtor may bring before the Court at any such emergency hearing is whether an Event of Default has occurred and/or is continuing, and the Debtor hereby waives its right to and shall not be entitled to seek relief, including under Section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Lender or the Prepetition Lender.

Notwithstanding the occurrence of an Event of Default or termination of the commitments to fund under the DIP Term Sheet or anything herein, all of the rights, remedies, benefits, and protections provided

to the DIP Lender under the DIP Loan Documents and the Interim DIP Order shall survive. This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.

        (b)    Upon an Event of Default, subject to the terms and conditions of the DIP Term Sheet, (i) the DIP Lender shall be permitted to accelerate the DIP Obligations of the Debtor, and (ii) the DIP Lender shall be permitted to terminate all commitments under the DIP Loan Documents. In any exercise of their rights and remedies upon an Event of Default, the DIP Lender is authorized to proceed under or pursuant to the DIP Loan Documents and this Interim DIP Order. All proceeds realized from any of the foregoing shall be turned over to the DIP Lender for application to the DIP Obligations pursuant to the DIP Loan Documents or the Prepetition Lender pursuant to the Prepetition Loan Documents.

        16.    **Transaction Proceeds; Survival of Protections**. Any and all net cash proceeds of an Asset Sale, of any DIP Collateral or debt issuance shall be remitted directly to the DIP Lender, as and when required under the DIP Loan Documents, for application in accordance with the terms of the DIP Term Sheet and this Interim DIP Order and following payment in full in cash of all of the DIP Obligations, to the Prepetition Lender for application against the Prepetition Lender Obligations in accordance with the terms of the Prepetition Loan Documents. If any proceeds remain following the payment of the full balance of the DIP Obligations and Prepetition Lender Obligations, such proceeds shall be held by the Debtor subject to further order of this Court. Without limitation of the generality of the foregoing, any and all net cash proceeds from any asset disposition of DIP Collateral shall be remitted directly to the DIP Lender, as and when required under the DIP Loan Documents, to repay the DIP Obligations in full in cash (except to the extent the DIP Lender or their affiliated designees, in their discretion, elect to (a) credit bid, or (b) receive debt securities issued by, or loans made to an entity which is the successful bidder for the Debtor's assets, in satisfaction of the DIP Obligations) and following payment in full in cash of all of the DIP Obligations, to the Prepetition Lender for application against the Prepetition Lender Obligations in accordance with the terms of the Prepetition Loan Documents. Unless and until the DIP Obligations are irrevocably repaid or

otherwise satisfied in full (including pursuant to a credit bid) or have been cash secured to the reasonable satisfaction of the DIP Lender, all commitments under the DIP Loan Documents to lend have irrevocably terminated, the protections afforded to the DIP Lender pursuant to this Interim DIP Order or the DIP Term Sheet, as applicable, and any actions taken pursuant thereto, shall survive the entry of any order confirming a Plan or converting the Case into Successor Cases, and the DIP Liens and DIP Superpriority Claims shall continue in these proceedings and in any Successor Cases, and such DIP Liens and DIP Superpriority Claims shall maintain their priority as provided by this the Interim DIP Order.

17.    **Modification of Automatic Stay**.  The automatic stay imposed under Bankruptcy Code Section 362(a) is hereby modified pursuant to the terms of the DIP Term Sheet as necessary to (a) grant the DIP Liens and to incur all liabilities and obligations to the DIP Lender under the DIP Loan Documents, the DIP Facility, and this Interim DIP Order, as applicable, and (b) authorize the DIP Lender to retain and apply payments hereunder.

18.    **Proofs of Claim**.  For the avoidance of doubt, the DIP Lender shall not be required to file proofs of claim in the Case or any Successor Cases and the Debtor's stipulations herein shall be deemed to constitute a timely filed proof of claim as may be necessary.  Any order entered by the Bankruptcy Court in connection with the establishment of a bar date for any claim (including without limitation administrative claims) in the Case or any successor cases shall not apply to the DIP Lender.

19.    **Release**.  Effective upon entry of this Interim DIP Order, but subject to paragraph 24 hereof, the Debtor and the Debtor's estate, on its own behalf and on behalf of each of its predecessors, their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge the DIP Lender, the Prepetition Lender and and its affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates and assigns, and predecessors and successors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations,

34

rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the Prepetition Loans, the Prepetition Liens, the Prepetition Loan Documents, the DIP Loans, the DIP Liens, the DIP Obligations, the DIP Loan Documents, this Interim DIP Order or the Final DIP Order, as applicable, and/or the transactions contemplated hereunder or thereunder (including the Restructuring Transaction (as defined in the Restructuring Term Sheet (as defined in the DIP Term Sheet)) contemplated in connection therewith), including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of th Prepetition Lender, the DIP Lender; provided, however, that nothing herein shall relieve any parties from fulfilling their obligations under the DIP Loan Documents or the Interim DIP Order.  These releases shall be binding on all parties in interest with respect to the Initial Advance, upon entry of the Interim DIP Order and shall be binding on all parties in interest with respect to all Subsequent Advances upon entry of the Final DIP Order.

20.    **Other Rights and Obligations**.

(a)    *Good Faith under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim DIP Order*.  Based on the findings set forth in this Interim DIP Order and in accordance with Section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Interim DIP Order, in the event any or all of the provisions of this Interim DIP Order are hereafter modified, amended or vacated by a subsequent order of this or any other Court, the DIP Lender is and will be entitled to the protections provided in Section 364(e) of the Bankruptcy Code and no such modification, amendment or vacation shall affect the validity and enforceability of any advances made hereunder or Lien or priority authorized or created hereby.  Notwithstanding any such modification, amendment or vacation, any claim

granted to the DIP Lender hereunder arising prior to the effective date of such modification, amendment or vacation of any DIP Protections granted to the DIP Lender shall be governed in all respects by the original provisions of the Interim DIP Order, and the DIP Lender shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Protections granted herein, with respect to any such claim.  Since the loans made pursuant to the DIP Term Sheet are made in reliance on the Interim DIP Order, the obligations owed the DIP Lender prior to the effective date of any stay, modification or vacation of the Interim DIP Order cannot, as a result of any subsequent order in the Case, or in any Successor Cases, be subordinated, lose their Lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status or priority of the DIP Liens and DIP Superpriority Claim granted to the DIP Lender under this Interim DIP Order and/or the DIP Loan Documents.  If any or all of the provisions of this Interim DIP Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall, to the extent provided in Section 364(e) of the Bankruptcy Code, not affect (i) the validity, priority or enforceability of any DIP Obligations incurred prior to the effective date of such reversal, stay, modification or vacatur or (ii) the validity, priority or enforceability of the DIP Liens or DIP Superpriority Claim.  Notwithstanding any such reversal, stay, modification or vacatur, any DIP Obligations incurred by the Debtor to the DIP Lender prior to the effective date of such reversal, stay, modification or vacatur shall, to the extent provided in Section 364(e) of the Bankruptcy Code, be governed in all respects by the original provisions of this Interim DIP Order, and the DIP Lender shall be entitled to all of the rights, remedies, privileges and benefits granted in Section 364(e) of the Bankruptcy Code, the Interim DIP Order and the DIP Loan Documents (with respect to all DIP Obligations).

(b)    *Expenses*.  Subject to the DIP Loan Documents, all reasonable and documented costs and expenses of the DIP Lender in connection with the DIP Loan and the Prepetition Lender in respect to the Prepetition Loans, whether incurred prior to or after the commencement of the Case, including, without limitation, reasonable, documented legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement of fees and expenses, and other out of pocket expenses will be paid by the Debtor in cash

on the Closing Date (to the extent incurred prior to such date) and, thereafter, on a bi-weekly basis, whether or not the transactions contemplated hereby are consummated; provided, however, that such costs and expenses incurred after the date of this Interim DIP Order shall be paid only after each relevant professional has provided copies of its fee and expense statements to the U.S. Trustee and counsel to any Committee appointed pursuant to Section 1102 of the Bankruptcy Code reasonably contemporaneously with the delivery of such fee and expense statements to the Debtor. Such statements may be in summary format and need not be submitted in the form of a fee application or comply with U.S. Trustee fee guidelines, but shall contain reasonable detail as to the number of hours worked and applicable hourly rates, but may be redacted to the extent necessary to delete any information subject to attorney-client privilege, any information constituting attorney work product or any other confidential information and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or any benefits of the attorney work product doctrine. The U.S. Trustee, any committee appointed pursuant to Section 1102 of the Bankruptcy Code or any other party in interest may object to the reasonableness of the fees, costs and expenses included in any professional fee invoice submitted hereunder, provided that, any such objection shall be forever waived and barred unless (i) it is filed with this Court and served on counsel to the parties seeking reimbursement no later than ten (10) days after the objecting parties received such applicable professional fee invoice, and (ii) it describes with particularity the items and categories of fees, costs and expenses that are subject to the objection and it provides for a specific basis for the objection to each category of fees, costs and expenses; provided, however, further that the Debtor shall pay all amounts that are not subject of any objection within ten (10) days of the applicable objection deadline. Any hearing on an objection to any payment of any fees, costs and expenses of such professionals shall be limited to the reasonableness of the particular items or categories of fees, costs, and expenses which are the subject to such objection.

(c)    *Binding Effect.*  The provisions of this Interim DIP Order shall be binding upon and inure to the benefit of the DIP Lender, and the Debtor and its respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtor or

with respect to the property of the estate of the Debtor) whether in the Case, in any Successor Cases, or upon dismissal of any such Chapter 11 or Chapter 7 Case.

(d) *No Waiver*. The failure of the DIP Lender to seek relief or otherwise exercise their rights and remedies under the DIP Loan Documents, the DIP Facility, or this Interim DIP Order, as applicable, shall not constitute a waiver of any of the DIP Lender's rights hereunder. Notwithstanding anything herein, the entry of this Interim DIP Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the DIP Lender under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the DIP Lender to (i) request conversion of the Case to a case under Chapter 7, dismissal of the Case, or the appointment of a trustee in the Case, or (ii) propose, subject to the provisions of Section 1121 of the Bankruptcy Code, a Plan or (iii) any of the rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Lender.

(e) *No Third-Party Rights*. Except as explicitly provided for herein, this Interim DIP Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

(f) *No Marshaling*. The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

(g) *Section 552(b)*. The DIP Lender shall be entitled to all of the rights and benefits of Section 552(b)(1) of the Bankruptcy Code and the "equities of the case" exception therein shall not apply.

(h) *Amendment*. The Debtor and the DIP Lender may amend, modify, supplement or waive any provision of the DIP Loan Documents, in accordance with the provisions thereof provided that, without Court approval, such amendment, modification, supplement or waiver, in the judgment of the Debtor and the DIP Lender, shall not materially affect the rights of third parties or is not material. Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by or on behalf of all the Debtor and the DIP Lender.

38

(i)     *Controlling Effect*.   In the event of a conflict between the express terms and conditions of the DIP Loan Documents and of the Interim DIP Order, the provisions of the Interim DIP Order shall govern and control.

(j)     *Enforceability*. This Interim DIP Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable effective as of the Petition Date immediately upon execution hereof.

(k)     *No Waivers or Modification of Interim DIP Order*.  The Debtor irrevocably waives any right to seek any modification or extension of this Interim DIP Order without the prior written consent of the DIP Lender, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

(l)     *Waiver of the Ten (10) Day Stay Under Bankruptcy Rule 6004(h)*.  The ten (10) day stay provisions of Bankruptcy Rule 6004(h) are waived and shall not apply to this Interim DIP Order.

(m)     *Preservation of Rights Granted Under this Interim DIP Order*.  Subject to the Carve-Out, no claim or lien having a priority senior to or *pari passu* with those granted by this Interim DIP Order to the DIP Lender shall be granted or allowed while any portion of the DIP Obligations remain outstanding, and, except as expressly contemplated by the DIP Loan Documents, the DIP Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under Section 551 of the Bankruptcy Code or, except as set forth in this Interim DIP Order, subordinated to or made *pari passu* with any other lien or security interest, whether under Section 364(d) of the Bankruptcy Code or otherwise.

(i)     Unless all DIP Obligations shall have been indefeasibly paid in full in cash or otherwise satisfied in accordance with the terms of the DIP Term Sheet, in the case of clause (A) below, the Debtor shall not seek, and in the case clauses (A) and (B) below, it shall constitute an Event of Default under the DIP Term Sheet if the Debtor seeks, or if there is entered, (A) any modification of the Interim DIP Order without the prior written consent of the DIP Lender, and no such consent shall be implied by any other action or inaction by the DIP Lender, or (B) an order converting or dismissing the Case.

39

(ii)    Except as expressly provided in this Interim DIP Order or in the DIP Loan Documents, the DIP Liens, the DIP Superpriority Claims and all other DIP Protections and rights and remedies of the DIP Lender granted by this Interim DIP Order and the DIP Loan Documents shall survive, and shall not be modified, impaired or discharged by (A) the entry of an order converting the Case to a case under Chapter 7 of the Bankruptcy Code, dismissing the Case, or (B) the entry of an order confirming a plan of reorganization in the Case and, pursuant to Section 1141(d)(4) of the Bankruptcy Code, the Debtor has waived any discharge as to any remaining DIP Obligations.  The terms and provisions of this Interim DIP Order and the DIP Loan Documents shall continue in the Case, in any Successor Cases, or in any superseding Chapter 7 case under the Bankruptcy Code, and the DIP Liens, the DIP Obligations, and the DIP Superpriority Claims, and all other rights and remedies of the DIP Lender granted by this Interim DIP Order and the DIP Loan Documents shall continue in full force and effect until all DIP Obligations are indefeasibly paid in full in cash or otherwise satisfied in accordance with the DIP Term Sheet.

(n)    *Payments Free and Clear.*  Any and all payments or proceeds remitted to the DIP Lender pursuant to the provisions of this Interim DIP Order or any subsequent order of this Court shall be irrevocable and received free and clear of any claim, charge, assessment or other liability.

(o)    *Information.*  The Debtor shall provide to the DIP Lender, counsel to the DIP Lender, and counsel to any Committee appointed (if any) written financial information or periodic reporting as required by the DIP Term Sheet.  The Debtor's advisors and management shall hold a weekly teleconference with the DIP Lender to discuss their business, operations, and financial performance.

(p)    *Limitation of Liability.*  In determining to make any loan under the DIP Term Sheet, or in exercising any rights or remedies as and when permitted pursuant to this Interim DIP Order or the DIP Loan Documents, the DIP Lender shall not be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).  Furthermore, nothing in this Interim DIP Order or in the

DIP Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the pre-petition or post-petition activities of any of the Debtor.

21.    **Exculpation**.  Nothing in this Interim DIP Order, the DIP Loan Documents, or any other documents related to the transactions contemplated hereby or thereby shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the DIP Facility.

22.    **Waiver**.  Other than the DIP Lender, no person or entity shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of Collateral or property after an Event of Default, or termination or breach under the DIP Loan Documents.

23.    **Rights to Credit Bid**.  The DIP Lender and Prepetition Lender shall have the right to (a) credit bid, and in such manner purchase (either directly or through one or more acquisition vehicles), all or any portion of the Prepetition Loans and/or the DIP Obligations at any sale of the DIP Collateral conducted under the provisions of the Bankruptcy Code, including under Section 363 of the Bankruptcy Code, Section 1123 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which the Debtor is subject, or (b) credit bid, and in such manner purchase (either directly or through one or more acquisition vehicles), all or any portion of the Prepetition Loans and/or the DIP Obligations at any other sale or foreclosure of the DIP Collateral and/or Prepetition Collateral conducted by the DIP Lender (whether by judicial action or otherwise) in accordance with applicable law, and shall have standing with respect to all aspects of any such sales or hearings related thereto.  Without limitation of the generality of the foregoing, the DIP Lender or its affiliated designee may elect to refinance the DIP Obligations through their receipt of debt securities issued by, or loans made to an entity which is the successful bidder for the Debtor's assets.  Notwithstanding the foregoing, any such credit bid on behalf of the DIP Lender or Prepetition Lender shall reduce the Prepetition Loans and/or DIP Obligations, as applicable, then-owing on a dollar-for-dollar basis in the amount of such credit bid.

24.    **Effect of Stipulations on Third Parties**.

(a)    *Generally*.    The admissions, stipulations, agreements, releases, and waivers set forth in this Interim DIP Order, including paragraph E and paragraph 19 (collectively, the "<u>Prepetition Lien and Claim Stipulations</u>") are and shall be binding on the Debtor.  In addition, the Prepetition Lien and Claim Stipulations shall be binding on any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including a Committee (if appointed), unless, and solely to the extent that, a party in interest with standing and requisite authority (other than the Debtor, as to which any Challenge (as defined below) is irrevocably waived and relinquished) (i) has timely filed the appropriate pleadings (including, but not limited to, a motion requesting that the Court grant it derivative standing to prosecute causes of action or other Challenges belonging to the estate, to which shall be attached a proposed draft complaint), and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 24) challenging the Prepetition Lien and Claim Stipulations (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "<u>Challenge</u>") by no later than sixty (60) days (A) from the date of formation of a Committee (if appointed), or (B) following the entry of this Interim DIP Order for any other party in interest with requisite standing (the "<u>Challenge Deadline</u>"), as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition Lender, or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline; <u>provided</u> that if a Chapter 11 trustee is appointed or the Case is converted to Chapter 7 prior to the expiration of the Challenge Deadline, the Chapter 11 trustee or Chapter 7 trustee, as applicable, shall have until the later of (1) the Challenge Deadline or (2) the tenth (10th) day after the appointment of the Chapter 11 trustee or the conversion of the Case to chapter 7, as applicable, to commence a Challenge, subject to any further extension by order of the Court; and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced

Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal.

a) *Binding Effect*.  To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien and Claim Stipulations, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Prepetition Lien and Claim Stipulations shall, pursuant to this Interim DIP Order, become binding, conclusive, and final on any person, entity, or party in interest in the Case, and their successors and assigns, and in any Successor Case for all purposes and shall not be subject to challenge or objection by any party in interest, including a trustee, responsible individual, examiner with expanded powers, or other representative of the Debtor's estate. Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Prepetition Lien and Claim Stipulations shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (a) above except to the extent that any of such Prepetition Lien and Claim Stipulations is expressly the subject of a timely and properly filed Challenge, which Challenge is successful as set forth in a final judgment as provided in subparagraph (a) above.  To the extent that any such Challenge proceeding is timely and properly commenced, the Prepetition Lender shall be entitled to payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred under the Prepetition Loan Documents in defending themselves in any such proceeding as adequate protection.  Upon a successful Challenge brought pursuant to this paragraph 24, the Court may fashion any appropriate remedy.

25.    **Break-Up Fee**.  The Court hereby approves the Break-Up Fee upon the terms set forth in the Restructuring Term Sheet and the DIP Term Sheet.  In the event that the Break-Up Fee becomes due and payable pursuant to the Restructuring Term Sheet, such fee shall constitute part of the DIP Obligations secured by the DIP Collateral and the superpriority administrative claims granted hereunder in respect to the DIP Facility.

26.    **Final Hearing**.

(a)    **The Final Hearing to consider entry of the Final DIP Order and final approval of the DIP Facility is scheduled for March 5, 2026 at 3:45 p.m. (ET), which shall occur remotely via ZOOM.**  If no objections to the relief sought at the Final Hearing are filed and served in accordance with

this Interim DIP Order, no Final Hearing may be held, and a separate Final DIP Order may be presented by the Debtor and entered by this Court.

(b)    On or before Tuesday, February 17, 2026, the Debtor shall serve, by U.S. mail, first-class postage prepaid, notice of the entry of this Interim DIP Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with copies of this Interim DIP Order, the proposed Final DIP Order and the DIP Motion, on: (i) the parties having been given notice of the Interim Hearing pursuant to paragraph D above; (ii) any party which has filed prior to such date a request for notices with this Court; (iii) counsel for any official committee appointed (if any); (iv) the Office of the United States Trustee; (v) the Internal Revenue Service; (vi) the United States Department of Justice; and (vii) counsel to the DIP Lender.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final DIP Order shall file written objections with the Clerk of this Court and serve any such objections so that the same are actually received on or before Tuesday, March 3, 2026 at 4:00 p.m. (Eastern Time) (the "**<u>Final DIP Objection Deadline</u>**") by: (i) the parties having been given notice of the Interim Hearing; (ii) any party which has filed prior to such date a request for notices with this Court;  (iii) counsel for any official committee appointed (if any); (iv) the Office of the United States Trustee; (v) the Internal Revenue Service; (vi) the United States Department of Justice; and (vii) counsel to the proposed DIP Lender. Notwithstanding the terms of this Interim DIP Order, this Court is not precluded from entering a Final DIP Order containing provisions that are inconsistent with, or contrary to any of the terms in this Interim DIP Order, subject to the protections under Section 364(e) of the Bankruptcy Code and the rights of the DIP Lender to terminate the DIP Term Sheet if such Final DIP Order is not acceptable to them.  In the event this Court modifies any of the provisions of this Interim DIP Order or the DIP Loan Documents following such further hearing, such modifications shall not affect the rights and priorities of DIP Lender pursuant to this Interim DIP Order with respect to the DIP Collateral, and any portion of the DIP Obligations which arises or is incurred, advanced or paid prior to such modifications (or otherwise arising prior to such modifications), and this Interim DIP Order shall remain in full force and effect except as specifically amended or modified at such Final Hearing.

27.    **Retention of Jurisdiction**.  This Court has and will retain jurisdiction to interpret and enforce this Interim DIP Order according to its terms.

###

**Submitted by:**
Joseph A. Pack, Esq.
*Counsel for the Debtor and Debtor-in-Possession*
Pack Law
51 Northeast 24th Street, Suite 108
Miami, Florida 33137
Tel: 305-916-4500
Email: joe@packlaw.com

Attorney Joseph A. Pack, Esq. is directed to serve a copy of this order on interested parties who do not receive service by CM/ECF pursuant to applicable rules.

**Exhibit A**

Approved Budget

**[TO COME]**

Debtor Cash Expenditures to Occur as Disclosed and Described at February 13, 2026 Hearing
Until the Approved Budget Is Agreed Upon Between the Debtor and DIP Lender

**<u>Exhibit B</u>**

**DIP Term Sheet**

**PAT MCGRATH COSMETICS LLC**
**DEBTOR-IN-POSSESSION FINANCING**
**FIRST-PRIORITY SENIOR SECURED DIP MULTI-DRAW TERM LOAN FACILITY**

***FOR DISCUSSION PURPOSES ONLY - NOT A COMMITMENT TO LEND***

This term sheet (this "Term Sheet") shall not become binding unless and until (1) the Term Sheet is signed by the DIP Lender (defined below) and the Debtor (defined below), and (2) the Interim Order (defined below) approving the DIP Facility (defined below) contemplated by this Term Sheet has been entered by the U.S. Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") which Interim Order shall include the application of sections 364(c), 364(d) and 364(e) of the Bankruptcy Code as prescribed in this Term Sheet. Prior to satisfaction of the two conditions set forth in the immediately preceding sentence, this Term Sheet shall be non-binding, for discussion purposes only and shall not be construed as a commitment of any kind to provide the DIP Facility. This Term Sheet shall be confidential until the DIP Lender (as defined below) provides its consent for it to be disclosed.

THIS TERM SHEET IS THE PRODUCT OF SETTLEMENT DISCUSSIONS BETWEEN THE DEBTOR AND THE DIP LENDER (AS DEFINED BELOW). ACCORDINGLY, THIS TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

This Term Sheet sets forth certain of the key terms and conditions by which GDA PMG FUNDING LLC (in its capacity as lender under the DIP Loan (as defined below), the "DIP Lender"), is willing to provide Pat McGrath Cosmetics LLC, as debtor and debtor-in-possession (the "Debtor" or the "Company" as applicable) [1] with a superpriority, senior secured DIP multi-draw term loan facility (the "DIP Facility") comprised of (a) New Money Loans (as defined below) in an aggregate principal amount of up to $10,000,000.00 (the maximum amount thereof, the "Commitment"), and (b) a roll-up of pre-petition indebtedness in the aggregate principal amount of up to $10,000,000.00 on a dollar-for-dollar basis for each dollar of New Money Loans authorized to be borrowed under the DIP Facility by the Bankruptcy Court.

This Term Sheet does not purport to summarize all of the terms, conditions, and other provisions with respect to the DIP Facility contemplated hereby. Unless otherwise stated herein, each material term set forth herein shall be included in a final, binding term sheet and an interim order and final order, each in form and substance satisfactory to the DIP Lender in its sole and absolute discretion (the "Interim Order" and the "Final Order", respectively, and together, the "DIP Order"), each authorizing the extension of the DIP Facility contemplated hereby.

---

[1] Pat McGrath Cosmetics LLC, as debtor and debtor-in-possession (individually, a "Debtor," and collectively, the "Debtors") in a case under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. commenced in the United States Bankruptcy Court for the Southern District of Florida (such case, the "Case", and such court, the "Bankruptcy Court").

[2] To the extent any non-debtor affiliate of the Company owns or shares any property (including, without limitation, any computer, website, domain, e-commerce channel, server, accounting or other operating system or data base) that is used in connection with the Company's business, then such affiliate shall guarantee and be jointly and severally liable in respect of, the DIP Facility and shall grant first priority liens on such respective assets, and all references to the "Company" or "Debtor" herein shall include each such non-debtor affiliate, mutatis mutandis, to the extent of the collateral described in this footnote.

| PROVISION | | TERMS |
|---|---|---|
| | | |
| **1. DIP LOANS:** | | Subject to closing conditions and reasonable documentation to be agreed upon, including, without limitation, the Bankruptcy Court's entry of the Interim Order and the Final Order (collectively, the "DIP Documentation") in form and substance satisfactory to the DIP Lender in its sole discretion, the DIP Lender, as the sole lender in connection with the DIP Facility agrees to provide the DIP Facility of up to $20 million (the "DIP Loan") as follows: <br><br> a) up to $10,000,000.00, in new cash advances (the "New Money Loans"); and <br><br> b) the "roll-up" into the DIP Facility (the "Roll-Up Loans"), of up to $10,000,000.00 (the "Roll-Up Amount") of prepetition loans (together with all principal, interest, costs and fees accrued thereon as of and after the Petition Date, the "Prepetition Loans") funded or otherwise held by GDA PMG Funding LLC ( in its capacity as lender prior to filing of the Case, the "Prepetition Lender") upon approval by the Bankruptcy Court of the Interim Order. <br><br> The New Money Loans will be made in multiple draws from time to time (though not more frequently than once per week), in each case, up to the dollar amount required for Debtor to pay its net disbursement (i.e. projected disbursements less projected receipts) as shown in the Approved Budget for the calendar week following delivery of Debtor's borrowing request (or in such other amounts acceptable to the DIP Lender in its sole and absolute discretion), subject to (w) receipt of five (5) business days' prior written notice of a borrowing request, (x) compliance with the Approved Budget as described below, (y) the absence of any Event of Default (as defined below) or any event, circumstance or condition, that with the passage of time, would become an Event of Default, and (z) satisfaction of the Conditions Precedent (as defined below) (in each case except to the extent the DIP Lender otherwise agrees in its sole and absolute discretion); provided, however, <br><br> i.  prior to approval by DIP Lender of an Approved Budget, DIP Lender shall have sole and absolute discretion as to whether to make any New Money Loan(s); <br> ii.  prior to the entry of the Final Order (as defined herein), the Debtor shall not be permitted to borrow New Money Loans (inclusive of amounts for the payment of Debtor's professionals and any Carve-Out) of more than |

$5,000,000.00 (the "Interim Loan Amount") in aggregate principal amount under the DIP Facility, such Interim Loan Amount to include funds sufficient to allow the Debtor to meet its payroll due on February 13, 2026 and such other amounts as may be approved by DIP Lender in its sole and absolute discretion (the "Initial Advance");

iii.   following entry of the Final Order, the Debtor may request and receive additional borrowings (or "advances") under the DIP Facility in accordance with the Approved Budget until the full $10,000,000.00 (excluding any PIK interest) in New Money Loans has been disbursed (each such advance a "Subsequent Advance");

iv.   once disbursed, New Money Loans may be repaid at any time but amounts so repaid may not be re-borrowed; and

v.   subject to Bankruptcy Court approval, upon entry of the Interim Order, the roll-up and deemed repayment of the Prepetition Loans shall automatically be deemed to occur in the amount of $10,000,000.00 shall automatically be deemed to have been rolled up into and shall become part of the DIP Facility.

Upon being drawn down, proceeds of the DIP Loans, which shall constitute the DIP Lender's Cash Collateral, will be deposited into a segregated bank account of the Debtor acceptable to the DIP Lender (each, a "DIP Account"); provided that the DIP Lender shall at all times have a perfected first priority lien thereon pursuant to the DIP Order and shall, at all times, have online access to review the status of the DIP Account, including all disbursements made therefrom, deposits, account statements and any other information that DIP Lender may request in connection therewith. So long as no Event of Default shall have occurred, amounts in the DIP Account may be used by a Debtor in accordance with the Approved Budget.

Any amounts remaining in the DIP Account at the maturity of the DIP Facility (whether by acceleration or otherwise) may be applied to reduce the DIP Obligations (as defined below) then outstanding, subject to payment in full in cash of the portion of the Carve-Out (as defined below) then incurred, plus the Post-Trigger Carve-Out Cap (as defined in the Interim Order) (solely to the extent that a Carve-Out Trigger Notice (as defined in the Interim Order) has then been delivered in accordance with Interim Order or Final Order, as applicable).

| | | As used herein, the term "<u>DIP Obligations</u>" shall mean all principal (including, but not limited to, any interest which is capitalized and added to principal hereunder), interest, fees, costs, expenses, charges and other amounts owing to the DIP Lender in respect of the DIP Facility including, but not limited to, the outstanding balance due in respect to the New Money Loans and the Roll-Up Loans, Alternative DIP Transaction Fee, Exit Fee, and the Break-Up Fee (as defined in the Restructuring Term Sheet (as defined below)). |
|---|---|---|
| **2. INTEREST RATE:** | | 12.5% per annum paid monthly in arrears on the last business day of each calendar month, either in cash or, at DIP Lender's sole discretion, in kind by automatically capitalizing any interest not paid in cash by adding it to the outstanding principal amount of the DIP Obligations monthly at 11:59 p.m. ET on the last calendar day of each month.<br><br>After the occurrence and during the continuance of an Event of Default, all outstanding DIP Obligations shall bear interest at an additional 7.50% per annum, which additional interest will be payable on demand. |
| **3. CASH COLLATERAL:** | | Subject to the terms and conditions of the DIP Order and any order(s) entered regarding Cash Collateral, the Debtor shall have the right to use, solely in accordance with the Approved Budget and as otherwise permitted under the DIP Facility, any Cash Collateral in which the Prepetition Lender or any other creditors of the Debtor may have an interest; provided that for each use and/or disbursement of such funds (a) DIP Lender has approved such use and/or disbursement in writing, and (b) subsequent to such disbursement Debtor shall deliver evidence satisfactory to DIP Lender in its sole discretion that the subject disbursement was made in the manner approved by DIP Lender.<br><br>The term "<u>Cash Collateral</u>", as used in this Term Sheet, shall have the meaning as defined in section 363(a) of the Bankruptcy Code.<br><br>The Interim Order and Final Order shall include provisions authorizing the Prepetition Lender to retain any cash in its possession or control which it received prior to or after the Petition Date that are proceeds of prepetition collateral as a result of exercising its rights as a secured creditor prior to the Petition Date following the occurrence of events of default and to the extent not applied prior to the Petition Date, to apply such amounts to the outstanding balance of the Prepetition Loans, in its sole |

| | |
|---|---|
| | discretion.  The Debtor shall also acknowledge in the Final Order that prior to the Petition Date, the Prepetition Lender received certain cash through the proper exercise of its post-default rights and remedies consistent with applicable law and appropriately applied such cash to the Prepetition Loans and the Interim Order and Final Order shall confirm that such cash does not constitute property of the estate.<br><br>Debtor shall provide daily reports showing all Debtor's deposits and disbursements with the report delivered before 10:00 AM (Eastern Time). |
| | |
| **4. CASH DOMINION:** | From and after the Closing Date, Debtor will cause or direct all cash receipts and collections received by the Debtor from all sources, including, without limitation, all proceeds from the sale of goods and inventory and other DIP Collateral, collection of accounts, credit card charges, to be transferred daily to the DIP Account.  To the extent required by DIP Lender, the Debtor will work with DIP Lender to implement cash management procedures satisfactory to the DIP Lender, including, but not limited to, the establishment of customary cash management arrangements (collectively, the "Cash Management Accounts"), which will provide for the DIP Lender to have control of certain other deposit and securities accounts as required by DIP Lender. |
| | |
| **5. FEES:** | **Commitment Fee**: None.<br><br>**Exit Fee**: The DIP Lender shall be entitled to receive an exit fee of $3,700,000 (the "Exit Fee"), at the earlier to occur of the (x) Maturity Date and (y) any the date on which (i) the other DIP Obligations are paid in full in cash or (ii) some or all of the DIP Obligations are credit bid in connection with any sale.  The Exit Fee shall be fully-earned as of the Closing Date.  For the avoidance of doubt, upon the Exit Fee being fully-earned, the Exit Fee shall constitute a DIP Obligation for the purposes of this Term Sheet and the Restructuring Term Sheet and shall receive the same treatment as the other DIP Obligations if the Plan of Reorganization is confirmed and shall otherwise be due and payable in cash or, in the discretion of DIP Lender (or any entity owned by the DIP Lender (or its designee)) may be included in a credit which may be submitted by the DIP Lender (or such designee). |
| | |

| | |
|---|---|
| **6. ALTERNATIVE DIP TRANSACTION FEE:** | In the event that the Plan of Reorganization (as defined below) is not consummated, the Debtor shall be required to pay to DIP Lender (in addition the payment in full of outstanding DIP Obligations, which shall include the aggregate amount of all payments and prepayments (voluntary, mandatory, by acceleration in connection with the exercise of rights and remedies or otherwise, or otherwise) paid to DIP Lender, in cash, with respect to the principal amount of the DIP Loan (including any such payments made on account of capitalized interest)) a fixed fee in the amount of $2,500,000.00, plus the DIP Lender's reasonable and documented out-of-pocket expenses, which are described in Section 28 herein (the "Alternative DIP Transaction Fee").<br><br>The Alternative DIP Transaction Fee shall be due and payable upon the earlier to occur of (i) the final repayment, including, without limitation, mandatory and/or optional prepayment (in connection with acceleration or otherwise), in full, of all DIP Obligations under the DIP Documentation, or (ii) the Maturity Date (other as a result of the Plan of Reorganization being confirmed by final, non-appealable order of the Bankruptcy Court). For the avoidance of doubt, the Alternative DIP Transaction Fee shall be due and payable no later than on the date of any credit bid of some or all of the Obligations submitted by the DIP Lender (or their designee, or any entity owned by the DIP Lender), thereby allowing the Alternative DIP Transaction Fee to be credit bid. |
| **7. REPAYMENT OF DIP FACILITY:** | The full outstanding balance of the DIP Obligations shall be due and payable in cash on the Maturity Date; provided, however, that the DIP Lender, in its sole discretion, may elect to equitize the DIP Loan and the Prepetition Loans pursuant to a plan of reorganization in form and substance satisfactory to it, subject to confirmation by the Bankruptcy Court. Any plan of reorganization proposed by the Debtor shall provide for either the payment in full in cash of all of the DIP Obligations and the Prepetition Loans or such other treatment as may be satisfactory to the DIP Lender and Prepetition Lender in its sole discretion, it being acknowledged that the Plan of Reorganization (as defined below) would be satisfactory to the DIP Lender. |
| **8. CREDIT BID:** | The DIP Lender may, at its sole and absolute discretion, credit bid all or any portion of the DIP Obligations (including the Alternative DIP Transaction Fee, the Exit Fee and the Break Up Fee (as defined in the Restructuring Term Sheet)) and the Prepetition Loans, in addition to any other amounts owing to the DIP Lender |

| | |
|---|---|
| | or Prepetition Lender, as part of any bid submitted in a sale of any portion or all the Debtor's assets pursuant to Section 363(k) of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code. |
| **9. MANDATORY PREPAYMENTS:** | The following mandatory prepayments of the DIP Facility are required:<br><br>(a) <u>Asset Sales</u>:  Immediately following the receipt by Debtor, prepayments in an amount equal to 100% of the proceeds (net of out of pocket, commercially reasonable transaction-related expenses determined acceptable by the DIP Lender, amounts then incurred in respect of the Carve-Out (plus the Post-Trigger Carve-Out Cap (solely to the extent that a Carve-Out Trigger Notice has then been delivered in accordance with Interim Order or Final Order, as applicable)), and amounts of such proceeds due and payable to holders of Permitted Prior Liens (as defined below) on the assets being disposed) of the sale or other disposition of any property or assets (including inventory) of Debtor outside the ordinary course of business ("<u>Asset Sale</u>").<br><br>(b) <u>Insurance Proceeds</u>:  Immediately following the receipt by Debtor, prepayments in an amount equal to 100% of the insurance and condemnation proceeds (net of reasonable transaction-related expenses determined acceptable by DIP Lender, amounts then incurred in respect of the Carve-Out (plus the Post-Trigger Carve-Out Cap (solely to the extent that a Carve-Out Trigger Notice has then been delivered in accordance with Interim Order or Final Order, as applicable)), and amounts of such proceeds due and payable to holders of Permitted Prior Liens on lost or damaged assets) received on account of any loss of or damage to any property or assets of Debtor. |
| **10. MATURITY DATE:** | The DIP Loan along with all outstanding interest, fees and expenses accrued and unpaid thereon shall be due and payable on the earliest of: (i) April 14, 2026; (ii) the effective date of a Plan of Reorganization for the Debtor confirmed by final, non-appealable order of the Bankruptcy Court; (iii) the date of a sale of all or substantially all of the assets of the Debtor; or (iv) acceleration of the DIP Loans upon or following the occurrence of an Event of Default (the "<u>Maturity Date</u>"). |
| **11. USE OF PROCEEDS:** | The DIP Loan may only be used for working capital, operating expenses, administrative expenses, and critical vendor payments |

|  | (if and as approved by the Bankruptcy Court) solely in accordance with the Approved Budget (as defined below). |
|  |  |
| **12. CLOSING DATE:** | The Initial Advance shall be made within three (3) business days of entry of the Interim Order except if needed sooner to meet the payroll due on February 13, 2026. |
|  |  |
| **13. SECURITY AND PRIORITY:** | The DIP Loan, including interest and fees, shall be secured by fully perfected first priority liens and security interests on all of Debtor's assets, pre-and post- petition, now or hereafter acquired, whether held directly or indirectly, subject only to any valid and perfected Permitted Prior Liens (defined below), including but not limited to, accounts, accounts receivable, books and records, cash collateral, cash and cash equivalents, chattel paper (including tangible and electronic chattel paper), commercial tort claims, contracts, contract rights, copyrights and copyright applications, creative assets, deposit accounts, documents (including negotiable documents), documents of title, domains, equipment (including, computer, servers and all accessions and additions to any equipment), general intangibles (including payment intangibles and software), goods, fixtures, insurance contracts and insurance proceeds, instruments, promissory notes, intellectual property, intellectual property licenses, leases, inventory, investment property, letter of credit rights, money, patents and patent applications, real property, securities, tax and other refunds, trade names, trademarks and trademark applications, websites, and all proceeds and supporting obligations thereof or relating thereto; all property of the estate of the Debtor wherever located within the meaning of section 541 of the Bankruptcy Code; and all books and records with respect to any of the foregoing, the computers and equipment containing said books and records, including, but not limited to, the proceeds from any recovery for the benefit of the Debtor's estates made on or on account of the avoiding powers outlined in Chapter 5 of the Bankruptcy Code (the "Avoidance Actions"), but such Avoidance Actions themselves shall not be subject to any lien (collectively, the " DIP Collateral"). <br><br>Such liens shall be deemed automatically perfected without the need to make filings or record any documentation under applicable non-bankruptcy law, provided, however, DIP Lender shall have the right to make any such filings or record any such instruments if it elects to do so in its sole discretion. <br><br>The DIP Loan and other liabilities and obligations of Debtor to DIP Lender under the DIP Loan (including, without limitation, any advances for legal fees and expenses) shall be: |

Page 8

(i)     Pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in the Case over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in, among other sections, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, 1114 and any other provision of the Bankruptcy Code, including, but not limited to, priority over the $1,000,000.00 debtor-in-possession loan made by Patricia A. McGrath (the "McGrath DIP") as approved on an interim basis by the Bankruptcy Court on or about February 2, 2026, under the *Interim Order Granting Debtor's Emergency Motion For Entry Of An Order (I) Authorizing The Debtor To Obtain Post-Petition Financing Pursuant To Sections 105(a), 362, 364(c) Of The Bankruptcy Code, And (II) Granting Super Priority Claims To The DIP Lender Pursuant To Section 364(c)(1) Of The Bankruptcy Code* (ECF No. 62) (the "McGrath Interim DIP Order");

(ii)    Pursuant to section 364(d) of the Bankruptcy Code, secured by valid, perfected, first-priority, priming and senior security interests and liens in and on the DIP Collateral, not subject to subordination or any other liens; and all existing liens, rights and interests in the DIP Collateral shall be primed and made subject to and subordinate to the perfected first priority senior liens to be granted to DIP Lender, for the benefit of DIP Lender, which senior priming lien in favor of the DIP Lender shall also prime any liens including without limitation adequate protection liens granted after the commencement of the Case;

(iii)   Pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by valid junior perfected security interests in and liens on all property of Debtor that is subject to: (a) non-avoidable, valid and perfected liens in existence as of the Petition Date, or (b) non-avoidable valid liens in existence as of the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code, which in each case had priority over the liens securing the Prepetition Loans under applicable state law as of the Petition Date (such liens described in (a) and (b) above, collectively, the "Permitted Prior Liens"); and

| | |
|---|---|
| | (iv)    Pursuant to section 364(c)(2) of the Bankruptcy Code, secured by valid, perfected, first-priority security interests and liens not subject to subordination in and on all DIP Collateral that is not otherwise subject to Permitted Prior Liens that are not subject to non-avoidable, valid and perfected liens.<br><br>In no event shall DIP Lender be subject to the equitable doctrine of marshalling or any similar doctrine with respect to the DIP Collateral. DIP Lender shall be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception of section 552(b) shall not apply to DIP Lender with respect to proceeds, products, offspring, or profits of any of the DIP Collateral.  The DIP Collateral and the DIP Loans shall not be subject to surcharge by the Debtor, a subsequently appointed chapter 11 or chapter 7 trustee or any other party in interest pursuant to Bankruptcy Code 506(c), such surcharge rights being irrevocably waived. |
| | |
| **14. CONDITIONS PRECEDENT TO THE INITIAL ADVANCE:** | The DIP Lender shall have no obligation to make any DIP Loan unless and until the following conditions are deemed to have been satisfied in full by DIP Lender in its sole and absolute discretion (collectively, the "Conditions Precedent"):<br><br>a)    The Bankruptcy Court shall have entered an Interim Order approving the DIP Loan on an interim basis, in form and substance satisfactory to DIP Lender in its sole and absolute discretion, which order shall be in full force and effect and shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of DIP Lender (which consent may be withheld in its sole discretion), which Interim Order shall among other things (i) authorize and approve the DIP Loan on an interim basis and the transactions contemplated thereby, including, without limitation, the granting of the super-priority status, security interests and liens, and the payment of all fees referred to herein; and (ii) provide for enforcement of DIP Lender's rights and remedies with respect to the DIP Loan on terms acceptable to DIP Lender, including without limitation a provision allowing DIP Lender the right to request an expedited hearing (on at least five business days' prior written notice) on a motion for relief from stay to enforce such rights and remedies; |

b) The Debtor and DIP Lender shall have agreed upon an Approved Budget;

c) All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Loan shall be in form and substance satisfactory to DIP Lender in its reasonable discretion, and said orders shall not be subject to any stay or injunction or otherwise subject to reversal on appeal as to any funded portion of the DIP Loans;

d) The DIP Documents or a Bankruptcy Court order shall incorporate cash management provisions that are satisfactory to the DIP Lender, in its sole and absolute discretion;

e) The Debtor shall provide accounting back up for detailing the amounts required to fund the payroll due on February 15, 2026, satisfactory DIP Lender in its sole and absolute discretion;

f) Debtor shall have continued (i) the critical vendors motion filed as ECF 5 and (ii) the utilities motion filed as ECF 7, in each case, until Debtor and DIP Lender have reached a mutually satisfactory agreement as to the relief sought therein;

g) The Debtor shall have executed the Restructuring Term Sheet with the DIP Lender and Prepetition Lender attached hereto as Exhibit A (the "Restructuring Term Sheet"), which Restructuring Term Sheet contemplates the Debtor's agreement to prosecute a plan of reorganization consistent with such Restructuring Term Sheet, which Restructuring Term Sheet and plan shall be in form and substance and satisfactory to DIP Lender its sole and absolute discretion (the "Plan of Reorganization");

h) The Debtor shall have appointed a Chief Restructuring Officer, pursuant to terms approved by DIP Lender in its sole and absolute discretion (the "CRO") (the DIP Lender acknowledging that an employee of Paladin Management, LLC approved by the DIP Lender shall be acceptable to it), which CRO shall have, until as other provided under the Plan of Reorganization, the sole individual authority to (i) represent and bind the Debtor, and (ii) authorize any and all disbursements by Debtor;

<table>
<tr><td></td><td>

i) An appointment of a Chapter 11 trustee or the conversion to Chapter 7 ("<u>MAC</u>") has not occurred; and

j) An Event of Default or event which with the passage of time or the giving of notice would constitute an Event of Default shall not have occurred.

The DIP Lender may waive any of the conditions precedent at any time or from time to time, including, without limitation, in respect of the DIP Loans advanced (or deemed advanced) to repay or create reserves for the repayment of the Prepetition Loans.

</td></tr>
<tr><td>

**15. CONDITIONS PRECEDENT TO SUBSEQUENT ADVANCES:**

</td><td>

On the funding date of each Subsequent Advance, the following additional conditions precedent shall have been satisfied or waived by DIP Lender:

a) All conditions precedent to the Initial Advance shall be satisfied;

b) There shall exist no Event of Default;

c) The Debtor shall have submitted a borrowing request in form and substance acceptable to the DIP Lender specifying the amount to be borrowed under the DIP Facility no later than five (5) business days prior to the proposed borrowing date; provided that any such borrowing request other than one in respect to the payroll due on or about February 15, 2026, shall be for a minimum of $250,000.00 (and in $50,000.00 increments if such request is for greater than the minimum amount);

d) With respect to the time period after entry of the Interim Order, the DIP Lender shall have received a copy of, or a certificate as to coverage under, the insurance policies in accordance with requirements that are customary for loan documents of this type and shall name the DIP Lender, on behalf of the DIP Lender, as additional insured or loss payee (as applicable), in form acceptable to DIP Lender;

e) The Debtor has complied with all DIP Milestones (as defined below) that were scheduled to occur prior to the date of such Subsequent Advance;

f) The representations and warranties of Debtor in the DIP Documentation shall be true and correct in all material respects;

</td></tr>
</table>

|  | g) Subject to Bankruptcy Court approval as may be required, all fees and expenses (including, without limitation, reasonable fees and expenses of counsel) of DIP Lender invoiced on or before the date of such advance have been paid;<br><br>h) The making of such DIP Loan shall not violate any requirement of applicable law and shall not be enjoined, temporarily, preliminarily or permanently;<br><br>i) The Interim Order and, following its entry, the Final Order shall be in full force and effect and shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of DIP Lender (which consent may be withheld in its sole discretion);<br><br>j) Debtor shall have operated in accordance with the Approved Budget prior to such advance, except for deviations which do not exceed Permitted Variances;<br><br>k) All first day orders that are filed in the Chapter 11 Cases entered by the Bankruptcy Court shall be reasonably acceptable to DIP Lender; and<br><br>l) No Event of Default has occurred and is continuing or would be reasonably expected to result after giving effect to any requested DIP Loan.<br><br>In addition, the Debtor shall be in compliance in all material respects with all the terms and provisions set forth herein and in the other DIP Documentation, and, at the time of and immediately after giving effect to such DIP Loan and the application of the proceeds thereof, no Event of Default shall have occurred and be continuing on such date or would be reasonably expected to result after giving effect to any requested DIP Loan.<br><br>The DIP Lender may waive any of the conditions precedent at any time or from time to time, including, without limitation, in respect of the DIP Loans advanced (or deemed advanced) to repay or create reserves for the repayment of the Prepetition Loans. |
| **16. CARVE-OUT:** | The DIP Loan shall provide for a carve-out for (i) the unpaid fees and interest due and payable to the Clerk of the Bankruptcy Court and the Office of the United States Trustee pursuant to 28 U.S.C. |

| | |
|---|---|
| | § 1930; (ii) the fees and expenses of a Chapter 7 or Chapter 11 trustee if one is appointed in the Cases, not to exceed $25,000.00; and (iii) the payment of all (a) allowed and (b) then accrued but unpaid (i.e. work-in progress amounts due and owing) but not yet subject to a fee application or allowance, for professional fees incurred by Debtor prior to the earlier to occur of the Maturity Date or the occurrence of an Event of Default hereunder (the "Carve-Out Trigger Date"), subject in each case to the Approved Budget, and allowance by the Bankruptcy Court (the "Pre-Carve-Out Trigger Amount"), and (ii) professional fees and expenses of the Debtor's professionals incurred in the Case after the Maturity Date in an amount not to exceed $50,000.00 in the aggregate (the "Post-Trigger Carve-Out Cap"; and, in the aggregate with clauses (i),(ii),(iii) and (iv) the "Carve-Out"). |
| | |
| **17. ADEQUATE PROTECTION:** | No adequate protection shall be provided to any prepetition creditor, except on terms acceptable to DIP Lender in its sole and absolute discretion. The Prepetition Lender shall be entitled to the following adequate protection:<br><br>a) Acknowledgement of the amount of prepetition indebtedness in the DIP Orders as an allowed , duly perfected senior secured claim, subject only to the DIP Loans and any Permitted Prior Liens;<br><br>b) Superpriority administrative expense claims, junior only to the Carve-Out and the superpriority claim granted hereunder in respect to the DIP Obligations;<br><br>c) Replacement liens in all assets of the Debtor (subject only to the Carve-Out, Permitted Prior Liens, and the liens securing the DIP Loan), which replacement liens shall be automatically perfected without the necessity of additional filings or actions; and<br><br>d) Interest shall continue to accrue on, be added to and constitute part of the Prepetition Loans for purposes of this DIP Term Sheet (and the GDA Prepetition Claims (as defined in the Restructuring Term Sheet)) but shall not be payable in cash prior to the Maturity Date, and such accrued post-petition interest shall be entitled to the same treatment as the Prepetition Loans.<br><br>Additionally, pursuant to the DIP Orders, as adequate protection for any diminution in the value of its collateral during the Case, to the extent it is determined by final, non-appealable order of the |

|  | Bankruptcy Court to have an allowed secured claim, Keyhaven PMG Blocker, Inc. ("Keyhaven" and the "Keyhaven Loans") shall be granted junior replacement liens (the "Keyhaven Junior Replacement Liens") in the DIP Collateral, subject to (i) the Carve-Out, (ii) any Permitted Prior Liens, (iii) the Prepetition Liens (as defined below), and (iv) the liens securing the DIP Loan. The Keyhaven Junior Replacement Liens shall be deemed to be automatically perfected without necessity of additional filings or actions, provided, however, that such Keyhaven Junior Replacement Liens and Keyhaven's prepetition loans and any other claims shall be subject to the subordination and other provisions of that certain Limited Consent and First Amendment to Secured Promissory Note dated as of April, 29, 2025, by and among the Debtor, Keyhaven and Prepetition Lender, which agreement shall remain in full force and effect and continue to govern as between Keyhaven, on the one hand, and the Prepetition Lender, on the other hand; provided, further, however, that the limitation on subordination provided thereunder shall not apply to the amount of the DIP Loans entitled to priority hereunder and under the DIP Orders. |
|---|---|
|  |  |
| **18. STIPULATIONS:** | The Debtor shall stipulate in each DIP Order as follows:<br><br>a) The Prepetition Loans in the aggregate of amount $37,425,180.94 are each valid, binding, and enforceable in accordance with their respective terms.<br><br>b) The Prepetition Lender's prepetition liens (collectively, the "Prepetition Liens") are valid, binding, perfected and enforceable liens against the property described in the prepetition security documents (collectively, the "Prepetition Collateral"), senior to all other prepetition liens and claims other than any Permitted Prior Liens.<br><br>c) The Debtor does not have any claims or counterclaims against DIP Lender affecting the validity, payment, or enforceability of the prepetition liens or prepetition claims, including, without limitation or, to the extent such claims or counterclaims exist, Debtor releases such claims or counterclaims. |
|  |  |
| **19. DEBTOR PROFESSIONALS:** | The DIP Lender shall not object to the proposed retention of the Debtor's professionals on February 13, 2026, including, as applicable, (i) Pack Law, as restructuring counsel; (ii) Gordian |

<table>
<tr>
<td></td>
<td></td>
<td>

Group, LLC, as investment bank and financial advisor; and (iii) Paladin Management Group, LLC, which shall provide the CRO (and such other personnel approved by DIP Lender in its sole and absolute discretion).

The DIP Lender agrees that the Carve-Outs that apply to the foregoing professionals are as follows, in the aggregate: (i) Pack Law, $1,000,000.00; (ii) Gordian Group, LLC ("Gordian"), (A) if the Plan of Reorganization (or an alternative plan that is otherwise supported by the DIP Lender in its sole discretion) is consummated, a flat fee of $1,950,000 (inclusive of success fees, monthly payments of $75,000, and all other amounts (except for reasonable expenses) paid under the Gordian engagement letter), (B) in the event the DIP Obligations and Prepetition Loans are repaid in full in cash, the terms otherwise contemplated in the Gordian engagement letter, and (C) otherwise, monthly payments of $75,000 per month for up to three (3) months; and (iii) Paladin Management Group, LLC, $500,000.

The DIP Lender shall not object to the proposed retention of the professional listed in the immediately preceding paragraph, but any additional professionals that are proposed to be retained in the Case shall be subject to pre-approval by DIP Lender in its sole and absolute discretion.

</td>
</tr>
<tr>
<td>

**20. EVENTS OF DEFAULT:**

</td>
<td></td>
<td>

The DIP Loan shall benefit from customary and otherwise appropriate events of default (each an "Event of Default"), including, without limitation, the following:

    a)  Unless extended by DIP Lender in DIP Lender's sole discretion, if a Final Order shall not have been entered by March 13, 2026, that is satisfactory to the DIP Lender in its sole discretion and which shall contain, among other things: (i) findings regarding the good faith of DIP Lender; (ii) the protections of Bankruptcy Code section 364(e); (iii) a requirement to comply with the DIP Milestones; and (iii) restrictions on the entry of any future order of the Bankruptcy Court dismissing or otherwise disposing of the Case unless and until the DIP Loan is repaid, in cash, in full;

    b)  Any failure to comply with the DIP Milestones (defined below) as of the date required;

    c)  Filing of any motion by Debtor seeking to obtain credit or incur indebtedness, or the taking of any other action

</td>
</tr>
</table>

by or on behalf of Debtor to obtain any credit or incurrence of indebtedness, that is: (x) secured by a security interest, mortgage or other lien on all or any portion of the DIP Collateral, or (y) entitled to administrative priority status which is equal or senior to claims of the DIP Lender (other than the Carve-Out) described in this Term Sheet unless the full outstanding amount of the DIP Obligations are to be repaid in cash from the proceeds of such indebtedness;

d) Institution of any judicial proceeding by Debtor seeking to challenge the validity of any portion of the DIP Documentation, the DIP Obligations, any of the obligations under the Prepetition Loans or the applicability or enforceability of same or which seeks to void, avoid, limit, subordinate or otherwise adversely affect any security interest created by or in relation to the DIP Documentation;

e) Failure of any condition precedent identified herein;

f) Failure of Debtor to timely comply with any DIP Milestones or the failure of the Debtor to incorporate the DIP Milestones into any bidding procedures motion;

g) The failure of Debtor to comply with reporting requirements as specified in the DIP Documentation, including, without limitation, the failure to provide to DIP Lender on a daily basis reports or other requested information;

h) Entry of an order dismissing the Case or converting the Case to a case under Chapter 7 of the Bankruptcy Code;

i) The failure of Debtor to (i) pay when due any principal (whether by scheduled maturity, acceleration, demand or otherwise), or (ii) pay within three (3) days of the due date thereof any interest, fee, indemnity or other amount payable under the DIP Loan when due (whether by scheduled maturity, acceleration, demand or otherwise);

j) The Debtors' support for, filing of pleadings seeking or the entry of an order of the Bankruptcy Court confirming a plan of reorganization in the Case or

approving a transaction pursuant to which a sale or other liquidation of all or substantially all of the assets of Debtor is contemplated (a "<u>Sale Transaction</u>"), which is not supported by the DIP Lender or which does not (i) contain a provision for the payment in full in cash of all of the DIP Obligations on or before the effective date of such plan or such Sale Transaction; or (ii) provide for such alternative treatment that may be satisfactory to the DIP Lender and Prepetition Lender in their sole discretion, it being agreed that the treatment described in the Restructuring Term Sheet would be satisfactory to the DIP Lender and Prepetition Lender;

k)  The entry of an order by the Bankruptcy Court dismissing the Case that does not contain a provision for the payment in full in cash of the DIP Loan and Prepetition Loan upon entry thereof;

l)  The entry by the Bankruptcy Court or an appellate court of an order with respect to the Case that (i) revokes, reverses, stays, modifies, supplements or amends the Interim Order and/or Final Order, except as consented to by DIP Lender in its sole and absolute discretion; (ii) permits any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the priority of DIP Lender, not in accordance with the terms of this Term Sheet and the Interim Order and/or Final Order; or (iii) grants or permits the grant of a lien on any DIP Collateral, not in accordance with the terms of this Term Sheet and the Interim Order and/or Final Order;

m)  Except as otherwise agreed by DIP Lender, the entry of an order by the Bankruptcy Court that is not stayed pending appeal granting relief from the automatic stay to any creditor of Debtor with respect to any claim asserted to exceed $100,000.00 in the aggregate (other than workers' compensation claims that are fully covered by insurance in the ordinary course of business) or permitting foreclosure on any material asset of Debtor;

n)  Any attempt by Debtor or a party acting on behalf of the Debtor's bankruptcy estates to challenge invalidate,

reduce or otherwise impair the indebtedness, liens or security interests of DIP Lender or Prepetition Lender;

o) Any attempt by Debtor, without the explicit consent of DIP Lender, to (i) reconstitute its board(s) of directors; (ii) remove any retained Chief Restructuring Officer (or similar Financial Advisory Firm) or their acceptable replacement(s), including the CRO, or (iii) retain or hire any advisor or third-party consultant not contemplated in the Approved Budget;

p) The commencement by motion or otherwise of any sale of any material assets of Debtor or any subsidiaries of Debtor, excluding sales of inventory made in the ordinary course of business, at any time during the Case, unless such sale either (i) provides for all net sale proceeds to be paid first to satisfy the full outstanding balance of the DIP Loan and Prepetition Loan; or (ii) is conducted on terms and with procedures that have been approved in advance by DIP Lender in its sole and absolute discretion;

q) Any disruption of the business operations of Debtor that has a material adverse effect after the date hereof, which, for the avoidance of doubt, shall include the termination of any contract with a supplier or material customer and/or a material reduction in the number of stores selling products of the Debtor;

r) The appointment of an interim or permanent trustee in the Case or the appointment of a receiver or an examiner in the Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of Debtor;

s) The payment of, or application for authority to pay, any pre-petition claim without the DIP Lender's prior written consent (including by email) or unless otherwise permitted under the Approved Budget;

t) The allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against DIP Lender, their claims or the DIP Collateral (other than with respect to the payment of the Carve-Out);

| | | |
|---|---|---|
| | u) | The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor to foreclose upon or enforce a lien or other interest in any DIP Collateral with an aggregate value in excess of $100,000.00; and/or |
| | v) | The Debtor proposes or supports, directly or indirectly, any plan of reorganization or sale or entry of any confirmation order or sale order that is not supported by the DIP Lender or conditioned upon the indefeasible payment in full in cash, upon the consummation of such plan of reorganization or such Sale, of all DIP Obligations and the Prepetition Loans. |
| **21. Remedies Upon Occurrence of an Event of Default:** | | Immediately upon the occurrence and during the continuance of any Event of Default (following the expiration of any applicable grace period), DIP Lender may, subject to the terms of the DIP Order and upon written notice to counsel for the Debtor, the Office of the United States Trustee (subject to the provisions of the immediately following paragraph with respect to any enforcement action by the DIP Lender against any DIP Collateral): (i) (a) declare all or any portion of the DIP Obligations to be immediately due and payable; (b) declare the termination, reduction or restriction of any further commitment to extend credit to the Debtor, to the extent any such commitment remains; (c) terminate the DIP Facility and the DIP Documentation as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Obligations, the DIP Liens (as defined in the Interim Order), DIP Super-Priority Claims (as defined in the Interim Order) or the other DIP Protections (as defined in the Interim Order); (ii) declare a termination, reduction, or restriction on the ability of the Debtor to use any Cash Collateral; and/or (iii) subject to the next paragraph, exercise all default-related rights and remedies, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under Sections 362 or 105 of the Bankruptcy Code or otherwise.<br><br>In addition, upon the occurrence of any Event of Default (following the expiration of any applicable grace period), and subject to the terms of the DIP Order and following the giving of five (5) business days' prior written notice to counsel for the Debtor, and the Office of the United States Trustee, the DIP Lender shall have relief from the automatic stay to foreclose on all or any portion of the DIP Collateral, collect accounts receivable and apply |

| | |
|---|---|
| | the proceeds thereof to the DIP Obligations (subject to payment in full in cash of the Carve-Out), occupy the Debtor's premises to sell or otherwise dispose of the DIP Collateral or otherwise exercise remedies against the DIP Collateral permitted by applicable non-bankruptcy law.  During such five (5) business day notice period, the Debtor and the Office of the United States Trustee shall be entitled to any emergency hearing with the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred and is continuing.   Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred or is not continuing, then (i) the automatic stay, as to the DIP Lender, shall be automatically terminated at the end of such notice period, without further notice, hearing or order, (ii) neither Section 105 nor any other provision of the Bankruptcy Code shall be utilized to preclude or restrict the DIP Lender from exercising its default-related rights and remedies, and (iii) the Debtor shall cooperate with the DIP Lender to effect an orderly liquidation of its DIP Collateral on terms and conditions acceptable to the DIP Lender in its sole and absolute discretion. |
| | Without limiting the foregoing, upon the request of the DIP Lender following the occurrence and during the continuance of any Event(s) of Default, if so directed by the DIP Lender, the Debtor shall use commercially reasonable efforts to sell all or such portion of the DIP Collateral as the DIP Lender shall specify and on such terms and conditions and pursuant to such bidding procedures as are acceptable to the DIP Lender in its sole and absolute discretion, and remit the proceeds therefrom to the DIP Lender for application to the DIP Obligations (subject to payment in full in cash of the Carve-Out), and in connection with the foregoing, the Debtor shall file and use commercially reasonable efforts to pursue one or more motions under Section 363 of the Bankruptcy Code, in form and substance satisfactory to the DIP Lender, for the entry of order(s) of the Bankruptcy Court (in form and substance satisfactory to the DIP Lender) approving bidding procedures (acceptable to the DIP Lender in its sole and absolute discretion) governing each such sale of DIP Collateral and approving each such sale of DIP Collateral that has been approved by the DIP Lender in its sole and absolute discretion. |
| **22. REPRESENTATIONS AND WARRANTIES:** | The Debtor represents and warrants to DIP Lender that the representations and warranties listed in **Exhibit B** attached hereto are true and correct. |
| | |

| 23. AFFIRMATIVE AND NEGATIVE COVENANTS: | The Debtor shall comply with the affirmative and negative covenants provided in Section 6(a) and Section 6(b) of the GDA Loan Agreement (as defined in the Interim Order), which covenants shall be deemed incorporated herein and to apply to the DIP Loans. Further, Debtor shall provide DIP Lender with copies of all records, reports, or information and other materials reasonably requested from time to time by DIP Lender in connection with its monitoring or review of the Approved Budget. In addition, Debtor shall cooperate with and permit representatives of DIP Lender to (i) have access to the DIP Collateral, Debtor's books and records, Debtor's bank accounts; and (ii) perform daily reviews of the Debtor's activities with designated employees, managers and/or representatives of the Debtor. |
|---|---|
| **24. CONSENTS:** | Any amendments, waivers and modifications to the terms of the DIP Loan and/or to the DIP Documentation will require consent of DIP Lender. No waiver of any of the provisions of this Term Sheet shall be deemed or constitute a waiver of any other provision of this Term Sheet, whether or not similar, nor shall any waiver be deemed a continuing waiver. |
| **25. BUDGET COVENANTS:** | As soon as reasonably practicable, Debtor shall submit to DIP Lender a proposed budget, which budget shall be subject to DIP Lender's approval in its sole and absolute discretion, and which budget may be amended from time to time with the prior written consent of the DIP Lender (as it may be so be approved and subsequently amended, the "Approved Budget").

The Approved Budget shall at all times reflect a 4-week cash flow commencing on February 13, 2026, containing line items of sufficient detail to reflect Debtor's projected receipts and disbursements for each week for such period, with updates to be made each week by Thursday of each week for the succeeding 4-week period, which updated budget shall become the Approved Budget if approved by the DIP Lender (the "Cash Flow Statement").

Together with each Cash Flow Statement, the Debtor shall provide DIP Lender with a report reflecting the actual disbursements for each one-week period ending the Saturday preceding each date on which the Cash Flow Statement is to be delivered and showing the dollar and percentage variances of actual disbursements from those reflected in the Approved Budget.

The Debtor shall not permit any of (i) the aggregate disbursements for any one-week period in the Approved Budget, (ii) the |

| | |
|---|---|
| | cumulative disbursements for each period from the Petition Date through the last day of any such period; or (iii) the disbursements for any individual line item in the Approved Budget less in each case those disbursements during such one-week period within any particular category which were originally scheduled to be, but were not, incurred within such category before the commencement of such one-week period, to exceed the respective amounts set forth in the Approved Budget for such one-week period or such cumulative period by more than 10% ("Permitted Variance"); provided that the foregoing shall not apply or be deemed to apply to professional fees, provided further that all professional fees shall at all times be subject to, and, in any event, shall not exceed the amounts provided in, the Approved Budget for the applicable period.  In addition, the Debtor shall not permit gross receipts for any one-week period in the Approved Budget, and for the cumulative period from the Petition Date through the last day of any month to be less than the respective amounts set forth in the Approved Budget for such one-week period or such cumulative period by more than 10%. |
| | The Debtor shall not, without the prior written consent of the DIP Lender, with respect to the applicable disbursement or agreement, make any disbursement or any series of related disbursements in excess of the amounts set forth in the Approved Budget, plus Permitted Variances. In addition, regardless of whether any of the following is reflected in the Approved Budget, the Debtor shall not, without the prior written consent of the DIP Lender, enter into, negotiate or otherwise engage in any discussions with any party regarding (i) any settlement agreements with any supplier, creditor or retailer of the Debtor, or (ii) any contracts or other contracts outside the ordinary course of the Debtor's business. |
| | Debtor shall provide DIP Lender with copies of all non-privileged reports, information and other materials requested from time to time by DIP Lender. |
| | In addition, Debtor shall cooperate with and permit representatives of DIP Lender to have access to the DIP Collateral, non-privileged records, management personnel and other employees of the Debtor, and non-privileged meetings. The Debtor shall make itself available to and cooperate reasonably with DIP Lender and their reasonable information requests. |
| **26. Inspection Rights:** | The DIP Lender and its financial advisors, consultants and other professionals and representatives shall (i) have full and complete access to and shall be entitled to visit and inspect, any of the |

|  |  | facilities or any assets owned or used in connection with the Debtor's business, any of the computer, accounting or operational systems owned or used in connection with the Debtor's business, and any of the books and records relating to the Debtor's business wherever located, and (ii) shall be entitled to discuss and/or review any matter relating to the Debtor's business affairs (including, without limitation, all contracts to which Debtor is a party), operations or the sale process with the Debtor, their respective officers, directors, employees and advisors and other professionals, as often as may be reasonably requested. To the extent any affiliate of Debtor has any facilities or assets or any computer, server, accounting or operational systems used in connection with the Debtor's business or any books and records relating to the Debtor's business, the DIP Lender shall (i) have full and complete access to and shall be entitled to visit and inspect, any such facilities (both at Debtor's headquarters and/or any off-site locations) or assets of such affiliate or any such computer, accounting or operational systems of such affiliate or any such books and records of such affiliate and (ii) shall be entitled to discuss and review any matter relating to the Debtor's business affairs, operations or the sale process with such affiliate, its officers, directors, employees and advisors and other professionals, as often as may be reasonably requested. In addition, the DIP Lender and its financial advisors, consultants and other professionals and representatives shall be entitled to communicate directly with any and all vendors, customers, creditors or other parties in interest with respect to any matter involving the Debtor, relating to the Debtor's business affairs, operations or the sale process. <br><br> Subject to attorney-client privilege and attorney work product, the Debtor and its Board of Directors shall cooperate, and shall cause the Debtor's officers, employees, advisors and other professionals to cooperate, with the DIP Lender in connection with the exercise of their access and informational rights as set forth in the immediately preceding paragraph. |

| 27. **Limitations on Use of DIP Loans and Cash Collateral:** | None of the DIP Loans, Cash Collateral, DIP Collateral or Carve-Out may be used for any of the following purposes:<br><br>(a) object to or contest the validity or enforceability of the Interim Order or Final Order or any obligations outstanding under the DIP Documentation;<br><br>(b) seek to modify any of the rights granted under the Interim Order, Final Order or any other DIP Documentation to the DIP Lender;<br><br>(c) make any payment in settlement or satisfaction of any prepetition or administrative claim, unless in compliance with the Approved Budget;<br><br>(d) object to, contest, delay, prevent or interfere with in any way the exercise of rights and remedies by the DIP Lender with respect to the DIP Collateral or the Prepetition Lender in respect to the collateral securing the Prepetition Loans (the "<u>Prepetition Collateral</u>") once an Event of Default has occurred (except that Debtor may contest or dispute whether an Event of Default has occurred and the Debtor shall be entitled to any notice provisions provided in any Interim Order or Final Order);<br><br>(e) object to or contest the validity, enforceability, priority or amount of the Prepetition Loans or the liens securing the Prepetition Collateral; or<br><br>(f) for any other disbursement or payment made by Debtor that is not approved by DIP Lender (to the extent not approved in the Approved Budget). |
| 28. **EXPENSES:** | Debtor shall pay, pursuant to the DIP Orders, on a current basis, all prepetition and postpetition fees and expenses of the DIP Lender and Prepetition Lender, including, without limitation, (i) reasonable out-of-pocket costs and expenses of DIP Lender and Prepetition Lender (including, without limitation, all reasonable fees, expenses and disbursements of outside counsels Brown Rudnick LLP, Stearns Weaver Miller, Development Specialists, Inc., and/or any other consultants and/or advisors) in connection with the diligencing, negotiation, preparation, execution and delivery of this Term Sheet and the DIP Documentation, the funding of all drawings under the DIP Loan, the administration of the DIP Loan, and any amendment or waiver of any provision of the DIP Documentation; (ii) the diligencing, negotiation, documentation, consummation, administration or any other aspect of the DIP Facility and the DIP Documentation, including, without |

limitation, internal administrative, consulting and monitoring fees; (iii) the diligencing, negotiation, documentation, consummation, administration or any other aspect of any reorganization and/or sale process in the Chapter 11 Cases, (iv) reasonable costs and expenses of DIP Lender and Prepetition Lender (including, without limitation, reasonable fees, expenses and disbursements of aforementioned counsel and consultants to DIP Lender and Prepetition Lender) in connection with the enforcement or protection of any of their rights and remedies under the DIP Loan or Prepetition Loan, and (v) reasonable costs and expenses of DIP Lender and Prepetition Lender (including, without limitation, all reasonable fees, expenses and disbursements of aforementioned outside counsel, consultants and/or advisors) in connection with the enforcement to date of DIP Lender's or Prepetition Lender's rights and remedies arising out of the Prepetition loans owing by Debtors and/or its affiliates to the Prepetition Lender. Such payments are to be reimbursed on a current basis by the Debtor, first from the proceeds of DIP Loans and thereafter from the Debtor's assets and shall in any event constitute part of the DIP Obligations.

All such costs and expenses shall be paid once per two-week period without any requirement to submit fee applications to the Bankruptcy Court; provided that prior to payment of such costs and expenses each relevant professional has provided copies of its fee and expense statements to the Debtor, U.S. Trustee, and any appointed Official Committee of Unsecured Creditors. The U.S. Trustee and/or Official Committee of Unsecured Creditors may object to the reasonableness of the fees, costs and expenses included in any such professional fee invoice, provided that, any such objection shall be forever waived and barred unless (i) it is filed with this Court and served on counsel to the parties seeking reimbursement no later than ten (10) days after the objecting parties receiving such applicable professional fee invoice, and (ii) it describes with particularity the items and categories of fees, costs and expenses that are subject to the objection and it provides for a specific basis for the objection to each category of fees, costs and expenses; provided, however, further that the Debtor shall pay all amounts that are not subject of any objection within ten (10) days of the objection deadline. Any hearing on an objection to any payment of any fees, costs and expenses of such professionals shall be limited to the reasonableness of the particular items or categories of fees, costs, and expenses which are the subject of such objection.

| | | For the avoidance of doubt, all such fees and expenses described in the immediately preceding sentence shall be reimbursed without regard to the amounts set forth in the Approved Budget with respect thereto and shall constitute DIP Obligations. |
|---|---|---|
| **29. DIP Milestones:** | | The DIP Orders shall provide that the Debtor will implement their Chapter 11 Cases in accordance with the milestones as reflected in <u>Exhibit C</u> attached hereto (the "<u>DIP Milestones</u>"). <br><br> The Debtor may extend a DIP Milestone only with the express written consent of the DIP Lender. |
| **30. OTHER TERMS:** | | **Governing Law.**  State of New York, except as governed by the Bankruptcy Code. <br><br> **Stay Waiver.**  Any applicable stay (including under Bankruptcy Rule 6004) shall be waived and such waiver shall be immediately effective upon entry of the Interim Order. <br><br> **Other Customary Terms**.  Other terms and conditions customary for post-petition financing of this type. <br><br> **Binding.**  The terms of any Interim Order and Final Order shall be binding on the Debtor and any successors of any of the Debtor, including any chapter 7 or 11 trustee. <br><br> **Ordinary Course Sales of Inventory**. For the purposes of this Term Sheet and the Prepetition Loan Documents (as defined in the Interim Order), any reference to Debtor's sale of inventory in the ordinary course of business shall mean sales by the Debtor of inventory at a price no greater than a 20% discount on the established retail value of such inventory and made solely to retailers approved by the DIP Lender in writing. <br><br> **Amendment and Waiver.**   No waiver, modification or amendment of the terms of this Term Sheet shall be valid unless such waiver, modification or amendment is in writing and has been signed by the Debtor and the DIP Lender. |

[Signature page to follow]

**ACKNOWLEDGED AND AGREED**:


**DEBTOR**:

**PAT MCGRATH COSMETICS LLC**


By: /s/ Patricia McGrath
Name: Dame Patricia McGrath
Title: Founder



By: /s/ Patricia McGrath
Dame Patricia McGrath




**DIP LENDER**:

**GDA PMG FUNDING LLC**


By: /s/ Gabriel de Alba
Name: Gabriel de Alba
Title: Managing Member

**<u>Exhibit A</u>**

**Restructuring Term Sheet**

# PAT MCGRATH COSMETICS LLC

## RESTRUCTURING TERM SHEET

This term sheet (together with all schedules, annexes and exhibits hereto, the "***Restructuring Term Sheet***") sets forth the principal terms of a proposed comprehensive restructuring (the "***Restructuring***" or "***Restructuring Transaction***") of the existing capital structure of Pat McGrath Cosmetics LLC (collectively, the "***Company***" or the "***Debtor***" and, upon emergence from chapter 11, the "***Reorganized Debtor***"), which will be consummate in the Company's case under chapter 11 pursuant to title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq*. (the "***Bankruptcy Code***") filed on January 22, 2026  (the "***Petition Date***") in the United States Bankruptcy Court for the Southern District of Florida (the "***Chapter 11 Cases***" and such court, the "***Bankruptcy Court***") pursuant to a chapter 11 plan containing terms set forth herein.[1]

THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES TO THE RESTRUCTURING SUPPORT AGREEMENT.

THIS RESTRUCTURING TERM SHEET IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE COMPANY, PAT MCGRATH, GDA (AS DEFINED BELOW) AND THE DIP LENDER (AS DEFINED BELOW). ACCORDINGLY, THIS RESTRUCTURING TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS, IN EACH CASE, SUBJECT TO THE TERMS HEREOF.

---

[1] Capitalized terms used but not defined herein or in **Annex 1** hereto have the meanings given to such terms in the DIP Term Sheet.

| Material Terms of the Restructuring Transaction | |
|---|---|
| **Term** | **Description** |
| **Company:** | Pat McGrath Cosmetics LLC, a New York limited liability company |
| **Claims and Interests to be Restructured:** | The Debtor's prepetition capital structure consists of:<br><br>**GDA Prepetition Claims.** Consisting of any and all claims held by GDA PMG Funding LLC ("***GDA***") as of the petition date including, but not limited to, all claims acquired from TVT Capital Source and TVTCap, all claims acquired from Settle Funding LLC and all additional amounts funded directly by GDA, in each case inclusive of all principal, interest, costs and fees accrued thereon as of and after the Petition Date, but excluding the amount rolled-up as part of the DIP Financing;<br><br>**Keyhaven Claims.** Consisting of any and all claims held by Keyhaven Blocker Inc ("***Keyhaven***") inclusive of all principal, interest, costs and fees accrued thereon as of the Petition Date;<br><br>**E Advance Services Claims.** Consisting of any and all claims held by E Advance Services LLC ("***E Advance Services***") inclusive of all principal, interest, costs and fees accrued thereon as of the Petition Date;<br><br>**Parkview Claims.** Consisting of any and all claims held by Parkview Advance LLC ("***Parkview***") inclusive of all principal, interest, costs and fees accrued thereon as of the Petition Date;<br><br>**800 Funding Claims.** Consisting of any and all claims held by 800 Funding LLC ("***800 Funding***") inclusive of all principal, interest, costs and fees accrued thereon as of the Petition Date;<br><br>**Amerifi Claims.** Consisting of any and all claims held by Amerifi Capital LLC ("***Amerifi***") inclusive of principal, interest, costs and fees accrued thereon as of the Petition Date;<br><br>**General Unsecured Claims.** Consisting of any unsecured prepetition Claim against the Debtor that is not an administrative claim, an unsecured priority claim, a GDA Prepetition Claim, a Keyhaven Claim, an E Advance Claim, a Parkview Claim, an 800 Funding Claim, an Amerifi Claim, a Critical Vendor Claim (as defined below) or an unsecured Claim otherwise subordinated or entitled to priority under the Bankruptcy Code (the "***General Unsecured Claims***"); and<br><br>**Existing Equity Interests.** Consisting of all existing equity interests in the Company. ("***Existing Equity Interests***"). |
| **DIP Financing:** | Prior to or following the Petition Date, the Debtor will enter into a credit agreement with funds managed by GDA to fund term loans (in such capacity, the "***DIP Lender***") to the Company, which will come in the form of debtor-in-possession financing (the "***DIP Facility***") consistent with the term sheet attached hereto as <u>**Annex 2**</u> (the "***DIP Term Sheet***") and otherwise acceptable to the DIP Lenders. The Debtor shall use the proceeds of the DIP Facility in accordance with the Approved Budget. The DIP Facility shall consist of up to $10 million in new money loans plus the roll-up of $1.00 of Prepetition GDA Secured Claims for each $1.00 of new money financing authorized under the DIP Facility. The obligations of the Company under the DIP Facility shall be referred to herein as the "***DIP Obligations***". |
| **Overview of Plan:** | The Restructuring Transactions shall be effectuated pursuant to plan of reorganization (the "***Plan***"), which shall be in form and substance acceptable to: (i) the Company; (ii) the DIP Lender; and (iii) GDA, and shall otherwise be subject to a plan of reorganization, disclosure statement and other definitive documents (collectively, the "***Definitive Documents***") acceptable to the Company and GDA. |

2

| | Pursuant to the Plan, in exchange for agreeing to equitize the full outstanding amount of the DIP Facility and the Prepetition GDA Secured Claim, GDA will receive, on the Plan Effective Date (to be defined therein), preferred equity and common equity of the Reorganized Debtor as further described in this Restructuring Term Sheet. |
|---|---|
| | On the Plan Effective Date, each holder of an allowed claim or allowed interest, as applicable, shall receive under the Plan the treatment described in this Restructuring Term Sheet in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's allowed claim or allowed interest, except to the extent different treatment is agreed to among the Reorganized Debtor, the GDA, and the holder of such allowed claim or allowed interest. For the avoidance of doubt, any action required to be taken by the Debtor on the Plan Effective Date pursuant to this Restructuring Term Sheet may be taken on the Plan Effective Date or as soon as is reasonably practicable thereafter in consultation with the GDA. |

| Treatment of Claims and Interests under Chapter 11 Plan | |
|---|---|
| **Claim** | **Proposed Treatment** |
| **Administrative Expense Claims and Priority Claims:** | Except to the extent that a holder of an allowed administrative expense claim or an allowed priority claim agrees to a less favorable treatment, each holder of an allowed administrative expense claim or an allowed priority claim will receive, in full and final satisfaction of such allowed claim, cash in an amount equal to such allowed claim on the Plan Effective Date or as soon as practicable thereafter or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **GDA DIP Obligations; GDA Prepetition Claims:** | On the Plan Effective Date or as soon as practicable thereafter, in full and final satisfaction of all DIP Obligations (as defined under the DIP Term Sheet) and the GDA Prepetition Claim, GDA shall receive: <br><br> • New Preferred (as defined below) in an amount equal to the unpaid principal, interest, fees and expenses of the DIP Obligations and the GDA Prepetition Claims (including, for the avoidance of doubt, prepetition and postpetition interest, fees and expenses accrued thereon); and <br><br> • New Common (as defined below) equal to 65% of all issued New Common on a fully diluted basis (i.e., assuming full issuance of the MIP and the other issuances of New Common contemplated by this Restructuring Term Sheet). |
| **McGrath DIP Obligations:** | On the Plan Effective Date or as soon as practicable thereafter, in full and final satisfaction of all obligations owned to McGrath under the $1,000,000 debtor-in-possession loan made by Patricia A. McGrath as approved on an interim basis by the Bankruptcy Court on or about February 2, 2026, under the *Interim Order Granting Debtor's Emergency Motion For Entry Of An Order (I) Authorizing The Debtor To Obtain Post-Petition Financing Pursuant To Sections 105(a), 362, 364(c) Of The Bankruptcy Code, And (II) Granting Super Priority Claims To The DIP Lender Pursuant To Section 364(c)(1) Of The Bankruptcy Code* (ECF No. 62) (the "***McGrath DIP***"), McGrath shall receive New Preferred in an amount equal to the unpaid principal and interest under the McGrath DIP. |
| **Keyhaven Claims:** | On the Plan Effective Date or as soon as practicable thereafter, the Keyhaven Claim shall be deemed cancelled and shall receive New Preferred in an amount equal to $500,000. |
| **E Advance Services Claims; Parkview Claims, Amerifi Claims; 800 Funding Claims:** | On the Plan Effective Date or as soon as practicable thereafter, E Advance Services, Parkview, Amerifi and 800 Funding shall each receive a cash payment equal to 1% of its applicable allowed claims in full and final satisfaction of any debt owed to E Advance, Parkview, Amerifi and 800 Funding, as applicable; provided that to the extent the aggregate of the allowed claims of E Advance, Parkview, Amerifi and 800 Funding exceeds $3,700,000, the payments shall be reduced pro rata. |

3

| Critical Vendor Claims: | On the Plan Effective Date, certain holders of general unsecured claims will be designated by the Debtor, with the consent of the DIP Lender in its sole discretion, as critical vendors (the "*Critical Vendors*" and the claims held by them, the "*Critical Vendor Claims*").  On the Plan Effective Date or as soon as practical thereafter, each holder of a Critical Vendor Claim shall receive such treatment as shall be determined by the Debtor and the DIP Lender in their sole discretion. |
|---|---|
| General Unsecured Claims: | On the Plan Effective Date or as soon as practicable thereafter, each holder of a General Unsecured Claim shall receive, except to the extent such holder agrees to less favorable treatment, its *pro rata* share of $250,000. |
| Existing Equity Interests: | On the Plan Effective Date, all Existing Equity Interest shall be cancelled, and holders of Existing Equity Interests shall receive, in the aggregate, 5% of the New Common, which New Common shall be distributed as determined by the Company in consultation with the DIP Lender. |
| **Other Terms Relevant to Chapter 11 Plan Implementation** | |
| Definitive Documents: | This Restructuring Term Sheet shall be subject to definitive documentations (the "*Definitive Documents*").  The Definitive Documents shall contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein and consistent with the terms of this Restructuring Term Sheet in all respects.  Any documents related to the Restructuring Transactions, including any Definitive Documents, shall be subject to the consent rights and obligations set forth in Restructuring Support Agreement and the DIP Loan Documents.  Failure to reference such consent rights and obligations as it relates to any document referenced in this Restructuring Term Sheet shall not impair such rights and obligations. |
| Capital Structure of Reorganized Debtor: | GDA will form a holding company ("*Holding Company*") to own 100% of the membership interests of Reorganized Debtor.<br><br>At closing, Holding Company equity shall consist of two classes, as follows:<br><br>**Preferred Equity.**  Perpetual, non-participating, non-convertible preferred equity issued to. Preferred equity shall have a 3x return ("*New Preferred*").  New Preferred will be issued to GDA and McGrath as described above.<br><br>**Common Equity.**  Common equity ("*New Common*") will be issued to GDA as described above, and to McGrath and MIP participants as described below. |
| Exit Loan: | Senior secured working capital financing facility from GDA or a third-party lender offering more favorable terms of up to $20 million, structured on market terms, including, but not limited to, a first lien security interest. |
| Tax Matters: | The Parties shall use commercially reasonable efforts to structure and implement the Restructuring Transactions in a tax efficient and cost-effective manner for the benefit of the Reorganized Debtor, GDA and the DIP Lenders, including with respect to NOLs.  The tax structure of the Restructuring Transactions shall be subject to the consent of GDA and the DIP Lenders.  The Debtor shall promptly take all actions as are reasonably necessary to implement such tax structure. |
| Restructuring Expenses: | Except as otherwise provided in, and subject to the notice requirements of, the DIP Orders, the Company shall pay the reasonable and documented prepetition and post-petition fees and expenses of any advisors to GDA and the DIP Lenders pursuant to the DIP Term Sheet. |

| | |
|---|---|
| **Amendments:** | This Restructuring Term Sheet may be amended only by a written agreement executed and delivered by the Company, GDA and the DIP Lender and to the extent required under the Bankruptcy Code, the approval of the Bankruptcy Court after notice and a hearing. |
| **Conditions Precedent:** | The occurrence of the Plan Effective Date shall be subject to the following conditions precedent, unless otherwise waived in accordance with the terms of the Plan:<br><br>i. The Debtor shall have neither proposed nor signified its support for an alternative plan of reorganization that is not supported by GDA and the DIP Lender and no event or condition shall have occurred which with the passage of time or the giving of notice or both would constitute a default or event of default under the DIP Facility;<br><br>ii. The Bankruptcy Court shall have entered the DIP Orders, which shall be in full force and effect and no Event of Default or condition which, with the passage of time or giving of notice, would become an Event of Default shall have occurred and continue to exist under the DIP Loan Documents including, but not limited to, a failure to comply with the milestones set forth in the DIP Term Sheet;<br><br>iii. The Definitive Documents shall (a) be consistent with the consent rights, terms and conditions set forth in this Restructuring Term Sheet and DIP Loan Documents, and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights set forth therein, and (b) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties;<br><br>iv. The Debtor shall have paid, in full and in cash, all reasonable and documented fees and expenses, including professional fees and expenses, GDA and the DIP Lenders, including, for the avoidance of doubt, the Restructuring Expenses;<br><br>v. The Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall not have been reversed, stayed, modified, or vacated on appeal;<br><br>vi. All actions, documents, and agreements constituting the applicable Definitive Documents, including any exhibits, schedules, amendments, modifications or supplements thereto, shall have been executed and/or effectuated, and shall be in form and substance materially consistent with and subject to the consent rights set forth in the Restructuring Support Agreement and the DIP Loan Documents;<br><br>vii. (a) Any and all requisite governmental, regulatory, and third-party approvals and consents shall have been obtained or waived, not be subject to unfulfilled conditions, and be in full force and effect, and (b) all applicable waiting periods shall have expired or terminated, in each case under each foregoing clause of (a) and (b), without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on the Restructuring Transactions, or the financial benefits of such Restructuring Transactions to the GDA; and<br><br>viii. No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Restructuring Transactions, the Restructuring Term Sheet or any of the Definitive Documents contemplated thereby. |

| | |
|---|---|
| **Milestones:** | The Debtor shall comply with the Milestones set forth in the DIP Term Sheet. |
| **Break-Up Fee** | In the event that a transaction contemplated hereby does not close on the Plan Effective Date as set forth in this Restructuring Term Sheet (except as otherwise agreed by the DIP Lender), DIP Lender shall be entitled to be paid a break-up fee of $2,500,000 (the ***Break-Up Fee***"). |
| **Unexpired Leases and Executory Contracts:** | As of and subject to the occurrence of the Plan Effective Date, and the payment of any applicable cure amount, and subject to the express written consent of GDA, all executory contracts and unexpired leases to which any of the Debtor are parties shall be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtor, pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtor on or before the Confirmation Date, or (iv) is specifically designated by the GDAas a contract or lease to be rejected.  The treatment of any subsidiaries of the Debtor shall be in the discretion of the DIP Lender. |
| **Governance and New Organizational Documents:** | Prior to the start of the Confirmation hearing, the Debtor and Holding Company shall adopt new or revised charters, limited liability company operating agreements, or other organization documents, as applicable, acceptable to GDA and the DIP Lender, each in their sole discretion, which documents will become effective as of the Plan Effective Date. <br><br> On the Plan Effective Date, a New Board shall be appointed in accordance with the terms of the New Organizational Documents, and the identity of the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing. <br><br> Certain terms concerning the corporate structure and governance of the Reorganized Debtor are described on **Annex 3** attached to this Restructuring Term Sheet **[,WHICH TERMS ARE TO BE INCLUDED IN PLAN SUPPLEMENT]** |
| **Management Incentive Plan; KERP:** | The Plan will provide for the establishment of a post-emergence management incentive plan on the Plan Effective Date (the "***MIP***").  Up to 10% of the New Common of Holding Company, on a fully diluted basis, will be reserved for issuance in connection with the MIP, with the terms of the MIP, including the vesting schedule and participants to be determined by the New Board. Pat McGrath shall not participate in the MIP. <br><br> **[FURTHER TERMS TO BE INCLUDED IN PLAN SUPPLEMENT]** |
| **Pat McGrath Equity Ownership and Employment Agreement:** | **[TO BE INCLUDED IN PLAN SUPPLEMENT]** |
| **Vesting of Assets in the Reorganized Debtor:** | On the Plan Effective Date, except as otherwise set forth in the Plan, pursuant to sections 1141(b)–(c) of the Bankruptcy Code, all assets of the Debtor, including all Retained Claims and Causes of Action, shall vest in the Reorganized Debtor, as applicable, free and clear of all liens, Claims, and encumbrances.  The Reorganized Debtor shall retain all rights to commence and pursue the Retained Claims and Causes of Action. |
| **Discharge; Releases; Debtor Releases; Consensual Releases; Exculpation; and Injunction:** | The Plan shall: (i) provide for the discharge of all Claims and liabilities that are subject to discharge to the fullest extent permitted under the Bankruptcy Code; (ii) contain customary release and exculpation provisions, including releases by the Debtor and consensual third-party releases, in form and substance reasonably acceptable to the Debtor and the released party, GDA and the DIP Lender (who shall grant reciprocal releases to the Debtor, Pat McGrath, and the other parties listed below who are receiving releases from the Debtor) to the extent such parties vote in favor of the Plan described herein and agree to provide releases to the Debtor, Pat McGrath, GDA and the DIP Lenders, [Keyhaven], Amerifi, Parkview, 800 Funding, and E Advance Services; and (iii) contain customary injunction provisions. |

**<u>ACKNOWLEDGED AND AGREED</u>**:


**<u>DEBTOR</u>**:

**PAT MCGRATH COSMETICS LLC**


By: /s/ Patricia McGrath
_____
Name: Dame Patricia McGrath Title:
Founder


By: /s/ Patricia McGrath
_____
Dame Patricia McGrath


**<u>DIP LENDER</u>**:

**GDA PMG FUNDING LLC**

By: /s/ Gabriel de Alba
_____
Name: Gabriel de Alba
Title: Managing Member

7

## Annex 1

| Certain Defined Terms | |
|---|---|
| **Term** | **Definition** |
| "***Bankruptcy Code***" | Means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, modified, or supplement from time to time). |
| "***Claim***" | Has the meaning ascribed to it in section 101(5) of the Bankruptcy Code. |
| "***Plan Effective Date***" | Means the date on which all conditions precedent to the occurrence of the effective date of the Plan shall have been satisfied or waived in accordance with the Plan. |
| "***Retained Claims and Causes of Action***" | Means all Claims and causes of action of the Debtor and its estate, other than any Claims or causes of action that are released under the Plan. |

8

**<u>Annex 2</u>**

**DIP Term Sheet**

**<u>Annex 3</u>**

**To Be Included With Plan Supplement**

**Exhibit B (to DIP Term Sheet)**

**Representations and Warranties**

The Debtor represents and warrants to DIP Lender that: (a) the undersigned signatory is duly authorized to request the DIP Loan and to bind Debtor to this Agreement. (b) Debtor is duly organized as a corporate or limited liability company, validly existing and in good standing under the laws of the State of New York and is fully authorized to enter into this Agreement and to perform Debtor's obligations hereunder, and this Agreement constitutes Debtor's legal, valid, and binding obligation; (c) all information provided by Debtor in connection with the DIP Loan, including all information related to Debtor's business, the DIP Collateral, financials, and any invoice(s), is true and correct, (d) to the best of Debtor's knowledge, there is no fact or circumstance that could adversely affect Debtor's business, assets or financial condition, Debtor's ability to perform Debtor's obligations under this Agreement, or the accuracy and completeness of Debtors representations and warranties, that has not been disclosed in writing, (e) subject to approval of the Bankruptcy Court, this Term Sheet and the performance of Debtor's obligations hereunder do not violate: (i) any applicable law, regulation, or order from any governmental agency; (ii) any charter, bylaws, or other organizational documents of the Debtor; or (iii) any indenture, agreement, or other instrument binding upon the Debtor, (f) Debtor has legal title to the DIP Collateral and is authorized to pledge the DIP Collateral to DIP Lender, (g) subject to approval of the Bankruptcy Court, all DIP Collateral is and will be free and clear of any and all liens, charges, attachments, or security interests, defenses, disputes, offsets, counterclaims, or rights of return or cancellation (except hereunder, and any other as disclosed to DIP Lender by Debtor prior to funding), (h) except as disclosed in writing to DIP Lender, Debtor has not transferred, assigned, pledged or granted a security interest, and there are no financing statements now or soon to be on file in any public office relating to any DIP Collateral in which Debtor is named or has signed as the debtor, and will not do so during the term of this Agreement without prior written consent from DIP Lender, (l) the goods and services Debtor has sold or subsequently sells complies and will comply with all applicable laws, regulations, contracts and commercial standards applicable thereto, (m) to the extent DIP Lender disburses funds directly to a creditor, unless otherwise disclosed to DIP Lender in writing, Debtor is not, has not been and will not be, subject to any dispute alleging fraudulent conduct on Debtor's part with creditor or any other third party; (n) to the extent DIP Lender disburses funds directly to a creditor, Debtor does not, and will not, dispute the validity of any invoice or any part of the balance of the invoice, and agrees that Debtor owes the creditor any related disbursement amount(s); and (p) other than the Case, there is no action, suit, proceeding or investigation pending or, to Debtor's knowledge, threatened against or affecting Debtor or Dame Patricia McGrath or any of Debtor's or Dame Patricia McGrath assets which, if determined adversely, could have a material adverse effect on Debtor's financial condition, business or Debtor's ability to perform Debtor's obligations under this Agreement. If any such action, suit, proceeding or investigation commences or is threatened, Debtor shall promptly, but no later than five (5) Business Days, notify DIP Lender in writing.

Each request by Debtor for an advance: (i) shall constitute an affirmation by Debtor that the foregoing representations and warranties remain true and correct as of the date of such request and, unless DIP Lender is notified to the contrary prior to the disbursement of the requested Advance, will be so on the date of such Advance, and (ii) shall constitute the representation and warranty of Debtor that the information set forth in each such request is true and correct and omits no material fact known to Debtor necessary to make the same not misleading, except as disclosed in Debtor's filings with the Bankruptcy Court.

## **Exhibit C**  **(to DIP Term Sheet)**

### **Milestones**

(a)      No later than two (2) business days following the hearing on February 13, 2026, the Bankruptcy Court shall have entered the Interim Order;

(b)      As soon as reasonably possible after entry of the Interim Order but not later than February 27, 2026, the Debtor shall have filed a plan of reorganization and a disclosure statement related thereto, together with a motion for conditional approval of the disclosure statement and a motion to approve the Plan of Reorganization, in form and substance acceptable to the DIP Lender in its sole and absolute discretion;

(c)      No later than March 13, 2026, the Bankruptcy Court shall have entered the Final Order;

(d)      On or before April 14, 2026, the Bankruptcy Court shall have entered the Confirmation Order approving the Plan of Reorganization, in form and substance acceptable to the DIP Lender in its sole and absolute discretion; and

(e)      On or before April 15, 2026, the Plan of Reorganization shall have been substantially consummated and become effective.