**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

|  |  |
|---|---|
| In re: | Chapter 11 |
| PAT MCGRATH COSMETICS LLC, | Case No. 26-10772-LMI |
| Debtor. | |

**KEYHAVEN PMG BLOCKER, INC.'S OBJECTIONS TO: (I) FINAL APPROVAL OF FIRST AMENDED DISCLOSURE STATEMENT; AND (II) CONFIRMATION OF FIRST AMENDED PLAN OF REORGANIZATION OF PAT MCGRATH COSMETICS LLC PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Keyhaven PMG Blocker, Inc. ("Keyhaven"), by and through its undersigned counsel, files these objections ("Objections") to (i) final approval of the First Amended Disclosure Statement [ECF No. 126] (the "Disclosure Statement") and (ii) confirmation of the First Amended Plan of Reorganization of Pat McGrath Cosmetics LLC [ECF No. 128] (the "Plan"). As grounds in support of the Objections, Keyhaven states as follows:

**SUMMARY OF THE OBJECTIONS**

The Court should deny final approval of the Disclosure Statement because it fails to contain adequate information; namely, valuation and/or financial information by which creditors and interest holders can gauge the value of New Preferred Equity and New Common Equity to be issued under the Plan.[1] The Plan, itself, is a textbook example of what Chapter 11 does not permit. The Plan was engineered to entrench GDA's control over the Debtor and extract value for its exclusive benefit, not to reorganize the Debtor in compliance with the Bankruptcy Code. The Plan is not proposed in good faith, is not fair and equitable in its treatment of Keyhaven's secured claim,

---

[1] All capitalized terms that are undefined herein shall have the meanings ascribed to them in the Plan.

and violates the absolute priority rule. The Plan purports to extinguish Keyhaven's liens and claim, notwithstanding the Debtor's own admission that Keyhaven's claim is partially secured in the amount of $4,766,066.00, without cash payments, valuation, credit bidding rights, or any lawful substitute, and replaces them with a token equity interest of merely $500,000 bearing no relationship to the value of the collateral or the enterprise. At the same time, the Plan hands GDA overwhelming control of the Reorganized Debtor, 65% of the New Common Equity, sweeping veto rights over all Plan Transaction Documents and retained causes of action, and extraordinary releases in its capacities as DIP lender, prepetition lender, and in its corporate capacity, and would permit GDA to "gift" value to junior insiders and existing equity holders even though Keyhaven will not be paid in full under the Plan. That result violates the Code's priority scheme, runs afoul of the absolute priority rule, and uses the confirmation process to accomplish the opposite of what the Bankruptcy Code requires, which is to maximize and distribute estate value to all creditors. Consequently, confirmation of the Plan is properly denied.

## BACKGROUND AND PERTINENT FACTS

In October 2024, Keyhaven loaned $10 million to Pat McGrath Cosmetics, LLC (the "Company" or "Debtor") at a time when the Company needed rescue working capital, pursuant to a *Secured Promissory Note* dated October 16, 2024 (the "Note"), the repayment of which was secured by a lien on substantially all assets of the Company. *See* Keyhaven's Proof of Claim (Claim No. 97-1) and attachments thereto (the "Keyhaven POC").[2]

By April 10, 2025, Keyhaven issued a *Notice of Default, Acceleration and Reservation of Rights* to the Company. Given the Company's continued liquidity constraints, however, Keyhaven agreed to subordinate its secured claim and liens up to $25 million so that GDA PMG Funding

---

[2] Separately, Keyhaven holds a small preferred equity interest in the Company as a result of investing indirectly through PMG1 Investments, Inc. in April of 2020.

LLC ("GDA") could provide additional financing to the Company, pursuant to a *Limited Consent and First Amendment to Secured Promissory Note* dated April 29, 2025 (the "First Consent"). Nine months later, on January 27, 2026, GDA sought to conduct a UCC Article 9 secured party auction of the Company's assets, which the Company halted when it filed a voluntary Chapter 11 bankruptcy petition in this Court on January 22, 2026 (the "Petition Date").

As of the Petition Date, Keyhaven has a perfected security interest in substantially all of the Debtor's assets which secured repayment of $10 million in principal plus $1,464,964.38 in accrued interest, for a total of $11,464,964.38, which is junior only to a first lien position held by GDA. *See* the Keyhaven POC. The Debtor stipulated to the amount of Keyhaven's claim and to the validity, priority and perfection of Keyhaven's liens securing the claim. The Court ordered adequate protection for Keyhaven, to guard against any diminution in the value of its interest in its prepetition collateral during the case. *See* ECF No. 131 (the Final Order approving GDA's DIP) at ¶ E(v) and ¶10(b)(i)-(iii).[3]

In order to support the continued viability of the Company, in mid-February 2026, Keyhaven agreed to further subordinate its claim and liens in favor of GDA, in an amount not to exceed $47,425,180.94, plus interest, fees and costs (and an additional $5 million if, in good faith, warranted), by way of a *Limited Consent* dated February 13, 2026 (the "Second Consent"), in connection with Debtor-In-Possession financing provided by GDA to the Debtor.

Despite initial collaboration between GDA and Keyhaven pertaining to a restructuring plan for the Company for the benefit of all stakeholders, with the Second Consent in hand, GDA quickly abandoned those efforts. As shown below, the Plan was engineered to primarily benefit GDA

---

[3] While the Final Order approving GDA's DIP estimated Keyhaven's claim as $11.8 million, the Keyhaven POC filed subsequently, updated the actual amount due as of the Petition Date, as $11,464,964.38.

rather than maximize and distribute estate value to creditors consistent with the Bankruptcy Code and, particularly, to the detriment of Keyhaven.

The disparity in the treatment of GDA's claim versus Keyhaven's claim is blatant and manifestly inequitable. Namely, the Plan grants GDA sweeping consent rights and control over all economic, governance and litigation matters, and provides GDA with an inordinate amount of the value and upside from the restructuring of the Debtor's business, while the second lien position of Keyhaven is cancelled, in exchange for preferred equity with a nominal value of $500,000 that is divorced from any valuation tied to its collateral or the Company, despite the Debtor's admission that 47.6% of Keyhaven's claim is, in fact, secured. *See* Debtor's bankruptcy schedules filed on March 9, 2026 at ECF No. 124, page 30 of 85 (Schedule D, 2.5), wherein the Debtor admits that the value of collateral that secures Keyhaven's $10 million loan claim is $4,766,066.00.  At the same time, the Plan allows GDA to control all decisions and activity pre and post Effective Date, provides for GDA to receive the lion's share of the restructuring value, and immunizes GDA from all liability.

| Pertinent Plan Language | Plan Section |
|---|---|
| GDA receives New Preferred Equity in an amount equal to its pre-petition secured claim and DIP claim, including pre-petition and post-petition interest, fees and costs. | Art. II(C) and Art. III(B)(3) |
| GDA receives a controlling amount of New Common Equity equal to 65% of all issued New Common Equity. | Art. II(C) and Art. III(B)(3) |
| GDA receives all Class A beneficial interests in the Liquidating Trust, entitling GDA to 80% of recoveries by the Liquidating Trust. | Art. II(C) and Art. III(B)(3) |
| The Liquidating Trust, which GDA funds $50,000 per year for up to 3 years, can only pursue retained causes of action with GDA's consent. Namely, the Liquidating Trust is required to obtain the consent of GDA before it initiates, files, prosecutes, enforces, abandons, settles, compromises, releases, withdraws, otherwise liquidates, or litigates to judgment any retained causes of action. | Art. IV(J) and (L) |

| | |
|---|---|
| Keyhaven's liens and secured claim are cancelled in exchange for $500,000 in New Preferred Equity, divorced from any valuation tied to its collateral or the Company, despite the Debtor's admission that 47.6% or $4,766,066.00 of Keyhaven's claim is, in fact, secured. | Art. III(B)(4) |
| Equity interests in the Debtor are cancelled, however, in GDA's sole and exclusive discretion, equity holders (Class 8), of which the Debtor's principal, Pat McGrath, holds 68% of existing common equity, will receive 5% of New Common Equity from GDA's 65% share of New Common Equity, to be distributed as determined by the Reorganized Debtor in consultation with GDA. | Art. III(B)(8) |
| Releases by the Debtor: GDA is released by the Debtor, Reorganized Debtor and the Debtor's Estate in its capacities as the (i) DIP Lender, (ii) the Prepetition Lender, and (iii) in its corporate capacity from causes of action on or before the Effective Date, pertaining to in connection with the Debtor (including management, ownership or operations), the Debtor's in or out of court restructuring efforts, the Chapter 11 case, the Disclosure Statement, the Plan, the DIP Term Sheet, the Restructuring Term Sheet, the Restructuring Transactions, release, or other Plan Transaction Document, agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, excepting actual fraud or gross negligence. | Art. VIII(B) |
| Releases by Holders of Claims and Interests: GDA is released, as of the Effective Date, by holders of claims and interests, for any claims, whether known or unknown, in the same manner reflected in the entry immediately above, excepting actual fraud or gross negligence. | Art. VIII(C) |
| Exculpation: GDA, as well as its affiliates, are defined as Exculpated Parties. As Exculpated Parties, GDA and its affiliates, shall not incur liability to any postpetition act taken or omitted to be taken in good faith, in connection with formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Consummation of the Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor, however, GDA and | Art I(A)(36)) and Art. VIII(E) |

| | |
|---|---|
| its affiliates are not exculpated from liability resulting from acts or omissions constituting gross negligence or willful misconduct or its obligations under the Plan, DIP Orders or related documents or orders of the Bankruptcy Court. | |
| Deemed Sale and Transfer of Assets:<br>In order to effectuate the vesting of all assets and property in the Debtor's Estate in the Reorganized Debtor and the Liquidating Trust free and clear of all Liens, Claims, charges, encumbrances, or other interests, the Plan shall be deemed to constitute a sale and transfer of such assets to the Reorganized Debtor or the Liquidating Trust, pursuant to 11 U.S.C. §363(b) and (f) in exchange for the consideration that holders of claims and interests will receive under the Plan. | Art. IV(D) |
| Cancellation of all Claims and Interests:<br>All notes, equity securities, credit agreements, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtor, or giving rise to any Claims against or Interests in the Debtor or to any rights or obligations relating to any Claims against or Interests in the Debtor including, without limitation, the various prepetition documents in connection with or related to the GDA Prepetition Claims, the Keyhaven Claims, and the Merchant Cash Advance Claims, shall be canceled without any need for a holder of any such claim or interest or the Debtor to take any further action with respect thereto, and the duties and obligations of all parties thereto, including the Debtor or the Reorganized Debtor, as applicable, shall be deemed satisfied in full, canceled, released, discharged, and of no further force or effect. | Art. IV(E) |
| GDA Controls Effectiveness of Plan:<br>Plan Supplement documents require GDA approval.<br>Plan Transaction Documents must be acceptable to GDA and the Debtor.<br>GDA can veto any alternative plan.<br>GDA controls the Debtor's business operations pre and post Effective Date, including rejection of executory contracts. | Art. 1(73) and (74)<br>Art. IX(A) |
| GDA must consent, in its sole discretion, to pre-Effective Date assumption of employee benefits and programs. | Art. V(F) |

**DISCLOSURE STATEMENT OBJECTIONS**

11 U.S.C. §1125(a) requires that a disclosure statement contain "adequate information" of the kind that would enable a hypothetical investor typical of holders of claims or interests in the case, to make an informed decision about the plan.

Here, the Plan contemplates a debt-for-equity conversion as the primary mechanism for restructuring the Debtor's balance sheet. Specifically, in satisfaction of GDA's prepetition secured claim and DIP claim — which total approximately $57 million or more in principal, interest, fees, and expenses — GDA is to receive New Preferred Equity, 65% of the New Common Equity on a fully diluted basis, and all Class A Beneficial Interests in the Liquidating Trust entitling GDA to 80% of recoveries by the Liquidating Trust. Keyhaven, in turn, is to receive only $500,000 in New Preferred Equity in full and final satisfaction of its $11.4 million claim. The existing equity holders will have their interests cancelled but will receive, as a "gift" from GDA, 5% of its New Common Equity.

While factors for disclosure may vary depending on the facts and circumstances of a particular case as articulated in *In re Metrocraft Pub. Services, Inc.*, 39 B.R. 567, 568 (Bankr. N.D.Ga. 1984), holders of claims and interests will necessarily require valuation and financial data in order to understand the value of equity being issued under a plan. Yet, here, the Disclosure Statement nowhere provides any estimate of the enterprise value, going-concern value, or reorganization value of the Debtor or the Reorganized Debtor. Nor does it include any financial projections, discounted cash flow analysis, comparable company analysis, or any other methodology by which a creditor or interest holder could assess what the New Preferred Equity or New Common Equity is actually worth. The Disclosure Statement itself concedes that the "valuation of the Reorganized Debtor" and the "price associated with any of the New Equity

Interests is not intended to represent the trading value of New Equity Interests in public or private markets," and acknowledges that "[a]ctual market prices of such securities at issuance will depend upon" numerous factors. *See* Section IV(D)(a). This is not a substitute for providing an actual valuation; it is an admission that none has been performed or disclosed.  Accordingly, the Court should deny final approval of the Disclosure Statement.

## PLAN OBJECTIONS

### I.        The Plan is not Proposed in Good Faith

### A.  The Plan Inequitably Distributes Substantially All Value and Control to GDA

A Chapter 11 plan cannot be confirmed under 11 U.S.C. §1129(a) if it has not been proposed in good faith. *See* U.S.C. §1129(a)(3). Although the Bankruptcy Code does not specifically define good faith, courts have generally reviewed the totality of the circumstances to decide whether there is a "reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Code." *In re JRV Industries, Inc.*, 344 B.R. 679, 684 (Bankr. M.D. Fla. 2006) (quoting from *McCormick v. Banc One Leasing Corp. (In re McCormick)*, 49 F.3d 1524, 1526 (11th Cir. 1995)). The focal point of the inquiry is directed to a review of the plan itself and, in light of the particular facts and circumstances, whether the plan will fairly achieve a result consistent with the purposes of reorganization as codified by the Bankruptcy Code. *Id.*

As shown by the chart above, the Plan was crafted to primarily benefit GDA rather than maximize and distribute estate value to creditors consistent with the Bankruptcy Code and, particularly, to the detriment of Keyhaven. The disparity between the treatment of GDA's claim and Keyhaven's claim is glaring. GDA receives New Preferred Equity equal to the full amount of its prepetition and DIP claims (including interest, fees, and costs), 65% of all New Common Equity, and 80% of Liquidating Trust recoveries through its Class A Beneficial Interests.

8

Meanwhile, Keyhaven's second-lien position is cancelled outright and replaced with a mere $500,000 in nominal preferred equity that bears no relationship to either the value of its collateral or the Company's assets. This result is particularly untenable given the Debtor's admission that almost half of Keyhaven's claim is secured. Compounding this imbalance, the Plan concentrates all decision-making authority in GDA both pre- and post-Effective Date, requiring GDA's consent for all Plan Supplement documents, Plan Transaction Documents, the assumption or rejection of executory contracts, and even the pursuit of retained causes of action by the Liquidating Trust, and yet insulates GDA from liability through sweeping releases by the Debtor, releases by all holders of claims and interests, and exculpation provisions benefitting both GDA and its affiliates. In sum, since the Plan prioritizes the interests of GDA over the statutory obligation to maximize value for creditors in accordance with the Bankruptcy Code, the Plan represents an improper use of the bankruptcy process and is, therefore, not proposed in good faith.

**B.      The Plan Violates the Bankruptcy Code's Priority Scheme**

The Plan further fails to satisfy the good-faith requirement for confirmation, given that it violates the priority rules set forth in the Bankruptcy Code. Namely, the Plan provides that, at GDA's sole and exclusive discretion, it may distribute 5% of its New Common Equity to Class 8 equity holders, bypassing all senior claims and simultaneously extinguishing Keyhaven's liens and secured claim in exchange for only $500,000 of New Preferred Equity that is untethered to the value of Keyhaven's collateral or the Company's assets, notwithstanding the Debtor's admission that Keyhaven's claim is meaningfully secured. This allocation cannot be reconciled with a good-faith effort to reorganize for the benefit of the creditor body as a whole. Rather, the Plan reflects an impermissible attempt to circumvent the Bankruptcy Code's priority scheme through a discretionary "gift" mechanism controlled by GDA alone, likely to advance the interests of insider

Pat McGrath (who owns 68% of existing common equity), junior interests, and GDA, while depriving Keyhaven - whose claim is senior to the interests of equity and the insider - of the value of its bargained-for rights. The Plan's own terms confirm this dynamic: GDA retains sole and exclusive discretion over whether to make the gift, the Reorganized Debtor distributes the gifted equity "in consultation with GDA," and the primary beneficiary of the gift is Pat McGrath herself, who holds a 68% interest in the existing equity that would otherwise be cancelled and extinguished. As such, the Plan does not constitute a good faith effort to achieve a consensual and equitable reorganization.

## II.    The Plan is not Fair and Equitable to Keyhaven

In order to cram down a Chapter 11 plan over the objection of an impaired creditor class, the plan must not discriminate unfairly and it must be fair and equitable to the objecting creditor class. *See* 11 U.S.C. §1129(b).  Here, Keyhaven, the holder of the Class 4 claim, has voted to reject the Plan [ECF No. 170] and files these Objections to confirmation of the Plan.

### A.  Keyhaven's Secured Claim

Keyhaven's Class 4 claim is, by the Debtor's own admission, at least partially secured in the amount of $4,766,066.00, as acknowledged by the Debtor in its bankruptcy schedules. The Plan can only be fair and equitable on account of Keyhaven's secured claim if Keyhaven retains its lien and receives deferred cash payments with a present value equal to the allowed amount of its secured claim, or if its lien attaches to the sale proceeds, or if Keyhaven is afforded the right to credit bid, or if Keyhaven receives the "indubitable equivalent" of its secured claim. *See* §1129(b)(2)(A)(i)(I-II) and §1129(b)(2)(A)(ii)-(iii). Here, the Plan does the complete opposite by stripping Keyhaven of its liens and claim in exchange for a paltry sum of $500,000 in preferred equity, without any valuation of Keyhaven's secured claim or the Company's assets to support

10

that such nominal equity equals or is even close to the present value of Keyhaven's secured claim. To the contrary, the Plan provides no cash payment whatsoever, does not allow Keyhaven to retain its lien, and denies Keyhaven any right to credit bid under §363(k).

The Plan also attempts to vest assets in the Reorganized Debtor or Liquidating Trust, free and clear of all Liens and Claims, by providing that "the Plan shall be deemed to constitute a sale and transfer of such assets to the Reorganized Debtor or Liquidating Trust as provided hereunder pursuant to 11 U.S.C. §363(b) and (f) in exchange for GDA's and other creditors and holders of Equity Interests agreement to compromise and exchange their Claims and Interests for the consideration they will receive under the Plan." *See* Art. IV(D). Such language, coupled with the language in the Plan at Art. IV(E), which cancels any and all notes, agreements, equity interests and claims including, explicitly, Keyhaven's claim, runs completely afoul of fair and equitable treatment under §1129(b)(2)(A)(ii)-(iii). Specifically, instead of complying with the Bankruptcy Code by requiring that Keyhaven's lien attach to the sale proceeds, mandating that Keyhaven be permitted to credit bid under §363(k) or, alternatively, providing Keyhaven with the "indubitable equivalent" of its secured claim, the Plan circumvents the requirements of the Code by forcing a transfer of assets and the extinguishment of Keyhaven's claim and liens. Again, there is no valuation of Keyhaven's secured claim or the value of the reorganized enterprise to support that $500,000 in preferred equity to Keyhaven under the Plan satisfies the "indubitable equivalent" of its claim.

### B.  Keyhaven's Deficiency Claim

The Plan can only be fair and equitable on account of Keyhaven's deficiency claim if Keyhaven receives or retains property with a value, as of the Effective Date, equal to the allowed amount of its claim or, in the alternative, if the holder of any claim or interest that is junior to

Keyhaven's claim does not receive or retain any property under the Plan on account of such junior claim or interest. *See* §1129(b)(2)(B)(i)-(ii). "The latter condition is the core of what is known as the 'absolute priority rule.'" *Alabama Dept. of Economic & Community Affairs v. Ball Heathcare-Dallas, LLC, et al. (In re Lett)*, 632 F.3d 1216, 1228-1229 (11th Cir. 2011) ("[t]he phrase 'fair and equitable' is not a vague exhortation to bankruptcy judges that they do the right thing; rather, it implements the so-called absolute priority rule under which an objecting class must be paid in full before any claim or interest junior to it gets anything at all" (quoting from *In re Perez*, 30 F.3d 1209, 1212-13 (9th Cir. 1994)). Bankruptcy courts have an "independent obligation to ensure that a proposed plan complies with th[e] absolute priority rule before 'cramming' that plan down upon dissenting creditor classes." *In re Lett*, 632 F.3d at 1220.

Here, the Plan woefully falls short. Even *assuming arguendo* that Keyhaven's claim in the amount of $11.4 million as of the Petition Date is completely unsecured, Keyhaven is not receiving value as of the Effective Date equal to the allowed amount of its claim under any set of circumstances. A nominal $500,000 in preferred equity interests to Keyhaven under the Plan cannot satisfy fair and equitable treatment, particularly given that no evidence is offered by the Debtor as to the reorganized enterprise's value in order to determine a fair and equitable allocation of preferred equity interests on account of Keyhaven's claim. The Plan's failure to provide any valuation evidence is especially concerning in light of the fact that GDA receives New Preferred Equity equal to the full amount of its prepetition and DIP claims and 65% of the New Common Equity, suggesting that the reorganized enterprise has substantial value, yet the Debtor offers Keyhaven only $500,000 in preferred equity on a claim of $11.4 million — a recovery of approximately 4.4% — without any justification.

Because Keyhaven is not receiving payment equal to the full amount of its claim, no junior class can receive any property under the Plan. Yet, here, a junior class is, in fact, receiving property. Namely, the Plan provides for a "gift" from GDA of 5% of its New Common Equity to holders of Class 8 interests, for distribution as determined by the Reorganized Debtor in consultation with GDA. The Plan is explicit that all Class 8 Existing Equity Interests "will be canceled, released, and extinguished as of the Effective Date" and that holders "will not receive any distribution on account of such Class 8 Existing Equity Interest," yet in the very next sentence, the Plan provides that GDA will gift 5% of New Common Equity to those same Class 8 holders. Since Class 8 existing equity interest holders are receiving property when Keyhaven's claim will not be fully paid under the Plan, the Plan violates the absolute priority rule codified in §1129(b)(2)(B)(ii) and, as such, the Plan cannot be confirmed.

### (i)      Gifting Violates the Absolute Priority Rule

The "gifting doctrine" in Chapter 11 bankruptcy cases, under which senior creditors voluntarily offer or "gift" a portion of their plan distributions to junior stakeholders (typically equity holders) while bypassing a dissenting intermediate class of creditors, has been expressly rejected by the Second and Third Circuit Courts of Appeal, as more fully discussed below. *See Dish Network Corp. v. DBSD North America, Inc., et al. (In re DBSD North America, Inc.)*, 634 F.3d 79 (2nd Cir. 2011) and *In re Armstrong World Industries, Inc.*, 432 F.3d 507 (3rd Cir. 2005). While the United States Supreme Court has not yet decided whether the gifting doctrine violates the absolute priority rule when a Chapter 11 plan is sought for confirmation, in *Jevic*, it reaffirmed that bankruptcy courts must strictly comply with the Bankruptcy Code's priority scheme in the absence of an affected creditor's consent:

> The Code's priority system constitutes a basic underpinning of business bankruptcy law. Distributions of estate assets at the termination of a business

13

> bankruptcy normally take place through a Chapter 7 liquidation or a Chapter 11 plan, **and both are governed by priority.** In Chapter 7 liquidations, priority is an absolute command – lower priority creditors cannot receive anything until higher priority creditors have been paid in full. See 11 U.S.C. §§ 725, 726. **Chapter 11 plans provide somewhat more flexibility, but a priority-violating plan still cannot be confirmed over the objection of an impaired class of creditors. See §1129(b).**

*Czyzewski, et al. v. Jevic Holding Corp., et al*, 137 S.Ct. 973, 983 (2017) (emphasis added). On that basis, the *Jevic* Court reversed approval of a structured dismissal for a Chapter 11 case that skipped over dissenting priority wage claimants while paying lower priority general unsecured creditors, because there is no "affirmative indication" in the Bankruptcy Code that Congress "actually meant to make structured dismissals a backdoor means to achieve the exact kind of nonconsensual priority-violating final distributions that the Code prohibits in Chapter 7 liquidations and Chapter 11 plans." *Jevic*, 137 S.Ct. at 984-985 ("….that would be flatly impermissible in a Chapter 7 liquidation or a Chapter 11 plan because they violate priority without the impaired creditors' consent").

Further, the *Jevic* Court declined to find that "rare cases" may justify a court disregarding the Bankruptcy Code's priority scheme, in order to preserve the protections that Congress granted to particular classes of creditors. *Id*. at 987 (citing to *Bank of America Nat. Trust and Sav. Assn. v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 444, (1999): the absolute priority rule was developed in response to "concern with 'the ability of a few insiders, whether representatives of management or major creditors, to use the reorganization process to gain an unfair advantage'") (quoting H.R. Doc. No. 93-137, pt. I, p. 255 (1973)).

In *DBSD*, the bankruptcy court found that the absolute priority rule was not violated when an existing shareholder received shares and warrants in the reorganized entity under a Chapter 11 plan despite the fact that a more senior class (a class consisting of the unsecured claim held by

14

Sprint) was not receiving the full value of its claim, because the shares and warrants were a "gift" from the holders of the Second Lien Debt, whose secured creditor status was undisputed, there were no ulterior, improper motives for the gift, and the complaining unsecured creditor would not receive more of a distribution if the gift had not been made. *DBSD*, 634 F.3d at 87 (citing *DBSD I*, 419 B.R. at 212).

The Second Circuit reversed the bankruptcy court's order confirming the plan, in part, based on the plain meaning of §1129(b)(2)(B)(ii), finding that the absolute priority rule applies when a junior class receives "any property" rather than "any property not covered by a senior creditor's lien." *Id.* at 97-98 ("Under Chapter 11, in contrast, §1129(b)(2)(B) provides clear 'statutory support' to reject gifting in this case, and the distribution scheme of Chapter 11 ordinarily distributes **all** property in the estate (as it does here), including property subject to security interests, see 11 U.S.C. §1129(b)(2)(A)") (emphasis provided in original).

Further, the *DBSD* Court found that the shares and warrants were gifted to the junior shareholder "on account of" its junior interest, meaning that the gift was made either because of its prior equity interest or, at least, partly on account of its prior equity interest to, at the minimum, ensure the existing shareholder's "continued cooperation and assistance in the reorganization," which the *DBSD* Court found sufficient to invoke a violation of the absolute priority rule. *Id.* at 95-96 ("The 'continued cooperation' of the existing shareholder was useful only because of the shareholder's position as equity holder and 'the rights emanating from that position' [whereas] an unrelated third party's cooperation would not have been useful").

In addition to finding that the absolute priority rule contains no exception for gifts based on the plain meaning of §1129(b)(2)(B)(ii), and noting that a material policy argument in favor of the absolute priority rule is to curtail self-enrichment by shareholders who often retain substantial

control over the Chapter 11 process, the *DBSD* Court also cited to specific legislative history confirming that no "gift" exception to the absolute priority rule was intended by Congress: "H.R. Rep. 95-595, 1978 U.S.C.C.A.N. 5963, 6372 (1977) (noting that absolute priority rule was 'designed' to prevent a senior class from giving up consideration to a junior class unless every intermediate class consents, is paid in full, or is unimpaired)." *Id.* at 100-101.

In *Armstrong*, the Third Circuit affirmed the bankruptcy court's denial of confirmation of a plan that provided for receipt of new warrants in the reorganized entity by holders of Class 7 asbestos personal injury claims, which were automatically waived and transferred to Class 12 equity interest holders if Class 6 holders of unsecured claims (whose claims were not paid in full) rejected the plan, which occurred and prompted an absolute priority violation objection by a holder of a Class 6 unsecured claim. *Armstrong*, 432 F.3d at 509. The *Armstrong* Court found that the plain meaning of §1129(b)(2)(B)(ii) "makes it clear that a plan cannot give property to junior claimants over the objection of a more senior class that is impaired" and that Congress' intent in that regard was consistent: "The legislative history shows that section 1129(b) was at least designed to address 'give-up' situations where a senior class gave property to a class junior to the dissenting class." *Id.* at 513. In reviewing other cases that suggested that secured creditors are free to do what they wish with distributions they receive under a plan, the *Armstrong* Court disagreed:

> They do not stand for the unconditional proposition that creditors are generally free to do whatever they wish with the bankruptcy proceeds they receive. Creditors must also be guided by the statutory prohibitions of the absolute priority rule, as codified in 11 U.S.C. §1129(b)(2)(B). Under the plan at issue here, an unsecured creditor class would receive and automatically transfer warrants to the holder of equity interests in the event that its co-equal class rejects the reorganization plan. We conclude that the absolute priority rule applies and is violated by this distribution scheme.

*Id.* at 514.

16

Consistent with the *Jevic* Court's mandate that bankruptcy courts must strictly comply with the Bankruptcy Code's priority scheme and avoid priority-violating distributions absent an affected creditor's consent, and the *DBSD* and *Armstrong* Courts' conclusions that "gifting" by a secured creditor to a junior class violates the absolute priority rule when the holder of a senior class is not paid in full and objects, the Plan in this case cannot be confirmed as a matter of law. Namely, GDA seeks to "gift" 5% of its New Common Equity to equity holders in Class 8 when the senior Class 4 claim of Keyhaven will not be paid in full. Under that circumstance, §1129(b)(2)(B)(ii) mandates that Class 8 holders cannot receive "any property," which includes 5% of New Common Equity, as that gift is "on account of" the Class 8 holders' existing equity interests (of which the Debtor's principal, Pat McGrath, holds 68% of existing common equity) because, at a minimum, the gift is made to ensure the continued cooperation and assistance by existing equity holders in connection with the reorganization. The parallel to *DBSD* is unmistakable: just as the Second Circuit found that distributions to an existing shareholder to secure "continued cooperation" were "on account of" the shareholder's junior interest, GDA's discretionary gift of New Common Equity to Class 8 holders here serves the same impermissible purpose of rewarding junior equity at the expense of Keyhaven's senior claim.

## CONCLUSION

In contravention of 11 U.S.C. §1125(a), the Disclosure Statement is devoid of valuation and financial data required for creditors and interest holders to assess the value of New Preferred Equity and New Common Equity sought to be issued under the Plan. As such, the Court should deny final approval of the Disclosure Statement. Further, based on the facts and case-law cited herein, the Plan fails to satisfy the requirements for confirmation under 11 U.S.C. §1129(a)(3) and §1129(b). The Plan was not proposed in good faith, is not fair and equitable to Keyhaven as the

17

holder of the Class 4 secured and deficiency claims, and violates the absolute priority rule by permitting GDA to "gift" New Common Equity to junior Class 8 equity holders while Keyhaven's claim remains unpaid. Accordingly, the Court should deny confirmation of the Plan.

Dated: April 7, 2026

Respectfully submitted,

**BERGER SINGERMAN LLP**
1450 Brickell Avenue, Suite 1900
Miami, Florida 33131
Telephone: (305) 755-9500
Facsimile:  (305) 714-4340

By:    */s/ Robin J. Rubens*
Jordi Guso
Florida Bar No. 863580
jguso@bergersingerman.com
Robin J. Rubens, Esq.
Florida Bar No. 959413
rrubens@bergersingerman.com

-and-

**Choate, Hall & Stewart LLP**
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
Facsimile:  (617) 502-4799
Jonathan D. Marshall
*(Admitted pro hac vice)*
jmarshall@choate.com
Jacob S. Lang
jslang@choate.com

*Co- Counsel for Keyhaven PMG Blocker, Inc.*

18

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Objections* were served on April 7, 2026: (i) by electronic transmission through the Court's CM/ECF system upon all parties on the attached CM/ECF Service List; and (ii) via U.S. Mail to all parties listed on the attached Master Service List to the extent that such parties were not served electronically through the Court's CM/ECF system.

By:  */s/ Robin J. Rubens*
Robin J. Rubens

## CM/ECF SERVICE LIST

- **Christopher D. Cathey**    chris.cathey@offitkurman.com, tcarlson@taylorenglish.com
- **Connie Y Choe**    cchoe@kelleydrye.com
- **Shawn M Christianson**    schristianson@buchalter.com, cmcintire@buchalter.com
- **Michael P Dunn**    michael.dunn@dunnlawpa.com, rbasnueva@dunnlawpa.com;tudani@dunnlawpa.com;lrodriguez@dunnlawpa.com;mflores@dunnlawpa.com
- **Lara Roeske Fernandez**    lfernandez@trenam.com, mmosbach@trenam.com;mwoods@trenam.com;lfernandez@ecf.courtdrive.com;mwoods@ecf.courtdrive.com;mmosbach@ecf.courtdrive.com
- **Dan L Gold**    Dan.L.Gold@usdoj.gov
- **Jordi Guso**    jguso@bergersingerman.com, fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.courtdrive.com
- **Daniel J Halperin**    dhalperin@stearnsweaver.com, lcruz@stearnsweaver.com;jmartinez@stearnsweaver.com;
- **Michael F Holbein**    mholbein@sgrlaw.com
- **Phillip M. Hudson III**    pmhudson@duanemorris.com, gagosto@duanemorris.com;mlswing@duanemorris.com;AutoDocketMIA@duanemorris.com
- **Amrit S Kapai**    akapai@dunnlawpa.com, rbasnueva@dunnlawpa.com;tudani@dunnlawpa.com;lrodriguez@dunnlawpa.com;mflores@dunnlawpa.com
- **Jessey J Krehl**    jessey@packlaw.com, jessey@ecf.courtdrive.com;tanya@packlaw.com
- **Adam M. Levy**    alevy@dglaw.com
- **Office of the US Trustee**    USTPRegion21.MM.ECF@usdoj.gov
- **Joseph A Pack**    Joe@packlaw.com, Joe@ecf.courtdrive.com;tanya@packlaw.com
- **Geoffrey J Peters**    colnationalecf@weltman.com, colnationalecf@weltman.com
- **Leanne McKnight Prendergast**    Leanne.Prendergast@pierferd.com, l3annemp@gmail.com
- **Patricia A Redmond**    predmond@stearnsweaver.com, jmartinez@stearnsweaver.com;mfernandez@stearnsweaver.com;dhalperin@stearnsweaver.com;lcruz@stearnsweaver.com
- **Robin J. Rubens**    rrubens@bergersingerman.com, efile@ecf.courtdrive.com;efile@bergersingerman.com
- **Thomas G Zeichman**    Tom@Zeichmanlaw.com, g67999@notify.cincompass.com;zeichman.thomasb@notify.bestcase.com

## MASTER SERVICE LIST

**Pat McGrath Cosmetics LLC**
**Case No. 26-10772-LMI**

Office of the United States Trustee
51 S.W. 1st Ave.
Suite 1204
Miami, FL 33130

800 Funding LLC
c/o its Registered Agent, Registered Agents Inc.
7901 4th St. N., Ste. 300
Saint Petersburg, FL 33702

A.W. Faber-Castell Cosmetics LLC
2555 Decade Ct
Elgin, IL 60124

Amerifi Capital, LLC
c/o its Registered Agent, Registered Agent
Solutions, Inc.
2138 Silas Deane Hwy., Ste. 101
Rocky Hill, CT 06067

Amphibious Comm. Cleaning Servs.
762 E 82nd Street
Brooklyn, NY 11236

Ancorotti Cosmetics SpA
Via dell'Industria
22 Crema
Lombardia 26013
Italy

Arizona Department of Revenue
PO Box 29085
Phoenix, AZ 85038-9085

Basck Ltd
16 Saxon Road
Cambridge
CB5 8HS
UK

Concrete Design Communications Inc.
2 Silver Ave
Toronto
ON M6R 3A2
Canada

Connie Y. Choe, Esq.
Kelley Drye & Warren LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007

E Advance Services LLC
370 Lex Ave.
Ste. 801
New York, NY 10017

Elizabeth C. Castano, Esq.
Brown Rudnick LLP
7 Times Square
New York, NY 10036

Eric R. Wilson, Esq.
Kelley Drye & Warren LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007

GDA PMG Funding LLC
Attn: Gabriel de Alba
1450 Brickell Bay Dr., Ste. 705
Miami, FL 33131

James W. Stoll, Esq.
Brown Rudnick LLP
7 Times Square
New York, NY 10036

Jeffrey L. Jonas, Esq.
Brown Rudnick LLP
7 Times Square
New York, NY 10036

Jonathan D. Marshall, Esq.
Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110

Jordi Guso, Esq.
Berger Singerman LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131

35689793-1

Keyhaven PMG Blocker, Inc.
45 Whitfield St.
FAO: Mrs. Sarah Brereton /
Mr. Andrew Ware
London, UK
W1T 4HD

Google LLC - Workspace
P.O. Box 39000
Dept. 33654
San Francisco, CA 94139

Intercos America, Inc.
PO Box 32073
New York, NY 10087-2073

Intercos Europe S.P.A.
Bergamina KM 21 150
Dovera CR 2610
Italy

Interfila Cosmetics Shanghai Co., Ltd.
No.1898 Daye Highway
Zhuanghang Town
Fengxian District  P.R Shanghai 201402
China

Lara Roeske Fernandez, Esq.
Trenam, Kemker, Scharf, Barkin, Frye, O'Neill
& Mullis, P.A.
101 East Kennedy Boulevard, Suite 2700
Tampa, FL 33602

Logfret, Inc
6801 West Side Avenue
North Bergen, NJ 07047

Max Solutions Canada
PO Box 57757
Postal Station A
Toronto
ON M5W 5M5

Missouri Department of Revenue
PO Box 475
Jefferson City, MO 65105

Parkview Advance LLC
600 Summer St.
Stamford, CT 06901

REGI SRL
Via Enrico Mattei, Nr.6-10-14
Bagnolo Cremasco  26010
Italy

Robin J. Rubens, Esq.
Berger Singerman LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131

Ryder Commerce by Whiplash
P.O. Box 745968
Los Angeles, CA 90074-5968

S. Axelrod LLC dba S. Axelrod Co
7 W.  30th St.
New York, NY 10001

Sean Christianson, Esq.
Buchaler LLP
425 Market St., Ste. 290
San Francisco, CA 94105-3496

Thomas G. Zeichman, Esq.
Beighley, Myrick, Udell, & Zeichman, PA
2385 NW Executive Center Dr., Suite 300
Boca Raton, FL 33431

TLogistics B.V.
Gerolsteinbaan 7-9
5121 DN Rijen  3512CB
Netherlands

Women Management LLC
55 Hudson Yards
3rd Floor
New York, NY 10001

35689793-1