**UNITED STATES BANKRUPTCY COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:

PAT MCGRATH COSMETICS, LLC                    CASE NO.: 26-10772-LMI
                                                                  CHAPTER 11

      Debtor.

_____/

**UNITED STATES TRUSTEE'S OBJECTION TO CONFIRMATION OF**
**FIRST AMENDED PLAN OF REORGANIZATION AND FINAL APPROVAL OF**
**FIRST AMENDED DISCLOSURE STATEMENT**

Guy Van Baalen, the Acting United States Trustee for Region 21 (the "United States Trustee"), by and through undersigned counsel, pursuant to Section 586(a)(3)(B) of title 28 and Sections 1125 and 1129 of title 11 of the United States Code (the "Bankruptcy Code") files this objection (the "Objection") to the Debtor's *First Amended Plan of Reorganization* (the "Plan"). [Dkt. No. 128] and *Amended Disclosure Statement* (the "Disclosure Statement"). [Dkt No. 126].[1] In support of this Objection, the United States Trustee states as follows:

**Introduction**

In *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 216–27 (2024) ("*Purdue*"), the United States Supreme Court held that, except in asbestos cases, chapter 11 plans may not include nonconsensual releases of creditor claims against non-debtor, third parties. The Supreme Court held that bankruptcy courts cannot involuntarily alter the relationships between non-debtors by imposing releases of claims between them. *Purdue*, 603 U.S. at 209, 227. Pat McGrath Cosmetics, LLC (the "Debtor") proposes a facially unconfirmable plan that provides releases to non-debtor third parties and implies consent to those releases by creditors who merely

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan or Disclosure Statement.

1

vote in favor of the Plan. As drafted, the Plan purports to bind thousands of holders of claims or interests to third-party releases, extending to countless non-debtors, including an indeterminate number of unidentified parties, unless the affected creditors take timely action to opt out. As the Plan is not confirmable, the Court should not approve the Disclosure Statement or authorize the solicitation procedures that would only serve to advance an unconfirmable plan. Specifically, the United States Trustee objects for the following reasons:

a. The Bankruptcy Code does not authorize the nonconsensual releases of non-debtor, third parties under a Plan;

b. The Debtors' proposed opt out provisions in the Ballots and explained in the Disclosure Statement are ineffective to confer affirmative consent to the third-party releases;

c. The Plan has permanent injunction provisions to enforce the third-party releases in violation of Supreme Court precedent set forth in *Purdue*; and

e. The Plan grants new equity interest to existing equity holders without satisfying the claims of more senior classes in violation of the absolute priority rule.

## Background

1. On January 22, 2026, the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code. [Dkt. No. 1].

2. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

3. On March 2, 2026, the Debtors filed the initial Plan and Disclosure Statement. [Dkt. No. 104 and 105].

4. On March 5, 2026, the Court held a hearing on the Debtor's Expedited Motion for Conditional Approval of the Disclosure Statement (the "Motion for Conditional Approval").

2

[Dkt. No. 106]. At the hearing on the Motion for Conditional Approval, the United States Trustee raised certain objections to the initial Disclosure Statement and Plan regarding the scope of the releases, the "opt-out" mechanism regarding the treatment of the releases on the proposed ballot, and other issues.

5. Despite the objections raised by the United States Trustee, the Court conditionally approved the Disclosure Statement and set a combined hearing on the final approval of the Disclosure Statement and confirmation of the Plan for April 13, 2026. *See* Order (I) Conditionally Approving Debtor's Disclosure Statement, (II)  Approving the Solicitation and Voting Procedures with Respect to Confirmation of the Proposed Chapter 11 Plan, and (III) Granting Related Relief (the "Order Conditionally Approving Disclosure Statement"). [Dkt. No. 132]. The Order Conditionally Approving Disclosure Statement preserved the United States Trustee's objections to the Plan and Disclosure Statement, each of which may be raised at the Combined Hearing. *Id.* at p.3, n.3.

6. On March 10, 2026, the Debtor filed the amended Plan (Dkt. No. 128] and the amended Disclosure Statement. [Dkt. No. 126]. Those provisions to which the United States Trustee objected previously remain in the Plan and Disclosure Statement. Those provisions are set forth in detail below.

### The Plan Proposes Objectionable Releases and Opt-Out Provisions

7. In this case, the United States Trustee objects for the principal reason that the Plan proposes impermissible non-debtor releases, seeks to have those releases improved implicitly unless a creditor affirmatively "opts-out" of the releases, and the grant of new equity interests to existing equity holders, even as a "gift" from senior secured creditor GDA PMG Funding, LLC

("GDA"), violates the absolute priority rule. The Plan proposes nine (9) classes of claims or interests with entitlement to vote as follows:

| Class | Designation | Impairment Status | Entitled to Vote |
|-------|-------------|-------------------|------------------|
| 1 | Other Secured Claims | Unimpaired | No (Deemed to Accept) |
| 2 | Priority Non-Tax Claims | Unimpaired | No (Deemed to Accept) |
| 3 | GDA Prepetition Claims | Impaired | Yes |
| 4 | Keyhaven Claims | Impaired | Yes |
| 5 | Merchant Cash Advance Claims | Impaired | Yes |
| 6 | General Unsecured Claims | Impaired | Yes |
| 7 | Intercompany Claims | Impaired | No (Deemed to Reject) |
| 8 | Existing Equity Interests | Impaired | No (Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | No (Deemed to Reject |

8.    Under the Debtor's proposed procedures, the Debtor will transmit ballots to holders of claims and interests in classes 3, 4, 5, and 6, which classes are entitled to vote. The Plan contains a conflict regarding class 8 in that the chart provides that Existing Equity Interests are deemed to reject the Plan and are not entitled to vote, but the text of Article III(B)(8)(c) provides that holders of class 8 interests are entitled to vote.[2] The Debtors do not intend to solicit votes from holders of claims in class 1, 2, 7, and 9. Only holders of claims or interests in impaired classes will receive a ballot. *See* Amended Disclosure Statement*, Dkt. No. 126 at p.26.

9.    The definition of "Released Party" appears at Article I, A.83 of the Plan and provides:

"*Released Party*" means, collectively, each of the following in their respective capacities as such: (a) Pat McGrath and any persons or Entities retained pursuant to sections 327 and 363 of the Bankruptcy Code; and (b) with respect to each of the foregoing Persons and Entities in clause (a), such Person's or Entity's **predecessors, successors and assigns, subsidiaries, Affiliates, and all of their respective current and former officers, managers, directors, principals, direct and indirect shareholders, direct and indirect members, advisors, consultants, and employees.** Notwithstanding anything contained herein or in Plan documents, the Released Parties shall not include any person or entity listed in the Schedule of Retained Causes of Action to be included in the Plan Supplement or any affiliate thereof. (Emphasis added).

---

[2] Dkt. No. 128 at p. 22 or 53. This inconsistency is likely a typo, and the Debtor intends not to solicit votes from class 8.

Similarly, the definition of "Releasing Party" appears at Article I, A.84 of the Plan and provides:

"Releasing Party" means, collectively, each of the following in their respective capacities as such: (a) the Debtor and the Reorganized Debtor; (b) with respect to each of the foregoing Entities in clause (a), such Entities' predecessors, successors and assigns, and all of their respective current and former officers, managers, directors, principals, direct and indirect members, employees, management companies, agents and other professionals, and such persons' respective heirs, executors, estates, servants and nominees; (c) **each Holder of a Claim entitled to vote on the Plan that votes to accept the Plan**; (d) **each Holder of an Interest, whether or not entitled to vote on the Plan, who does not affirmatively opt out of the releases provided by the Plan on the applicable opt-out form provided to such Holder**; and (e) without limiting the foregoing, **each Holder of a Claim or Interest who is entitled to vote on the Plan and abstains from voting on the Plan or votes to reject the Plan (or is deemed to pursuant to the terms hereof) and who does not affirmatively opt out of the releases** provided by the Plan on the applicable Ballot indicating that they opt not to grant the releases provided in the Plan. (Emphasis added).

As should be clear from even a casual reading of these definitions, the scope of parties that are released under this Plan is staggering. Aside from the Debtor and the Reorganized Debtor, these "Released Parties" include entities, persons, successors, subsidiaries, former officers, indirect shareholders, and a litany of others that, as a class, facially violates *Purdue*. Moreover, despite lenient pre-*Purdue* practice, the scope of the Released Parties may have violated even the most generous jurisdictions that permitted non-debtor, third party releases.

10. Article VIII of the Plan, tiled "**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**" provides releases by the Debtor in Subsection B as follows:

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party, Dame Pat McGrath, GDA, in its capacities as the DIP Lender and Prepetition Lender and in its corporate capacity, and Keyhaven is deemed released and discharged by the Debtor, the Reorganized Debtor, its Estate, and their Releasing Parties from any and all Causes of Action, including any derivative claims, which have been or may be asserted on behalf of the Debtor, that the Debtor, the Reorganized Debtor, or its Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, the Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part,**

5

the Debtor (including management, ownership, or operation thereof), the Debtor's in- or out-of-court restructuring efforts, the Chapter 11 Case, the Disclosure Statement, the Plan, the DIP Term Sheet, the Restructuring Term Sheet, the Restructuring Transactions, release, or other Plan Transaction Document, agreement, or document created or entered into in connection with the Disclosure Statement, or the Plan, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission constituted actual fraud or gross negligence. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement(s)) reinstated with respect to, or executed to implement, the Plan.

11. The releases by "Holders of Claims and Interests" appears in Article VIII, Subsection C

and provides:

Notwithstanding anything contained in this Plan to the contrary, and in all respects subject to the DIP Orders and the Restructuring Term Sheet, as of the Effective Date, for good and valuable consideration, each Releasing Party is deemed to have released and discharged each Released Party, Dame Pat McGrath, GDA, in its capacities both as the Prepetition Lender and the DIP Lender, and Keyhaven from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtor, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including management, ownership, or operation thereof), the Debtor's in- or out-of-court restructuring efforts, the Chapter 11 Case the Disclosure Statement, the Plan, or the Restructuring Transaction, contract, instrument, release, or other Plan Transaction Document, agreement, or document created or entered into in connection with the Disclosure Statement, or the Plan, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission constituted actual fraud or gross negligence. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any Person or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement)

6

**Reinstated with respect to, or executed to implement the Plan. For the avoidance of doubt, nothing in this Plan shall release, waive or otherwise limit the rights of all Persons and Entities who have held, hold, or may hold direct, independent Claims against any non-Debtor party without such Person or Entity's consent or deemed consent as provided for in the Plan, Disclosure Statement, any Ballot to vote on the Plan, or order of the Bankruptcy Court.**

12. The holders of the foregoing claims are enjoined, per Subsection D titled "**Injunction**",

from and after the Effective Date from taking any of the following actions:

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtor, the Reorganized Debtor, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan. *Provided, however,* and for the avoidance of doubt, nothing in the Plan shall in any way hinder, delay, or affect the rights GDA and the DIP Lender to enforce its rights under any of the documents issued in connection with the Plan, to the extent not inconsistent with the Plan.**

13. The ballot for voting on the Plan provides the following regarding the effects of voting or

abstaining from voting:

| **IMPORTANT INFORMATION REGARDING CERTAIN RELEASES BY HOLDERS OF CLAIMS:** |
| --- |
| **IF YOU VOTE TO ACCEPT THE PLAN, YOU WILL BE DEEMED TO GRANT THE RELEASES FOUND IN ARTICLE VIII.C OF THE PLAN** |

> **(REPRODUCED BELOW) REGARDLESS OF WHETHER YOU CHECK THE BOX IN ITEM 3 BELOW.**
>
> **IF YOU ABSTAIN FROM VOTING OR VOTE TO REJECT AND SUBMIT A BALLOT WITHOUT CHECKING THE BOX IN ITEM 3 BELOW, YOU WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN.**
>
> **IF YOU FAIL TO SUBMIT A BALLOT, YOU WILL BE DEEMED TO HAVE CONSENTED TO THE RELEASES FOUND IN ARTICLE VIII.C OF THE PLAN.**
>
> **IF YOU ABSTAIN FROM VOTING OR VOTE TO REJECT, YOU MUST OPT OUT OF THE RELEASES PROVIDED IN ARTICLE VIII.C OF THE PLAN BY CHECKING THE BOX IN ITEM 3 BELOW IN ORDER TO NOT BE BOUND BY SUCH RELEASES.**
>
> ***IF YOU WISH NOT TO BE BOUND BY THE RELEASES IN ARTICLE VIII.C OF THE PLAN YOU MUST "OPT OUT" BY CHECKING THE BOX IN ITEM 3***

*See* Order Conditionally Approving Disclosure Statement at p. 21, Ex. 1-B "Form of Ballots" (the "Ballot"). The Ballot then reproduces the various release provisions in their entirety followed by the "Opt-Out" provision as follows:

> **COMPLETE THIS ITEM 3 ONLY IF YOU ARE ABSTAINING FROM VOTING ON THE PLAN IN ITEM 2 ABOVE.**

The Holder of the General Unsecured Claim identified in Item 1 above elects to:

> ☐ **OPT OUT of the Release in Article VIII.C of the Plan**
> **(Releases by Holders of Claims and Interests)**

14. Based on the definition of "Releasing Parties," the Plan would impose third-party releases on all those claim holders who fail to affirmatively opt-out of the release on the Ballot. Specifically, the Plan will impose the third-party releases on all holders of claims or interest who (i) vote to accept the Plan; (ii) are solicited and do not vote either to accept or reject the Plan and do not opt out of granting the releases; (iii) vote, or are deemed, to reject the Plan but do not opt out of granting the releases; or (iv) are presumed to accept the Plan but do not opt out of granting the releases. In other words, the only mechanism to manifest a claimholder's intent to deny the release of so many non-debtor, third

8

parties is to check the "OPT OUT" box on page 5 of the Ballot – whether the claimant votes on the Plan or not. Failing to check the box that appears at the bottom of page 5 of the Ballot waives, forever, that claimant's right to pursue possible claims against non-debtor, third parties for all but actual fraud and gross negligence claims.

## Statutory Standards and United States Trustee Standing

15. Pursuant to 28 U.S.C. § 586, the United States Trustee is charged with the administrative oversight of cases commenced pursuant to title 11 of the Bankruptcy Code. This duty includes monitoring chapter 11 plans and disclosure statements and filing comments relating to the same. 11 U.S.C. § 586(a)(3)(B). This duty is part of the United States Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that United States Trustee has 'public interest standing' under 11 U.S.C. § 307, which goes beyond mere pecuniary interest); *Morgenstern v. Revco. D.S. Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing United States Trustee as a "watchdog").

16. Pursuant to 28 U.S.C. § 586(a)(3)(B), the United States Trustee is charged with "monitoring plans and disclosure statements filed in cases under chapter 11 of title 11 and filing with the court, in connection with hearings under sections 1125 and 1128 of such title, comments with respect to such plans and disclosure statements." 28 U.S.C. § 586(a)(3)(B). Accordingly, under 11 U.S.C. § 307, the United States Trustee has standing to be heard on the issues raised in this Objection.

17. Pursuant to Section 1125(b) of the Bankruptcy Code, the proponent of a plan may not solicit its acceptance unless there is transmitted to creditors "the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing by the court as containing

9

adequate information." 11 U.S.C. § 1125(b). Implicitly, such adequate information includes a representation that the proposed plan is one that can be confirmed.

18. If there is a defect that renders a plan patently or inherently unconfirmable, the Court may consider and resolve that issue at the disclosure statement stage before requiring parties to proceed with solicitation of the plan and a contested confirmation hearing. *In re Am. Cap. Equip.*, LLC, 688 F.3d 145, 153–54 (3d Cir. 2012). In this instance, the Disclosure Statement has only been conditionally approved, and there is no bar to the Court requiring additional solicitation so that creditors may vote upon a corrected plan that does not require creditors to opt-out of the improper non-debtor, third-party releases and does not violate the absolute priority rule.

19. The speed with which this case has moved is artificial. The filing milestones and shortened timelines for proposing and confirming a plan have been driven solely by the demands of GDA. While administrative costs of remaining in bankruptcy are a legitimate concern, the speed with which the Disclosure Statement and Plan are to be considered serves only GDA's interests in consummating its loan-to-own transaction. It is unclear whether any other constituency is served by the attempt to confirm a defective Plan this quickly.

20. If the plan is patently unconfirmable on its face, then approval of the disclosure statement must be denied. *In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (collecting cases); *Am. Cap. Equip., LLC*, 688 F.3d at 154 (3d Cir. 2012) (the Court's equitable powers under 11 U.S.C. § 105 permit the Court to control its own docket and, therefore, to decline to approve a disclosure statement when the plan it supports may not be confirmable). A plan is patently unconfirmable when confirmation defects cannot be overcome merely by creditor voting and the confirmation defects relate to matters upon which the material facts are not in dispute or

have been fully developed at the disclosure statement hearing. *Am. Cap. Equip., LLC*, 688 F.3d at 154–55.

21. Section 1129(a) of the Bankruptcy Code sets forth the requirements for confirming a chapter 11 plan. Among other things, a plan must comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). In order to be confirmed, a Chapter 11 reorganization plan must be submitted in good faith and not by any means forbidden by law. 11 U.S.C. § 1129(a)(3). "The focus of a court's inquiry is the plan itself, and courts must look to the totality of the circumstances surrounding the plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start. m *McCormick v. Banc One Leasing Corp. (In re McCormick)*, 49 F.3d 1524, 1526 (11th Cir. 1995) (citations omitted).

22. The Debtors bear the burden of establishing that the Plan complies with all elements of section 1129. *See, e.g., In re Stein Mart, Inc.*, 629 B.R. 516, 522 (Bankr. M.D. Fla. 2021).

### The Bankruptcy Code Does Not Authorize Nonconsensual Third-Party Releases

23. After *Purdue*, there can be no dispute that nonconsensual third-party releases are not authorized under the Bankruptcy Code. *Purdue*, 603 U.S. at 216–27. The Court in *Purdue* did not, however, prohibit chapter 11 plans from memorializing consensual third-party releases, and it did not "express a view on what qualifies as a consensual release." *Id*. at 226. As argued *supra*, the scope of the parties included in the definition of "Released Parties" in the Plan facially violates *Purdue*. *See id*. No one can reasonably argue otherwise.[3] The issue for the Court is whether consent to expansive non-debtor, third-party releases can be implied by a creditor failing to check the "Opt Out" box on the Ballot. The Court should hold that such a mechanism does not

---

[3] For the avoidance of doubt, while GDA is a non-debtor, third-party, the extent of its release was approved by the Court in the *Final Order (I) Authorizing the Debtor to Obtain Post-Petition Secured Debtor-In-Possession Financing; (II) Granting Liens and Providing for SuperPriority Administrative Expense Status, (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (the "DIP Financing Order"). [Dkt. No. 131 at ¶ 19].

imply a creditor's consent to such releases because the Plan's mechanism for doing so violates applicable non-bankruptcy law as well as bankruptcy law post-*Purdue*.

24. A consensual third-party release is a separate agreement between non-debtors governed by non-bankruptcy law. As the Supreme Court recognized in *Purdue*, a release is a type of settlement agreement. *Purdue*, 603 U.S. at 223. A bankruptcy court can acknowledge the parties' agreement to a third-party release, but the authority for a consensual release is the agreement itself in compliance with applicable state law, not the Bankruptcy Code. If a claim has been extinguished by virtue of the agreement of the non-debtor parties, then the court is not using the forcible authority of the Bankruptcy Code or the Bankruptcy Court to extinguish a property right

25. Here, there is no *existing* release agreement between claim holders and non-debtor, third-parties for the Court to recognize. The Debtor instead seeks to use the power of this Court to impose a third-party release in favor of the Released Parties from each holder of a claim without its affirmative consent. Instead, that consent is merely implied whether a creditor votes to accept, reject, abstains, or otherwise – unless the "OPT OUT" box on the bottom of page 5 of the Ballot is checked. To permit this implied consent would impermissibly alter the relations among non-debtors because a valid release does not exist under non-bankruptcy law.

26. State law governs whether non-debtors have agreed to release each other. Nothing in the Bankruptcy Code allows parties to disregard state law when a debtor seeks to impose a third-party release in a plan. The "'basic federal rule in bankruptcy is that state law governs the substance of claims.'" *Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450 (2007) (cleaned up); *accord Butner v. United States*, 440 U.S. 48, 55-57 (1979). This is because "[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying

12

substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code." *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000).

27. Courts thus apply state law when the question is, for example, whether a debtor has entered a valid settlement agreement. *See American Prairie Constr. Co. v. Hoich*, 594 F.3d 1015, 1023 (8th Cir. 2010) ("We apply South Dakota law to determine whether a settlement agreement was formed."); *Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *PRLP 2011 Holdings LLC v. Manuel Mediavilla, Inc. (In re Manuel Mediavilla, Inc.)*, 568 B.R. 551, 567-68 (B.A.P. 1st Cir. 2017) (per curiam) (observing that "the Bankruptcy Code does not provide explicit rules for the interpretation or construction of agreements").

28. The Bankruptcy Code is generally concerned with the relationship between a debtor and its creditors, *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513-14 (1938) ("The subject of bankruptcies is nothing less than the subject of the relations between an insolvent or nonpaying or fraudulent debtor, and his creditors, extending to his and their relief."), not the relationships among *non*-debtors. Given that applicable state law generally governs the relationship between debtor and creditors, applicable state – and not federal bankruptcy law – must govern property and contractual rights between non-debtors.

29. The rule is no different for third-party releases. No Bankruptcy Code provision governs claims between non-debtors. Nor does the Bankruptcy Code define "consent," a "non-debtor release," or a "third party release." *See generally* 11 U.S.C. § 101. Because there is no federal statute that preempts state law governing when and whether non-debtors have released each other, state law applies, and bankruptcy courts may not create their own federal rule of decision. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

30. In *Erie*, the Supreme Court held that, "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." *Id.* at 78. "[O]nly limited areas exist in which federal judges may appropriately craft the rule of decision," such as "admiralty disputes and certain controversies between States." *Rodriguez v. FDIC,* 589 U.S. 132, 136 (2020); *see also Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'").

31. Moreover, "the basic federal rule in bankruptcy is that state law governs the substance of claims." *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007). As with claims, the rule is no different for third-party releases. Unlike a bankruptcy discharge, which "is an involuntary release by operation of law," "[i]n the case of voluntary releases, the non-debtor is released from a debt, not by virtue of 11 U.S.C. § 1141(b), but because the *creditor agrees to do so*." *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503, 507 (Bankr. D.N.J. 1997) (emphasis in original); s*ee also Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions "unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source of the bankruptcy court's authority"). Thus, "the Bankruptcy Code has not altered the contractual obligations of third parties, the parties themselves have so agreed." *Arrowmill*, 211 B.R. at 507.

32. While multiple bankruptcy courts have addressed the issue of which law governs the validity of non-consensual, third-party releases post-*Purdue,* more recent cases hold that the issue is determined by applicable state law. *See, e.g., In re Gol Linhas Aereas Inteligentes, S.A.*,

14

675 B.R. 125, 13-32 (S.D.N.Y. 2025) (reversing confirmation order and holding that consent cannot be implied by silence and "opt out" mechanism not sufficient under New York or federal law); *In re Diocese of Buffalo, N.Y.,* Case No. 20-10322 (Bankr. W.D.N.Y. Mar. 3, 2026), Dkt. No. 4627 at p.7, 11 ("rejecting debtor's call to create a federal common law on the issue of consent" and requiring debtor to design a ballot that will require creditors to expressly "opt-in" to third party releases); *In re Tonawanda Coke Corp.,* 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (holding that any proposal for third-party releases "is an ancillary offer that becomes a contract upon acceptance and consent" and is governed by state law); *In re Smallhold, Inc.*, 665 B.R. 704, 720 (Bankr. D. Del. 2024) (adopting the contract model that requires creditors to affirmatively consent); *In re SunPower Corp.*, Case No. 24-11649 (CTG) (Bankr. D. Del. Oct. 18, 2024), Dkt. No. 872 (approving third-party releases with opt-ins through voting to accept the plan or by submitting the applicable *opt-in* form); *but see In re Robertshaw US Holding Corp.,* 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) (holding that *Purdue* did not change the viability of opt-outs); *In re Pipeline Health Sys., LLC*, Case No. 22-90291 (MI), 2025 WL 686080, at *4 (Bankr. S.D. Tex. Mar. 3, 2025) (same).

33. While "opt-out" mechanisms certainly pre-date *Purdue*, they were not universally accepted as implying consent to third-party releases. "There is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism" for third-party releases in chapter 11 plans." *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015). And no such rule should be announced in this case. *See, e.g., In re Spirit Airlines, Inc.,* No.24-11988, 2025 WL 737068, at *18, *22 (Bankr. S.D.N.Y. Mar. 7, 2025) (holding that whether a debtor has consented to release another non-debtor is not a "matter of federal bankruptcy law").

**New York Law Does Not Permit Silence to Mean Consent (and neither does Florida Law)**

34. The Debtor "is a New York entity organized under the laws of the State of New York, with its office located at 29 East 19th Street, 8th Floor, New York, NY 10003. [Dkt. No. 8, at ¶ 16]. While GDA is a Florida entity, it is not the Debtor, and it is not the proponent of the Plan. Accordingly, the Debtor's existence, operations, and commercial relations with its creditors are governed by New York law in the absence of a specific contract provision to the contrary.

35. New York courts look to the Restatement (Second) of Contracts (1981) (the "Restatement"), which sets out blackletter principles of contract law that state courts across the country generally agree on. *See*, *e.g.*, *Wu v. Uber Techs., Inc.*, 43 N.Y.3d 288, 299 (2024) (citing Restatement § 19); *Diarassouba v. Urban*, 892 N.Y.S.2d 410, 417 (App. Div., 2d Dep't 2009) (citing Restatement § 69). New York law, "a binding contract requires an objective manifestation of mutual assent, through either words or conduct, to the essential terms comprising the agreement." *Wu*, 43 N.Y.3d at 299. Treatises say the same: "[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration." Restatement § 17(1). In *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) the Second Circuit observed "'[t]o form a valid contract under New York law, there must be an offer, acceptance, consideration, ***mutual assent and intent to be bound***.'" (citation omitted and emphasis added).

36. Thus, "[o]rdinarily[,] an offeror does not have power to cause the silence of the offeree to operate as acceptance." Restatement § 69 cmt. a; *accord Albrecht Chem. Co. v. Anderson Trading Corp.*, 298 N.Y. 437, 440 (1949); *Russell v. Raynes Assocs. L.P.*, 569 N.Y.S.2d 409, 414 (App. Div. 1st Dep't. 1991); 1 Corbin on Contracts § 3.19 (2025); 2 Williston on Contracts § 6:67 (4th ed.). Indeed, "[u]nder New York law, silence generally does not constitute acceptance

16

of an offer unless the effect of the silence is to mislead the other party." *Wilhelmshaven Acquisition Corp. v. Asher*, No. 91Civ. 3657, 1992 WL 170671 at *3 S.D.N.Y. July 2, 1992).

37. There are limited circumstances when "silence" or "inaction" can demonstrate consent. Restatement §§ 19(1), 69(1). But those circumstances are "exceptional." Restatement § 69 cmt. a. Moreover, these exceptions are really forms of estoppel preventing an offeree who engaged in wrongful or deceptive conduct from denying the formation of a contract. Those exceptions are not applicable here. Restatement § 69(1); *see also* Restatement § 69 cmt. c ("The mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting.").

38. First, silence may operate as acceptance "[w]here an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation." Restatement § 69(1)(a). This exception clearly does not apply here where the claimant is not entering into a contract for services with an expectation to make a payment – we are contemplating the release of potential claims against non-debtor, third parties.[4] Moreover, the "expectation of payment," if there is one, is the creditor releasing its rights to payment on its claim for the prospective distribution it receives pursuant to the Plan, and not an additional sacrifice of its right to pursue independent claims against third-parties.

39. Second, silence may operate as acceptance "[w]here the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer." Restatement § 69(1)(b). Under this

---

[4] Florida law agrees on these exceptions to the general rule and requires a course of conduct or acceptance of a benefit by the silent party in holding that a specific contract could be implied in fact. *Tipper v. Great Lakes Chemical Co.,* 281 So.2d 10, 13 (Fla. 1973); *Lewis v. Meginniss*, 12 So. 19, 21 (Fla. 1892). In these circumstances, Florida law implies the *promise to pay* a reasonable amount for the services. *Lewis*, 12 So. at 21; *Lamoureux v. Lamoureux*, 59 So.2d 9, 12 (Fla. 1951); *A.J. v. State*, 677 So.2d 935, 937 (Fla. 4th DCA 1996); *Dean v. Blank*, 267 So.2d 670 (Fla. 4th DCA 1972).

17

exception, silence may constitute acceptance where [an offeree] is under such duty to speak that his or her 'conduct, accompanied by silence, would be deceptive and beguiling." *Russell*, 569 N.Y.S.2d at 414 (quoting *Brennan v. National Equitable Inv. Co.*, 247 N.Y. 486 (N.Y. 1928)). This exception also does not apply. Creditors are not under a duty to "speak" or even to vote on the Plan, and they have not engaged in deceptive or beguiling conduct.

40. Third, silence may operate as acceptance "[w]here because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept." Restatement § 69(1)(c). The Restatement's comments further clarify that section 69(1)(c) refers to an "[e]xplicit statement by the offeree, usage of trade, or a course of dealing" or "exercise of dominion." Restatement § 69 cmts. d and e. No such circumstances exist here. This exception likewise does not apply as no "course of dealings" could be universally applied to the creditor body that implies consent to such broad, implied non-debtor releases. Thus, under New York law, "where the recipient of an offer is under no duty to speak, silence, when not misleading, may not be translated into acceptance merely because the offer purports to attach that effect to it." *Albrecht Chem.*, 298 N.Y. at 440; *accord Russell*, 569 N.Y.S.2d at 414.

41. What is more, Florida law agrees with New York law on the existence of the elements of enforceable contracts, including that affirmative consent must be manifested to bound by a contract.[5] *See Kendel v. Pontious,* 261 So.2d 167, 169-70 (Fla. 1972) (the general rule is that an acceptance is not valid, and thus is ineffective to form a contract, unless it is communicated *to the offeror*) (emphasis added); *accord Gibson v. Courtois,* 539 So.2d 459, 460 (Fla. 1989) ("A mere offer not assented to constitutes no contract, for there must be not only a proposal, but an

---

[5] Courts surveying other state's laws note the uniformity of the principal that silence cannot be construed as acceptance of an offer. *Elfar v. Wilmington Trust, N.A.*, No. 20-0273, 2020 WL 7074609, at *2 n.3 (E.D. Cal. Dec. 3, 2020) ("The court is aware of no jurisdiction whose contract law construes silence as acceptance of an offer, as the general rule."), adopted by 2020 WL 1700778, at *1 (E.D. Cal. Feb. 11, 2021); accord 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67 (4th ed.).

acceptance thereof. So long as a proposal is not acceded to, it is binding upon neither party")
(citations omitted); *Gendzier v. Bielecki,* 97 So.2d 604, 608 (Fla. 1957).

42. Here, the Debtor through the Plan seeks to impose on each creditor a third-party release
in favor of each of the Released Parties unless he, she, or it opts out of it. In other words, the
Debtor asks this Court to deem consent to exist when a creditor is merely silent— by not
checking a box labelled "OPT OUT" on a the bottom of page 5 of the Ballot (even if he or she
rejects the Plan), as well as if the creditor has not voted at all.

43. Creditors, however, have no duty to vote on the Plan let alone respond to an opt-out
concerning their rights against other non-debtors. *See*, *e.g.*, 11 U.S.C. § 1126(a) (providing that
creditors "may" vote on a plan). Even where there are conspicuous warnings that a party will be
bound if they remain silent, that is not sufficient to recast a party's silence as consent to a third-
party release. *See In re SunEdison, Inc.*, 576 B.R. 453, 460-61 (Bankr. S.D.N.Y. 2017) (*rejecting*
the argument "that the warning in the Disclosure Statement and the ballots regarding the
potential effect of silence gave rise to a duty to speak").

44. That these traditional concepts of contract law apply to the determination of what
qualifies as a "consensual" third-party release was recently made clear by the United States
District Court for the Southern District of New York. On December 1, 2025, the Southern
District of New York reversed the confirmation of a chapter 11 plan because it ruled that the
ability to opt out did not make releases in favor of non-debtors consensual. *In re GOL Linhas
Aéreas Inteligentes S.A., et al.*, 675 B.R. 125, 132 (S.D.N.Y. Dec. 1, 2025). The District Court in
*GOL* held that, regardless of whether state or federal law applies,[6] opt-out third-party releases are
not consensual. The *GOL* court observed that "the same several principles of contract law apply

---

[6] The court in *GOL*, 675 B.R. at 130, also noted that a choice of law analysis is not necessary where the same
principles of contract law apply under federal and state law. The same reasoning applies here as in *GOL*.

19

under both federal and state law" and, "[t]hose principles indicate the third-party releases at issue here [opt-out releases] are nonconsensual and, thus, barred by the Supreme Court in *Purdue*." *GOL*, 675 B.R. at 130.

45. In *GOL*, the District Court also addressed the exceptions to the silence is not acceptance rule and found that those exceptions did not apply. Judge Cote clearly considered the limited exceptions and observed, "[t]he Debtors do not seriously dispute that, under New York state law, the third-party [opt-out] releases would be nonconsensual." *Id.* at *5. Nor do those exceptions apply here, as explained above. Moreover, as Judge Cote noted, even the bankruptcy court's decision in the underlying case conceded that "state contract laws across the country, [do] not recognize silence as consent to a contract in most situations." *GOL,* 672 B.R. at 131. If the Debtor attempts to raise arguments that rely on the exceptions to the binding rule that consent requires acceptance, this Court should similarly reject those arguments.

46. The Debtor may, and likely will, argue that there is some body of federal law that applies and compels a different result than applicable state law contract principles. This argument is wrong (1) because there is no unique federal interest here that requires the Court to engage in separate law-making, and (2) the result would not be different if the Court looked to federal law. As the Supreme Court has remarked: "Should federal courts rely on state law, together with any applicable federal rules, or should they devise their own federal common law test? To ask the question is nearly to answer it." *Rodriguez v. FDIC*, 589 U.S. 132, 133 (2020) (noting that cases where federal courts may engage in law-making are few and far between). Neither condition for federal law-making exists here – there is no uniquely federal interest to protect, and Congress has not granted the courts power to develop substantive law. *See, e.g., Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (citations omitted).

47. Federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of states or relations with foreign nations, and admiralty cases. *Texas Indus.*, 451 U.S. at 641; *accord Atherton v. FDIC*, 519 U.S. 213, 218 (1997) ("[W]hen courts decide to fashion rules of common law, 'the guiding principle is that a significant conflict between some federal policy or interest and the use of state law must first be specifically shown.'") (citation omitted). No "such uniquely federal interest" exists in this case. *See id.* Whether a creditor has agreed to release causes of action against a non-debtor does not concern the rights and obligations of the Unites States or implicate interstate or international relations. Moreover, this is not an admiralty case. The question involved here is a property right governed by underlying contract law. *See, e.g., Rodriguez*, 589 U.S. at 137 (a property rights question arising in the context of a federal bankruptcy case does not change its character as being governed by state law) (citing *Butner v. United States*, 440 U.S. 48, 54 (1979)).

48. In addition, there is no dispute that federal courts lack the power to develop unique, substantive federal law regarding the issue of when non-debtors surrender property rights, like causes of action, against other non-debtors. There is no provision of the Bankruptcy Code that confers this power.

49. Moreover, even if the Court were to look to federal law to determine the issue of consent to the third-party releases, the result would be no different. *See GOL*, 675 B.R. at 131 (" . . . even under federal law, the third-party releases are non-consensual and barred by *Purdue*"). Federal law, to the extent it might apply, relies on the same principles of general contract law, which also reject any notion that silence can imply consent. *See id.* (citing *McGowan v. Sears, Roebuck &*

*Co.*, 908 F.2d 1099, 1106 (2d Cir. 1990) (explaining that federal substantive law of contracts "incorporates generally principles of contract law").

50. As argued above, the exceptions to the general rule that consent cannot be implied from silence do not apply here. The outcome would be no different under federal law, and the third-party releases in this case are non-consensual where a creditor does not affirmatively "opt out." *See id.*, at 131 (holding that the third-party releases were nonconsensual under federal law where the plan required creditors to opt out).

**Class Action Settlement Procedures Are Not Applicable to Non-Consensual Releases**

51. The Debtor may argue that the Court can approve the non-consensual, third-party releases by appeal to class action procedures. Class action settlement procedures, however, are not applicable to non-consensual, non-debtor releases in bankruptcy cases.

52. The Supreme Court has unanimously ruled that "courts may not 'recognize a common-law kind of class action' or 'create a *de facto* class action at will.'" *United States v. Sanchez-Gomez*, 584 U.S. 381, 389 (20180 (*quoting Taylor v. Sturgell*, 553 U.S. 880, 901 (2008)). Class actions are substantively and procedurally different in that members of a certified class "are considered parties to the litigation" and "may be bound by the judgment." *Sanchez-Gomez*, 584 U.S. at 387; *see Conceicao v. Nat'l Water Main Cleaning Co.*, 650 F. App'x 134, 135 (3d Cir. 2017) ("Judicially approved settlement agreements are considered final judgments on the merits for purposes of claim preclusion."). Moreover, the Supreme Court in *Sanchez-Gomez*, 584 U.S. at 389-90, held that there is no such thing as a "functional class action" that can preclude claims "outside the formal class action context". There is no such class action here, and no class has been certified under Rule 23.

53. As Judge Cote in *Gol Linhas* explained in a substantially similar context, "there is no suggestion that the releasing parties in this bankruptcy are members of a defined class certified to litigate or settle defined claims or that the Rule 23 procedures and its safeguards have been followed." *GOL*, 675 B.R. at 132. Accordingly, there is no legal or factual basis for the Debtor to shoehorn class action procedures into this bankruptcy case to force the approval of non-consensual, non-debtor releases. Class action procedures are not applicable here, and the Court should reject any attempt to impose them. *See Gol*, 675 B.R. at 132 ("[t]he opt-out mechanism utilized in the class action context simply does not apply to the third-party release here.").

**Third-Party Releases Should Not be Imposed on Parties that Abstain from Voting**

54. A creditor's failure to vote on the Plan also should not be construed as consent to the non-debtor, third-party releases. The Plan proposes to impose third-party releases on any creditors who abstains from voting and does not return a ballot. The Court should not approve these third-party releases (and related injunction), which are nonconsensual and violate *Purdue*. The Debtor should be required to adopt an "opt-in" procedure to gain affirmative consent from those creditors who would approve such releases.

55. There is no basis to infer consent by any creditor who does not vote and takes no action with respect to the Plan. Creditors have no legal duty to vote on the Plan, much less to respond to an offer in a solicitation for the Plan to release non-debtors. *See,* 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan). Consent cannot be inferred from silence because "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." Restatement § 69 cmt. c (1981). Nor can it "impose on him any duty to speak." *Id.* § 69 cmt. a.

23

56. In *In re Smallhold, Inc.*, 665 B.R. 704 (Bankr. D.Del. 2024), the court held that an opt-out third-party release was nonconsensual and ineffective as against creditors who abstained from voting on a chapter 11 plan. The Court observed:

> It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor. But as to the creditor's rights against third parties—which belong to the creditor and not the bankruptcy estate—a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy.

*Id*. at 721.

57. Even before *Purdue*, Bankruptcy Courts routinely held that opt-out third-party releases were inadequate to constitute consent to such releases by non-voting creditors. *See, e.g., . In re Chassix Holdings, Inc.,* 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015). In *Chassix*, Judge Wiles explained:

> Finding "consent" in these circumstances is to some extent a legal fiction. We know from experience that many creditors and interest holders who receive disclosure statements and solicitation materials simply will not respond to them, either because they elect not to read them at all or for other reasons. We also know from experience that a certain number of people will make mistakes in interpreting the procedures that are outlined in the Ballots. [. . .] The point is that inattentiveness, inaction and mistake are a known and expected part of the voting process.

*Chassix*, 533 B.R. at 78. Judge Wiles went on to hold that to infer consent to third partes releases for non-voting creditors "is simply not realistic or fair, and would stretch the meaning of 'consent' beyond the breaking point." *Id*. at 80-81 (citing *re Washington Mut. Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011)). This Court should employ the sound reasoning expressed in *Chassix* similarly to deny that creditors carry the burden of affirmatively opting out of the releases.

58. Other courts similarly rejected requests to impose third-party releases on parties' inaction prior to *Purdue*, especially as to those parties who do not vote. *See, e.g.*, *In Patterson v. Mahwah Bergen*, 636 B.R. 641, 688 (E.D. Va. 2022) (District Court held that neither contract law nor

24

class action law supported debtors' argument that failure to vote or to opt out could be deemed consent to a release and that construing either as consent violates due process as well.); *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) ("[T]he Court concludes that the opt out mechanism is not sufficient to support the third party releases anyway, particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place). Failing to return a ballot is not a sufficient manifestation of consent to a third party release.") (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999)); *In re Emerge Energy Servs. LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) ("[T]he Court cannot on the record before it find that the failure of a creditor or equity holder to return a ballot or Opt-Out Form manifested their intent to provide a release. Carelessness, inattentiveness, or mistake are three reasonable alternative explanations."); *In re SunEdison Inc., et al.*, 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017). Similarly, a creditor's inaction should not be implied to mean consent to third-party releases in this case.

### Third-Party Releases Should Not Be Imposed On Parties that Vote to Reject the Plan

59. The Plan seeks to impose non-debtor, third-party releases on each creditor who votes to reject the Plan unless they take the additional step of affirmatively opting out of the releases by checking the box at the bottom of page 5 of the Ballot form. Implying consent to the third-party releases where creditors have expressly voted against the Plan is absurd (regardless of how many places the instructions tell them to "opt out"). Such creditors will have voted to *reject* the Plan, how could assent to its most objectionable terms be inferred?

60. The *Chassix* decision articulates just how illogical it is to infer that parties who vote to reject the Plan, nevertheless, somehow consent to the Plan's releases:

> As to creditors who might vote to reject the Plan: the Court noted that it was difficult to understand why any other action should be required to show that the

25

creditor also objected to the proposed third party releases. If (as prior cases have held) a creditor who votes in favor of a plan has implicitly endorsed and "consented" to third party releases that are contained in that plan, then by that same logic a creditor who votes to reject a plan should also be presumed to have rejected the proposed third party releases that are set forth in the plan. The additional "opt out" requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.

*Chassix*, 533 B.R. at 79.

61. Similarly, the bankruptcy court in *Trident Holdings* embraced the same reasoning and explained:  "voting against the plans means you're not consenting and therefore we know where you stand and you're not voting in favor of the releases." *In re Trident Holding Company, LLC, et al.*, Case No. 19-10384(SLH), ECF No. 375 (Bankr. S.D.N.Y. May 1, 2019), Hearing Tr. 25: 4-6.

62. It is beyond dispute that creditors who vote to reject the Plan will not have affirmatively and unambiguously demonstrated their consent to grant releases to non-debtors. They have more likely done just the opposite. Accordingly, the Court also should not approve the third-party releases being imposed on parties that vote to reject the Plan.

### **Consent to Third-Party Releases Should Require an Opt-In**

63. Consent to the third-party releases should require more than just a vote in favor of the Plan. The Debtor seeks to have the Court deem creditors who vote to accept the Plan, but do not wade through multiple pages of verbiage to find and check the "Opt Out" box on the bottom of page 5 of the Ballot, to have consented to those releases. That result would also be wrong.

64. Voting for a plan does not reflect the unambiguous assent that should be required to find consent to a release. *See, e.g., In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Development Corp.,* 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (holding that because consensual

releases are premised on the party's agreement to the release "it is not enough for a creditor to abstain from voting for a plan, or even to simply vote 'yes' to a plan").

65. Voting to accept a plan without checking an "opt out' box does not constitute acceptance of an offer to enter into a third-party contract to release claims against non-debtors. Such creditors will not have "manifest[ed] [] mutual assent to the exchange and a consideration." Restatement § 17(1). Rather, the act of voting on the Plan without checking the box is nothing more than silence with respect to the offer, which does not "manifest[] [an] intention that silence may operate as acceptance." Restatement § 69 cmt. a. "The mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction," *id.*—in this case, the freedom to vote on a chapter 11 plan. In this case, the Court should consider what a creditor is doing when it voting to accept the Plan, which is mainly accepting the distribution scheme that describes the terms of payment and reorganization, and not the relinquishment of possible rights against non-debtor parties.

66. Conversely, the Court should require that the Plan and Ballot provide creditors the opportunity to "Opt-In" to manifest their consent to the third-party releases. The confirmed plan in *Purdue* provided such a mechanism in the *Eighteenth Amended Joint Chapter 11 Plan. In re Purdue Pharma L.P., et al.,* Case No. 19-23649 (Bankr. S.D.N.Y.). In its *Modified Bench Ruling Granting Confirmation of the Eighteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (the "Purdue Ruling") Case No. 19-23649, 2025 WL 3246149 at *1 (Bankr. S.D.N.Y. November 20, 2025), the Court observed:

> Of particular importance, the releases in the Plan for the Sackler Parties (as defined below) who are providing funds to claimants is consistent with the Supreme Court's 2024 decision in these cases. That is because the releases here are provided only on a consensual basis, with claimants being given the choice to provide the releases—to 'opt in' using the terms of the bankruptcy world—and,

by doing so, to obtain the additional value provided as part of the Sackler settlement. But no one is required to do so. Parties are free to preserve their right to sue the Sackler Parties, with such a right preserved unless the party takes the affirmative step of opting in to the release, . . . The Third-Party Releases provided for under the Plan utilize an opt-in mechanism, as '[a] clearer form of 'consent' can hardly be imagined.' *In re Chassix Holdings, Inc.*, 533 B.R. 64, 80 (Bankr. S.D.N.Y. 2015).

67. Other courts have recognized the need for opt-in procedures to obtain consent to third-party releases even where creditors may vote in favor of the plan. For example, in *In re First Mode Holdings, Inc.*, Case No. 24-12794 (Bankr. D. Del. February 6, 2025), the Bankruptcy Court for the District of Delaware disagreed with the approach requested by the committee and directed that consent to non-debtor releases be obtained by opt-in procedures. In *First Mode*, Judge Owens referred to opt-in procedures as the "gold standard" for obtaining consent to third party releases. *First Mode Holdings*, Case No. 24-12794 (Bankr. D.Del. Feb. 6, 2025) (Dkt. No. 266), Hearing Tr. at 37:14-38-9; 41:14-23. The Court should require the Debtor to observe the "gold standard" in this case and re-solicit votes with an affirmative opt-in mechanism for creditors to manifest their possible assent to the third-party releases.

## The Grant of Equity Interests to Class 8 Violates the Absolute Priority Rule

68. The Plan violates the absolute priority rule by providing new equity interests in the Reorganized Debtor to the holders of cancelled interests without providing that more senior classes of creditors be paid in full before any such interests can be granted. [Dkt. No. 128, Art. III(B)(8)]. The mechanism for a grant of these new equity interests is a discretionary "gift" from GDA's holdings, which it would otherwise be empowered to keep as the senior secured creditor with collateral rights in the interests outside of and through the Plan.

69. This "gift" of new equity interests, the value of which are wholly undefined, is a direct give-away to existing equity – namely Dame McGrath[7] – in contravention of the Bankruptcy Code. While existing equity interests will not receive cash distributions under the Plan (because they are subordinate to creditor claims), there is no justification provided or mechanism explained for GDA's exercise of discretion in making such a multiple class-skipping gift. As such and if the Debtor attempts to cram-down, the Plan violates §1129(b)(2)(B)(i)-(ii) because an objecting class[8] will not have received the full value of its claims and the junior class of existing equity interest holders will have received new equity in the Reorganized Debtor. This "gift" scheme for existing equity is a textbook violation of the absolute priority rule. *See id.; Alabama Dept. of Economic & Community Affairs v. Ball Healthcare-Dallas, LLC, et al. (In re Lett)*, 632 F.3d 1216, 1228-1229 (11th Cir. 2011) (remarking that the phrase "fair and equitable" instantiates the absolute priority rule "under which an objecting class must be paid in full before any claim or interest junior to it gets anything at all") (citations omitted). Bankruptcy courts have an "independent obligation to ensure that a proposed plan complies with the absolute priority rule before 'cramming' that plan down upon dissenting creditor classes." *In re Lett*, 632 F.3d at 1220. The Plan cannot be confirmed with such an unlawful class-skipping provision.

70. As the Supreme Court held in *Jevic*, plans that violate the absolute priority rule cannot be confirmed over the objection of an impaired class of creditors. *Czyzewski, et al. v. Jevic Holding Corp., et al*, 137 S.Ct. 973, 983 (2017). The Supreme Court in *Jevic* reversed the approval of a structured dismissal of a chapter 11 case where general unsecured creditors were paid ahead of priority wage claimants. The Supreme Court reasoned that the lack of authority for such class-skipping mechanisms in the Bankruptcy Code in either chapter 7 or chapter 11 plans did not

---

[7] Dame McGrath holds approximately 68% of the Debtor's existing equity.
[8] See for example, the *Objection*s to the Plan and Disclosure Statement filed by Keyhaven PMG Blocker, Inc. [Dkt. No. 182].

"make structured dismissals a backdoor means to achieve the exact kind of nonconsensual priority-violating final distributions that the Code prohibits in Chapter 7 and Chapter 11 plans." *Jevic*, 137 S.Ct. at 984-985.

71. Moreover, the Supreme Court in *Jevic* reaffirmed its holding in *Bank of America Nat. Trust and Sav. Assn. v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 444, (1999), where the absolute priority rule was announced and remarked that no "rare cases" may even provide a justification to avoid the Code's strict priority scheme. *Id.* at 987.

72. Class-skipping grants of equity interests are not exempt from the absolute priority rule, whether their value is ascertainable or otherwise. *See, e.g.*, *Dish Network Corp. v. DBSD North America, Inc., et al. (In re DBSD North America, Inc.)*, 634 F.3d 79 (2d Cir. 2011). In *DBSD*, the Second Circuit held that there is no exception to the absolute priority rule for gifts of property, especially gifts that could enrich existing insiders, unless and until senior classes are paid in full. *DBSD*, 634 F.3d at 101 (reversing confirmation order that violated absolute priority rule via gift to existing equity where more senior creditor claims were not satisfied under plan).

73. This case presents no exception. There is nothing about the "gift" of new equity interests to holders of existing interests in Class 8 to be distributed at GDA's discretion that observes the absolute priority rule or justifies an exception to § 1129(b)(2)(B)(ii). Accordingly, the Plan is not "fair and equitable" as to all creditors and cannot be crammed-down over the objection(s) of dissenting classes.

74. Because the Plan is not "fair and equitable" it has not been proposed in good faith and cannot be confirmed. *See* 11 U.S.C. §1129(a)(3).

**WHEREFORE**, the United States Trustee respectfully requests that the Court (i) SUSTAIN the Objection as argued herein, (ii) deny confirmation of the Plan, (iii) require the Debtor to

amend the Disclosure Statement, the Plan, and the Ballot and (iv) grant such other and further relief as it deems just and proper.

Dated:  April 9, 2026.

Guy Van Baalen
Acting United States
Trustee Region 21

/s/ *Daniel L. Gold*
Daniel L. Gold, Esq.
Trial Attorney
Office of the U.S. Trustee
51 S.W. 1st Avenue, Suite 1204
Miami, FL 33130
T:  (305) 536-7355
F:  (305) 536-7360

I HEREBY CERTIFY that a true copy of the foregoing was served on those parties entitled to service via CM/ECF on April 9, 2026.

*Daniel L. Gold, Esq.*
Trial Attorney
Office of the United States Trustee